RECEIVED
USDC. CLERK. CHARLESTON. SC
2011 MAR 14 P 3: 01

# UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

John G. Singletary and Carla C. Singletary,

Plaintiff(s)

v

The City of North Charleston
City of North Charleston Building Dept.
City of North Charleston Zoning Dept.
City of North Charleston Zoning Board of Appeals
City of North Charleston Legal Dept.
R. Keith Summey, City of N.Chas., Mayor
Darbis Briggman, City of N.Chas. Chief Bldg. Official
William B. Gore, City of N.Chas. Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively

Defendant(s)

Civil Action No. C/A No.: 2:09-cv-01612-MBS

**NOTICE OF APPEAL**

**PLAINTIFFS JOHN SINGLETARY AND CARLA SINGLETARY'S MOTION FOR STAY AND APPEAL TO FOURTH CIRCUIT ON JUDGE MARCHANT AND JUDGE CARR'S REPORT**

TO: FOURTH CIRCUIT COURT OF APPEALS

Notice is hereby given that John Singletary and Carla Singletary, Plaintiffs in the above name case, hereby appeal to the United States Court of Appeals for the Fourth Circuit from the interlocutory Judgments and decisions of U.S. Magistrates Honorable Robert Carr, Marchant, and all other magistrate reports Pursuant 28 USC 1292 in the above named case. Order on Motion to Quash, Order on Motion for Miscellaneous Relief, Order on Motion to Amend/Correct, Order on Motion for Recusal, Order on Motion to Quash, Order on Motion for Hearing, Order on Motion to Quash, Order on Motion to Vacate, Order on Motion to Compel. Judge Carr the date of his retirement, and Honorable Bristow Marchant, who was not assigned to the case based upon last information forwarded to plaintiff by the clerk of court, rendered on 1/31/2011 and 3/2/2011 respectively and in the interest of justice move for an order staying proceeding and a remand to the U.S. District Court's Presiding District Judge.

Also Pursuant 28 636 (c) JS

Movant appellants, Carla Singletary and John Singletary hereby petition this Honorable Court for an order imposing a stay upon the appellees in the matter on the 14th Day of March 2011.

CERTIFICATE OF SERVICE

I John Singletary herby certify that a true and correct copy of this **PLAINTIFFS JOHN SINGLETARY AND CARLA SINGLETARY'S MOTION FOR STAY AND APPEAL TO FOURTH CIRCUIT ON JUDGE MARCHANT AND JUDGE CARR'S REPORT** in forgoing style and matter was dispatched with sufficient U.S. prepaid postage to defendants attorney of record, and other interested parties on March 14th 2011.

Dated: March 14th, 2011

Respectfully Submitted

John Singletary
Pro se
johnsing@knology.net
(843) 693-2823
4321 Waterview Circle
North Charleston, SC 29418

# UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

John G. Singletary and Carla C. Singletary,

Plaintiff(s)

v

The City of North Charleston
City of North Charleston Building Dept.
City of North Charleston Zoning Dept.
City of North Charleston Zoning Board of Appeals
City of North Charleston Legal Dept.
R. Keith Summey, City of N.Chas., Mayor
Darbis Briggman, City of N.Chas. Chief Bldg. Official
William B. Gore, City of N.Chas. Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively

Defendant(s)

Civil Action No. C/A No.: 2:09-cv-01612-MBS

**PLAINTIFFS JOHN SINGLETARY AND CARLA SINGLETARY'S MOTION FOR STAY AND APPEAL TO FOURTH CIRCUIT ON JUDGE MARCHANT AND JUDGE CARR'S REPORT**

**PLAINTIFFS JOHN SINGLETARY AND CARLA SINGLETARY'S MOTION FOR STAY AND APPEAL TO FOURTH CIRCUIT ON JUDGE MARCHANT AND JUDGE CARR'S REPORT**

TO: FOURTH CIRCUIT COURT OF APPEALS

Notice is hereby given that the undersigned Plaintiffs hereby appeal from the Judgments and decisions of U.S. Magistrates Honorable Robert Carr, Marchant, and all other magistrate reports Pursuant 28 USC 1292 in the above named case and Hereby appeal to the Unites States court of appeals for the Fourth Circuit from all magistrate orders in the above case. Order on Motion to Quash, Order on Motion for Miscellaneous Relief, Order on Motion to Amend/Correct, Order on Motion for Recusal, Order on Motion to Quash, Order on Motion for Hearing, Order on Motion to Quash, Order on Motion to Vacate, Order on Motion to Compel. Judge Carr the date of his retirement, and Honorable Bristow Marchant, who was not assigned to the case based upon last information forwarded to plaintiff by the clerk of court, rendered on 1/31/2011 and 3/2/2011 respectively and in the interest of justice move for an order staying proceeding and a remand to the U.S. District Court's Presiding District Judge.

Movant appellants, Carla Singletary and John Singletary hereby petition this Honorable Court for an order imposing a stay upon the appellees in the matter pending below upon the following basis.

**Legal Standard**

This Court has broad discretion to stay the pending certification proceeding under its inherent power to control its docket:

A trial court has broad discretion to stay all proceeding in an action pending the resolution of independent proceedings elsewhere. See Landis v N. Am Co., 299 U.S. 248, 254 57 S. Ct. 163, 81 L. Ed. 153 (1936). "The power to stay proceeding is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants, " Air line Pilots Ass'n v. Miller, 523 U.S. 866, 879, 118 S. Ct. 1761, 140 L.Ed. 2d 1070 n. 6 (1998) (quoting Landis, 299 U.S. at 254-55, 57 S. Ct. 163, 81 L. Ed. 153). Indeed, "[a} trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." Leyva v. Certified Grocers of Cal., Ltdl, 593 F.2d 857, 863-64 (9th Cir. 1979). See, Collins v. South Carolina Pub. Serv, Auth., 2006 Wl 1851305, at *1 (D.S.C. June 30, 2006). For the reasons set forth below, Plaintiffs respectfully urge this Court to exercise these inherent powers and stay this lawsuit pending resolution by the Fourth Circuit Appeals Court.

1

The purported order of the U.S. Magistrate Judge Robert Carr dated 1/31/2011 was void per se in as much as plaintiffs law suit seeking relief and filed on 6/18/2009 was pending before U.S. District Judge for the District of South Carolina Honorable Margaret Seymour through who had already issued a schedule and order from a motion to compel directing defendants to surrender requested discovery documents and electronic discovery that they have refused and failed to do. The order of the U.S. Magistrate Judge Carr attempts to overturn, supersede and circumvent the standing order of the Presiding U.S. Magistrate Judge Margaret Seymour issued on 11/5/2010.

2

U.S. District Judge Margret Seymour not only previously assumed jurisdiction in the said matter hereinabove referred to but issued a scheduling order in order to effect a timely disposition of the matters pending before her including a fixed deadline for discovery pursuant to Rule 26 FRCP and equally pertinent, U.S. District Judge Seymour ordered appellees to provide appellants with certain discovery request by appellant by within 20 days of the order of 11/5/ 2010 Exhibit "A" hereto attached which order appellees have failed to comply with said order, refused to answer production of documents request per FRCP, refused to answer admissions, and refused to answer

FOIA request. Clearly the Fourth Circuit is cognizant of the intimate relationship between Disclosures and Discovery and the appellants ability to adequately prepare a case for court based upon a pre-constructed discovery strategy. Under no circumstances should there be allowed such flagrant disobedience and disregard for a standing District Judges Order.

3

The Supreme Court noted that "[i]n the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation. Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President Washington one day before the Sixth Amendment was proposed, provided that 'in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of counsel.'" *Faretta v. California*, 422 U.S. 806, 813 (1975). In November of 2010 appellants requested and obtained permission dismissing their counsel of record and thereafter have proceeded to pursue their litigation Pro se in accord with their U.S. Constitutional right. There after the federal clerk of court without consent of Pro se plaintiffs nor any submission to appellants unilaterally referred the litigation to the said U.S. Magistrate Honorable Robert Carr despite appellants non-consent and expressed opposition which is contrary to FRCP Rule 73 (a), Rule 73 (b) (3) that was filed, and 28 U.S.C. 636(c), prohibition spelled out in detail requiring express written consent. Furthermore plaintiffs vigorously objected to the said maneuver and filed an objecting motion to vacate the referral and based upon a previous bias ruling of Honorable Judge Carr to dismiss the case and disallow FRCP rule 27 without just cause, appellant also immediately requested recusal of Judge Carr, 12/23/2011. These extraordinary circumstances lead appellants to request recusal of U. S. Magistrate Carr prior to his rulings. After the retirement of Judge Carr appellant was informed by the court and recorded on the system that the case would be referred to yet another magistrate judge, Honorable Judge Hendricks-Howe. Appellants were blindsided and surprised to be notified that Judge Marchant who based upon appellants notification from the federal court and according to the PACER System was not even assigned to the case made eight rulings in less than twenty four hours from a plethora of documents and transcripts while totally ignoring pertinent motions and refusal of a requested emergency hearing and others. Appellant enquired about the reassignment that appellant was never notified of until after appellant enquired on 3/10/2011. On 3/11/2011 Mr. Shehan from the Charleston Division office called appellant about 10:24 AM to inform him that their office made a mistake and erred in failed to notify the appellant of the second and uncommon reassignment. It appears to appellant that the case was hastily transferred for some unknown reason to Honorable Judge Marchant and within less than twenty four hours numerous rulings were made in haste in defense of Honorable Judge Carr's previous rulings that were unauthorized and lacked jurisdiction based upon non consent of jurisdiction from appellants for Judge Carr or any other magistrate judge putting into question judicial fairness, justice, and mutual detachment. Clearly the orders appear to be are erroneous and contrary to law. They appear to be unfounded based upon the facts of the case evidence and appear to reach incorrect legal conclusions.

Plaintiff appellants also filed and served numerous subpoenas duces tecum authorized by the US. District clerk, upon non-litigant third parties whom plaintiffs deemed possessed and could provide information or proof(s) vital to the disposition of their claim. Prior to issuing the subpoenas the clerk contrary to FRCP Rule 45(a)(3) required appellants to complete each subpoena and allowed the defendants to object to the issuance of the subpoenas with substantially delayed subpoenas delivery and allowed defendants to combined efforts with deponents in order to collaborate on motions to quash and request protective order. All subsequent appellants request for subpoenas to clerk have been denied in an attempt to derail appellants discovery strategy. This type of self interjection by clerks lends itself to systematic abuse and has subjected appellants to a vexatious and frustrating ordeal when the FRCP Pursuant Rule 45 (a)(3) states the "the clerk must issue a subpoena, signed but otherwise in blank, to a party who request it. That party must complete it before service." Appellants have subsequently submitted subpoenas and clerk has refused to sign and issue requested subpoenas and appellant has been barred from the benefit of the subpoena discovery process and restricted from further subpoena discovery tools shackling appellants efforts to present their case. Defendants have refused plaintiffs FOIA request and request for digital files with metadata information attached. Please see *Rosenfeld v. Department of Justice*, Civil Nos. 85-1709, 85-2247 (N.D. Cal.) and *Romero v. Allstate Ins.* Co., 2010 U.S. Dist. LEXIS 111985 (E.D. Pa. Oct. 21, 2010). In order that justice rolls on like a mighty river appellants must be allowed unabridged discovery and opportunity to uncover the naked truth of the existing evidence. After all the purpose of discovery is to disclose not to conceal

5

The U.S. clerk again contrary to the provisions of 28 U.S. 73 referred the same to U.S. Magistrate Carr over appellants objection (see appellants exhibit "B" attached). If no choice exists then the consent provision looses weight and becomes a confusing and useless. The Magistrate's jurisdiction is only derived from the consent of the parties alone and becomes a matter of contract by express consent, anything less becomes shanghaiing and dragooning when against the will of the parties the magistrate is forced upon them. Please reference, Paul Edward Archie, Et Al., Plaintiffs, Paul Edward Archie, Plaintiff-Appellant, v. David A. Christian, Et Al., Defendants-Appellees., 808 F.2d 1132 (5th Cir. 1987). Puryear v. Ede's, Ltd., 7312d 1153 (5th Cir. 1984)., Ultimately the appellant is being forced to comply with an imposing local rule requirement that are not consistent with the Acts of Congress and rules adopted and Ordered by the Supreme Court of the United States in the FRCP and forces appellant to lose rights duly granted them by the United States Supreme Court.

6

Despite the prior objections of appellants, U.S. Magistrate awareness of plaintiffs prior motion to recuse Magistrate Judge Carr proceeded to quash and disallow Plaintiffs subpoenas on the nebulas ground that the same were not relevant or too burdensome and did so without review nor

hearing even though appellants has requested such and provided concrete evidence of tampering with evidence by the defendants, altering evidence, destroying evidence, evidence of conspiracy, and has false documents provided by defendants, more egregious than that the said magistrate issued a protective order barring the plaintiffs from FRCP subpoenas, issued a protective order to shield defendants wrong doings (city police holding appellant at gun point in own home, police and 9 city officials coercing appellants minutes before ZBA meeting to fill out unneeded variance application, city destroying tapes and information, and a laundry list of other incidents) , shackled the discovery process, overlooked and bypassed previous motions filed by plaintiffs, some still not addressed, and flagrantly disregarded the previous rulings of the U. S. district Judge to produce documents per the request for production of documents.

Movants believe that 28 U.S.C. Sec 636(c.) is controlling and thus seeks Summary reversal of the decision of U. S. Magistrates who were precluded for and prohibited from nor had any legal authority or jurisdiction of matters pending in the United States District Court below. The case in error was assigned to the magistrates disregarding parties consent. In addition appellants have included a few of the many exhibits C, D, E, F, G, H, I, J, K, L, M, N, O, P & Q with brief explanations to shed additional light and to provide addition foundation for understanding of the case at bar.

| Exhibit | Brief Explanation |
|---|---|
| C | Post & Courier article with erroneous information on plaintiffs with city quotes and slurs such as "Who does that black man think he is, building such a large home in the City of North Charleston." |
| D | Original site plan submittal requirement given at approval |
| E | Altered site plan from city and purported to be original site plan |
| F | Defendants submittal that the city does not have a copy of the code at time of plaintiffs approval and it cannot be obtained because it is " a rolling code" |
| G | Document from Dept. of Archives and History per SC Records Retention Act stating Defendants are obligated to maintain in office the very documents they claim do not exist |
| H | Defendants acknowledgement that Building Department refused to perform mandatory inspection and a non ICC sanctioned illegal hold was place upon project |
| I | Circuit Judge refusal to recusal after admitting having worked for defendants in multiple capacities and stating contrary to transcript and his direct words in a 15 min hearing that he listen to merits of case. |
| J | Transcript showing that Circuit Judge stated in his own words he would not discuss any merits of case, no other hearing was ever held. Hearing was held for 15 min in the middle of a Jury Hearing. Appellants guest is during a short recess or break, full adjudication did not take place. ( Page 12 row 9-14 explains) |
| K | Defendant's untrue statement of phantom regulations to prevent lucrative movie contract from being carried out. TV Show Army Wives film constantly less than ½ mile from appellants home and in may North Charleston homes with no Certificate of Occupancy |

| | |
|---|---|
| L | Court Stenographer denial of Plaintiff's hearing ( court administrator had no record of hearing when enquired either) |
| M | Court Management Supervisor documents showing jury case held that appellant's case was sandwiched between during a short recess or break and reluctancy to provide case information until appellants request if subpoenas would be necessary to obtain info. |
| N | Defendants Memorandum showing backdating of documents (defendants in responsive pleading admitted that appellants only became aware of need for variance on day of variance April 7, 2008 (document metadata file will prove date of document construction). Defendant's also mention the existence and predicates the second hearing which was granted upon hearing the tape the defendants later state did not exist. |
| O | The city attorney's letter which purports that the tape of the May 5, 2008 meeting malfunctioned, yet eleven pages of detailed minutes have been submitted from memory, the city presented technician notes from the April meeting and stated that the May notes were "unsuccessful" , whatever that means. |
| P | The May meeting agenda and minutes. Which was done form memory eleven pages |
| Q | Unsolicited by the plaintiff, a copy of the neighborhoods petition to the city in favor of the plaintiff. In addition as reflected in the May minutes the city requested the community vote and three votes were mandated by the city and all three times the votes were in favor of the plaintiffs, contrary to the community wishes and contrary to the ZBA bylaws requiring a concurring majority which they ZBA did not have the ZBA denied the request. |

Wherefore plaintiffs respectfully submit that plaintiffs appellants are entitled to a stay and reversal of all magistrate rulings, opinion, reports, orders and remand of the matters herein referral to the U. S. District court below for a disposition of the case upon its merits. Movants also beg for the assessment of cost, expenses and attorney fees.

DATED this 14th day of March, 2011.

CERTIFICATE OF SERVICE

I John Singletary herby certify that a true and correct copy of this **PLAINTIFFS JOHN SINGLETARY AND CARLA SINGLETARY'S MOTION FOR STAY AND APPEAL TO FOURTH CIRCUIT ON JUDGE MARCHANT AND JUDGE CARR'S REPORT** in forgoing style and matter was dispatched with sufficient U.S. prepaid postage to defendants attorney of record, and other interested parties on March 14th 2011.

Dated: March 14th, 2011

Respectfully Submitted,

John Singletary
Pro se
johnsing@knology.net
(843) 693-2823
4321 Waterview Circle
North Charleston, SC 29418



UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

John O. Singletary and Carla C. Singletary,

Plaintiffs,

vs.

City of North Charleston, City Bldg. Dept. and Darbis Brigman, City Zoning Dept. and William Gore, City ZBA and Donald Schaeffer, City Legal Dept., City Mayor Keith Summey, City Bldg. Inspector Rick Williams, City Zoning Inspector Mary Cohen, and ZBA Sec. Adrienne Williams.

Defendants.

C/A No.: 2:09-cv-01612-MBS

**CONSENT ORDER ON MOTION TO COMPEL**

This matter comes before the court on the parties' proposed resolution of the pending Motion to Compel and for Sanctions (the "Motion") (ECF No. 60). The parties hereby advise the court that they have consulted regarding defendants' responses to plaintiffs' Requests for Production and have resolved the matters raised in the Motion, as follows.

The parties agree that the defendants shall produce the following items:

1. Copies of the indexes of any manuals (training or otherwise) addressing setback measurements, variances and other issues pertinent to this case; memos addressing the same; and information from the personnel files of employees in these departments which reflects such training;

2. Tape recordings from any meetings (since 2005) which address issues of zoning, variances, setbacks, and other issues similar to those in this case, as well as any tape retention policy of the City of North Charleston for such tapes;

3. Minutes of such meetings;

4. Any notes from the meeting addressing the Singletary property as the taping of the meeting was not successful;

5. A list of any City of North Charleston cases from the past 6 years which have involved federal issues of housing, zoning, and/or claims of discrimination (Equal Protection Claims, Due Process Claims, etc.) other than claims involving law enforcement or employment;

6. A delineation of Mr. Singletary's FOIA requests and the responses to such, and the identification of the documents previously produced;

7. A listing of complaints from the subdivision regarding the Singleton property- any available call logs will be checked for such complaints that may have come in by phone where there is no corresponding document;

8. A list of any calls to law enforcement regarding the Singletary property; any dispatches to the property; and any assistance that law enforcement may have provided to code enforcement with respect to the property of the plaintiffs;

9. A summary of the zoning/planning/building process employed when there is a complaint against a property owner;

10. Documents relating to setback enforcement since 2005;

11. A list of denials of Certificates of Occupancy from 2005 today, with a notation of the reason(s) for such denials;

12. Any policy or procedure manuals and/or memos or other documents outlining the relationship between the zoning, building and planning departments and how the various approvals work;

13. Any call logs, documents, memos, notes, etc. relating to calls to or from City officials about the Singletary property (for example, complaints, calls from or to his bank, appraisers, etc.); and

14. The production of the required privilege log for items redacted from the files previously provided.

Defense counsel shall have all available, discoverable computer documents relating to the Singletarys' Waterway Drive property placed upon a flash drive or CD for production electronically. Defense counsel will also review defendants' responses to requests 3-8, 12, 14-19, 22, 25, 31, 34, 36, 37, 37, and 40 and, to the extent that it is possible, provide specific references to the documents previously produced.

It is hereby ORDERED that these items be produced within twenty (20) days of the date of this Order.

/s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
United States District Judge

November 15, 2010
Charleston, South Carolina

We So Move:

*s/Stephanie P. McDonald*
STEPHANIE P. McDONALD
Fed. I.D. No.: 6294
SANDRA J. SENN
Fed I.D. No.: 5761
Senn, McDonald & Leinbach, LLC
P.O. Box 12279
Charleston, SC 29422
(843) 556-4045

Attorneys for Defendants

*s/Veronica Small*
VERONICA SMALL
(Bar No. 02881)
Family Legal Services, LLC
1847 Ashley River Road, Ste. 200
(843) 763-3900

And

SCOTT F. SMITH (P28472)
Smith Law Group, PLLC
28400 Northwestern Hwy., Ste. 100
Southfield, MI 48034
(248) 355-3358

Attorneys for Plaintiffs

John Singletary
4321 Waterview circle
North Charleston, SC 29418
December 23, 2010

RECEIVED
USDC. CLERK. CHARLESTON, SC

2011 JAN 12 A 11: 16

**The Honorable Margaret B. Seymour**
U.S. District Judge
Matthew J. Perry, Jr. Courthouse
901 Richland Street
Columbia, SC 29201

January 12, 2011

Dear Honorable Judge Margaret Seymour:

By copy of this letter to defendant's attorney and other interested parties, in this effort to resolve this pending matter that is an emergency. Defendants in this case have abused the discovery process by not responding to discovery request and simply ignoring Honorable Judge Seymour's order to discovery of FOIA and Production of Documents. The amendment to mechanics of discovery in the FRCP pursuant Rule 33,34,and 36 stating the party seeking discovery, rather than the objecting party, is made responsible for invoking Judicial determination of discovery disputes not resolved by the parties and Judicial sanction are tighten with respect to unjustified insistence upon or objection to discovery. The change also states that answers and objections are to be served together when, in fact, the defendant has not done so for the admissions. The defendant's attorney has admitted to receiving the request for admission on Nov. 22, 2010 and returned the objections with not answers 31 days after receiving the request when the law only allows 30 days. The admission by law must be deemed as admitted.

The plaintiffs are clearly entitled under the Freedom of Information Act to have been given or delivered to plaintiff when, in fact, they have not is a clear cut intentional intolerable violation of their duty to disclose requested information. The SC law allow for sanction of $100.00 for the first offense, $200.00 for the second offense, and $300.00 for the third and subsequent offenses. North Charleston has been received and signed for more than 40 case related requests that are specific and refused to answer the request even though they state they have. North Charleston's case history shows a pattern and practice of ignoring FOIA request. Moreover defendant insistence upon and refusal to this date in refusing to grant plaintiff a **certificate of occupancy inspection** and the final certificate of occupancy is in breach of its own delay inspection code requirements and is an outrageous and ravenous overreaching of plaintiffs rights under color of law.

Sincerely,

John Singletary

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC. CLERK, CHARLESTON, SC
2011 JAN 12 A 11: 16

John G. Singletary and Carla C. Singletary

Plaintiff(s)

v.

The City of North Charleston
City of North Charleston Building Dept.
City of North Charleston Zoning Dept.
City of North Charleston Zoning Board of Appeals
City of North Charleston Legal Dept.
R. Keith Summey, City of N.Chas., Mayor
Darbis Briggman, City of N.Chas. Chief Bldg. Official
William B. Gore, City of N.Chas. Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively

Defendant(s)

Civil Action No. C/A No.: 2:09-cv-01612-MBS

MOTION FOR EMERGENCY HEARING

**MOTION FOR EMERGENCY HEARING**

TO: The Honorable Margret Seymour
Unites States District Judge

Plaintiffs John Singletary and Carla Singletary, by and through their undersigned attorney Pro se hereby move this Honorable Court for an **emergency** hearing in the foregoing styled matter premised upon grounds underscored below:

1

A return of discovery of request from the vendor and "Municode" custodian reveals a score of falsified documents maliciously contrived by an apparent conspiracy to deliberately and intentionally back dated and present under false pretense certain documents to misrepresent the actual date of origin so as to justify their use in controlling the outcome and adverse disposition of plaintiffs constitutional legal rights before the City of North Charleston Zoning Board of Appeals and Charleston County Circuit Court and now this court.

2

In other words, simply put, to make fraudulent use of zoning laws not in existence at the time of plaintiffs proceedingbefore the ZBA and were contrived and used as if they pre-existed plaintiffs hearing before that board (ZBA). Please note that plaintiff's coerced application for variance was dated April 7, 2008, the very same day of the ZBA meeting Defendant then craved reference to reliance and dependence upon this "phantom" non-existent code and later made up a code and submitted this facsimile by email (electronic transfer) to Municode. Defendants earlier denial of any emailsor communication to third parties involving this casewas factual incorrect, fraudulent, and show bad faith. Far worse than this, defendants utilized its personnel to further the conspiracy to perpetrate a fraud on plaintiffs and this court through willful and intentional acts.

3

As part and parcel of this monstrosity of a continuing conspiracy, soughtthe aid of this court to lend assistance to this fraud by way ofasking for protective orders to further conceal the fruits of its evil deeds as embodied in its motion to this courtdated December 23, 2010. Defendants attempt to legally conceal an illegal actthru the use of the power of this court.

4

Plaintiffs verily believe that defendants insistence on: 1) thevery use of these bogus documents; 2) jumbled documents without question correlation; 3)falsely representingthat they have produced discovery materials which they have not;4) disorganized unnumbered bemused responses all constitute a conspiratorial effort to defraud and defeat plaintiffs claimfor relief and plaintiff'sday in court will continue unless this court intervenes to enjoin their pursuit.

5

Plaintiffs believes an inspection of FOIA, discovery requested and other discovery ordered by this court juxtapose the defendants responses would clarify the discovery disputes between parties. Accordingly plaintiffs believe that an emergency hearing is warranted to enjoin the fraudulently practices, require defendants to produce documents, cease and desist from their unlawful practices and show cause why they shouldn't be held in contempt and why the imposition of sanctions together with a default judgment being granted against them.

6

Defendant's attorney has misrepresented information regarding good faith atempt with plaintiff. Defendant's attorney has misrepresented plaintiffresponse to defendants in house attorney regarding FOIA responses. Mayor Summey has indicated to Zoning Department Head in memo that the ZBA Zoning tapes requested by plaintiff exist, even thoughcity attorneys have denied the existence of such tapes. Zoning Department Head, Williamgore, has indicted in memo that the zoning tapes exist. Defendants have literally altered the site planrequirements after the fact. Defendants have altered definitions and other parts of the code after the fact (parts that has never been changed in the history of the city) in order to cover up their wrong doing. Defendants have altered the front yard setback section of the code in order to mislead the Trier of fact in this case

(the most recent relevant changes occurring in March of 2010). Defendants have changed the zoning requirements for the plaintiff's residence after the fact of approving the site and building plan and are attempting to retroactively apply the new zoning status to the plaintiff. The Plaintiff s street is the only street in the entire North Charleston Code that is used as a boundary, a recent change in order to declare a height nonconformity that does not exist. The Defendants have communicated with many third parties even though they have deniedsuch. Third parties such as Wachovia, Beresford, David Bates, Patrick Percy, Municode, Ramond Owens, Nation Action Network and others releasing information to them that they would not otherwise have had Defendant have frustrated and abused the discovery process by willfully and intentionally refusing to answer discovery request.

Wherefore: Plaintiffsmove that predicated upon the foregoing premises

1 This matter be accelerated by way of emergency hearingfor disposition by this court
2 Defendants be required to produce prior to hearing date set by this court to provide FOIA and all discovery matters as ordered by this court and those for which they are in default
3 Defendants be required to show court why judgment by default should not be entered against them by virtue of its fraudulent practice together with the paymentof cost, attorney feed, together with compensatory and punitive judgment.

DATED this 12th day of JANUARY, 2010.

Respectfully Submitted

John Singletary
Pro se for John Singletary and Carla Singletary
johnsing@knology.net

(843) 693-2823
4321 Waterview Circle
North Charleston, SC     29418

**CERTIFICATE OF SERVICE**

I John Singletary herby certify that a true and correct copy of this Motion for Emergency Hearing in forgoing style and matter was dispatched with sufficient US prepaid postage to defendants attorney of record, and other interested parties on January 11 th 2011. .

Dated: Jan. 12, 2010

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC, CLERK, CHARLESTON, SC
2011 JAN -7 P 3:54

John G. Singletary and Carla C. Singletary,

Plaintiff(s)

v.

The City of North Charleston
City of North Charleston Building Dept.
City of North Charleston Zoning Dept.
City of North Charleston Zoning Board of Appeals
City of North Charleston Legal Dept.
R. Keith Summey, City of NC Mayor
Darbis Briggman, City of NC Chief Bldg. Official
William B. Gore, City of NC Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively and other s to be named

Defendant(s)

C/A No. :2:09-cv-01612-MBS-RSC

PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT TO MOTON FOR DEFAULT JUDGEMENT

**To: TO THE HONORABLE MARGRETT SEYMOUR**
**United States District Judge**

**PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT TO MOTON FOR DEFAULT JUDGEMENT**

Issues Presented: In Whether Defendant's refusal to comply with US District Judges' Order directing Defendants to respond to Plaintiff's discovery requests originally due May 15, 2010 within 20 days after ruling on plaintiff's motion to compel entitles plaintiff to a judgment by default? Movant believes so and deadline for the time constraint and defendant's response has passed. Defendants' neither sought an extension of time from this court prior to the set expiration date nor provided this court with any extenuating

legal reason why not any effort made to comply with the previous order of this court were made. In this connection the case of Turner v. Hudson Transit Lines, Inc., illumination. There it was held. There as here the defendants failed to provide any bonafide reason for neglecting to respond to discovery served upon them. The court held defendants in default.

*Qualcomm Inc. v. Broadcom Corp.*[4] and *Metropolitan Opera Association v. Local 100, Hotel Employees & Restaurant Employees International Union*,[5] are towering reminders of the most severe sanctions—dismissals, multimillion dollar awards, and bar association referrals—that can be imposed for the most egregious misconduct. illustrated by *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities*,

> [i]t is no defense to suggest, as the defendant[s] attempt[], that particular employees were not on notice. To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant. The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials.

The judge has the option of treating the defendant's failure to comply as a contempt of court. Domestic rule 37 (b) (2) (D). As a consequence of the defendant's being found in contempt, the judge can order him imprisoned or fined to compel his obedience to her discovery orders. G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 41 n.13 (1st Cir. 1980). Parker v. United States, 153 F.2d 66, 70 (1st Cir. 1946).

**Woloohojian v. Bogosian, 821 A.2d 681, 2003 R.I. LEXIS 127 (R.I., 2003)** Rule 37 (b)(2)(C) of the Superior Court Rules of Civil Procedure affords a trial justice wide discretion to "render[] a judgment by default against the disobedient party" when that party fails to obey an order to comply with discovery [*3] obligations. **Travelers Insurance Company, 785 A.2d 568, 569 (R.I. 2001)** (mem). This Court has held that the entry of a default judgment for failure to comply with a discovery order will only be reversed upon a showing of an abuse of discretion. **Mumford v. Lewiss, 681 A.2d 914, 916 (R.I. 1996)** (per curiam). "An abuse of discretion results from the granting of a motion for default judgment in the absence of evidence demonstrating persistent refusal, defiance or bad faith." **Travelers Insurance Company, 785 A.2d at 569**.The defendant's inaction and non-responsiveness belie her protestations of good faith and best efforts. As we observed in *Mumford,* there is often a point in litigation when a party is entitled to a dismissal of an action in which the opposing party's "failure to comply with discovery requests and related court orders causes inordinate delay, expense, and frustration for all concerned." **681 A.2d at 916**. The motion justice's conclusion in this case that the defendant's persistent refusal to provide the requested information despite numerous opportunities to do so warranted a default and dismissal was clearly within his discretion. **Fournier v. Town of Coventry, 615 A.2d 118, 119 (R.I. 1992)** (per curiam). Despite this additional time in which to comply and the entry of a conditional order of default,

defendant chose to be "noncompliant and dilatory." **Mumford, 681 A.2d at 916**. At a subsequent hearing on March 20, 2002, plaintiff brought to the court's attention that the boxes of documents in the motel room and defendant's answers to interrogatories were non-responsive on their face. Likewise North Charleston's attempts to skirt its court ordered responsibilities by leaving a box of hard copy documents at Pro Copy with no reference to which document is for which question. The plaintiffs requested digital files and plaintiff has even supplied the necessary media to transfer the information onto. Clearly the defendants have no intention to comply with the court ordered discovery for they have even ignored and passed the Honorable Judge Seymour's Order's deadline.

Defendants have continually refused to surrender requested litigation hold notification notice and has admitted and attest to sloppy record keeping as well as information lost. The defendant's attorney continual attempt to play ignorant to the existence of requested materials as a defense.
The amendment to mechanics of discovery in the FRCP pursuant Rule 33,34,and 36 stating the party seeking discovery, rather than the objecting party, is made responsible for invoking Judicial determination of discovery disputes not resolved by the parties and Judicial sanction are tighten with respect to unjustified insistence upon or objection to discovery. The change also states that answers and objections are to be served together when, in fact, the defendant has not done so for the admissions and have not answered plaintiff's production of documents sufficiently to constitute a FRCP compliant response and are considered not answered. The defendant's attorney has admitted to receiving the request for admission on Nov. 22, 2010 and returned the objection with not answers 31 days after receiving the request when the law only allows 30 days. The admission by law must be deemed as admitted.

North Charleston as in the following case have attempted to request protective orders and suggest unduly burdensome request, and motions to quash without sufficient compliance. The court obviously contra to their initial objection to the subpoenas being issued has determined the right to request the information through discovery the following case details the concept and principles similar in this case with the reverse of positions, yet the concepts are relevant and applicable.

**Court Denies Protective Order Supported by Vague Assertions**
*U & I Corp. v. Advanced Med. Design, Inc.*, 2007 WL 4181900 (M.D.Fla. Nov. 26, 2007). In this breach of contract case, the defendant filed a second motion to compel and sought sanctions for insufficient compliance with the first motion to compel, claiming the plaintiff failed to produce numerous 2004 e-mail attachments, relevant correspondence and certain critical documents identified by Bates number. The plaintiff countered with a motion for a protective order, arguing that the request was unduly burdensome as the parties already exchanged over six thousand pages. The court was not persuaded by the plaintiff's vague assertion and denied the motion for the protective order. The defendant also subpoenaed similar documents from a non-party who sought to quash the subpoena, claiming undue burden. The court was again not persuaded by the lack of detail provided as to the efforts required to comply and upheld the subpoena. Before ruling on the issue of sanctions, the court ordered the plaintiff to submit an affidavit from its corporate

representative detailing the cause of the missing information and efforts undertaken to retrieve it.

The following are additional relevant cases that specify ruling on refusals to comply with production request and in the requested format.

Court Grants Motion to Compel Non-Party's Production but Refuses to Impose Sanctions – *In re Rule 45 Subpoena Issued to Robert K. Kochan*, 2007 WL 4208555 (E.D.N.C. Nov. 26, 2007).

Court Orders Production in Native Format upon Showing of Particular Need – *Ryan v. Gifford*, 2007 WL 4259557 (Del.Ch. Nov. 30, 2007).

This pattern of conduct exhibited by defendants erecting barriers to the free flow of information and release of information sought by plaintiff is a manifest showing of dilatory tactics evidencing bad faith and intentional breach of plaintiff's due process and equal protection rights embodied in the 14th Amendment. We believe so.

It must be assumed that defendants utterance of lies including their insistence on maintaining that documents which the plaintiffs are clearly entitled under the Freedom of Information Act have been given or delivered to plaintiff when, in fact, they have not is a clear cut intentional intolerable violation of their duty to disclose requested information. Moreover defendants insistence upon and refusal to this date in refusing plaintiff a certificate of occupancy in breach of its own code requirements is an outrageous and ravenous overreaching of plaintiffs under color of law. Defendants failure to admit that its failure to issue the C/O in keeping with its code requirements mandating issuance of the certificate of occupancy by virtue of their failure to make inspection within the required time after written request by plaintiff to do so is yet another instance of governmental arrogant abuse of power prohibited by sec 1983 US Constitution.

In *The Pension Committee of the University of Montreal Pension Plan, et al. v. Banc of America Securities LLC, et al.*, No. 05 Civ. 9016 (SAS), 2010 WL 184312 (S.D.N.Y. Jan. 15, 2010), Judge Scheindlin revisits the issue of spoliation in a lengthy opinion that is worth reading.

Of its own admittance North Charleston has made known its actions that constitute spoliation their actions amount to grossly negligence. The City of North Charleston ignored its duty to preserve which was triggered before litigation commenced due to the ZBA controversy and the communication exchange prior to the filing of the lawsuit.suit.

North Charleston's refusal and "failure to issue a *written* litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information." North Charleston has acted in bad faith and a grossly negligent manner.

Plaintiff has continually reiterated the importance of preserving records to the defendants

that were in their possession, custody or control, failure to preserve relevant documents supports a finding of gross negligence.

Plaintiff's exhibits A,B,C,D show the continual effort on the part of the plaintiff in order to in good faith acquire proper discovery from defendants to no avail.

DATED this 7th  day of Jan., 2010.

CERTIFICATE OF SERVICE

I John Singletary herby certify that a copy of Plaintiffs Memorandum of Law in Support to Motion to Default Judgment have been mailed to defendants attorneys, others interested parties and a copy to District Honorable Judge, Margret Seymour  with sufficient postage and a letter requesting response.

Dated: Jan 7,   2010

Respectfully Submitted

John Singletary

johnsing@knology.net
(843) 693-2823
4321 Waterview Circle
North Charleston, SC   29418

PLAINTIFF'S EXHIBIT A

**John Singletary**

**From:** Veronica Small [vsmall@familylegalservicesllc.com]
**Sent:** Tuesday, May 25, 2010 12:33 PM
**To:** Stephanie McDonald; Scott Smith; John Singletary
**Subject:** Singletary Discovery Production Documents

Dear Stephanie:

This letter is written in response to your fax of May 24, 2010 regarding the above referenced discovery documents. Please forward to us all documents in digital format pursuant to the e-discovery rules if at all possible.

Regarding the FOIA requests, please have all of those documents copied if not available in digital format. Regarding the city files, please have all records copied or provide same in digital format if available.

My client will be happy to provide a usb media stick in order to facilitate your providing all documents in digital format. I look forward to receiving all of the discovery requests within the next 24 to 48 hours. Thanks for your cooperation in this matter.

Veronica G. Small
Family Legal Services, LLC
1847 Ashley River Road, Suite 200
Charleston, SC 29407
843-763-3900 fax 843-763-5347

CONFIDENTIAL: PRIVILEGED COMMUNICATION - CONTAINS ATTORNEY WORK PRODUCT
This message is from the law firm of Family Legal Services, LLC, Veronica G. Small. This message could contain viruses and it is the responsibility of the receiver to check and delete them. If you have received this communication in error, please reply to the sender that you have received the message in error and delete the message or notify us immediately at 843-763-3900.

PLAINTIFF'S EXHIBIT B

**John Singletary**

**From:** Veronica Small [vsmall@familylegalservicesllc.com]
**Sent:** Wednesday, May 26, 2010 10:29 AM
**To:** John Singletary
**Subject:** RE: Re Discovery Documents

When we get the documents, we will be able to see if the rules for "claim of privilege was followed." If it was not followed, then the appropriate action will be taken.

Veronica G. Small
Family Legal Services, LLC
1847 Ashley River Road, Suite 200
Charleston, SC 29407
843-763-3900 fax 843-763-5347

CONFIDENTIAL: PRIVILEGED COMMUNICATION - CONTAINS ATTORNEY WORK PRODUCT
This message is from the law firm of Family Legal Services, LLC, Veronica G. Small. This message could contain viruses and it is the responsibility of the receiver to check and delete them. If you have received this communication in error, please reply to the sender that you have received the message in error and delete the message or notify us immediately at 843-763-3900.

---

To: johnsing@knology.net; vsmall@familylegalservicesllc.com
Date: Wed, 26 May 2010 10:13:29 -0400
Subject: Re: Re Discovery Documents
From: johnsing@knology.net
CC: ssmith3352@aol.com; carlasing@knology.net

Hello Atorney Smith and Smalls,

Stephanie stated there are documents that will fil under the claime of privilege rule. In the original request for the production of documents we stated very clerly the procedure for them to follow when claiming documents are pprivileged. The procedure is listed below.

CLAIMS OF PRIVILEGE
If an objection to a request is based upon a claim of privilege or attorney work product, identify each document so withheld. With regard to all documents or portions of documents withheld on this basis, identify its creator, provide a brief description of the document, and state with particularity the basis of the claim of privilege, work product, or other ground of nondisclosure.
Please refer them to the document and request that they follow this procedure.

John

**On Tue 25/05/10 1:02 PM , Veronica Small vsmall@familylegalservicesllc.com sent:**

These should be available on Friday.

Veronica G. Small
Family Legal Services, LLC
1847 Ashley River Road, Suite 200

Charleston, SC 29407
843-763-3900 fax 843-763-5347

CONFIDENTIAL: PRIVILEGED COMMUNICATION - CONTAINS ATTORNEY WORK PRODUCT
This message is from the law firm of Family Legal Services, LLC, Veronica G. Small. This message could contain viruses and it is the responsibility of the receiver to check and delete them. If you have received this communication in error, please reply to the sender that you have received the message in error and delete the message or notify us immediately at 843-763-3900.

PLAINTIFF'S EXHIBIT C

FAMILY LEGAL SERVICES, LLC

*Veronica G. Small, Attorney*

Mailing Address: P. O. Box 80637
**Charleston, South Carolina 29416**
**843-763-3900 (ph); 843-763-5347(fax)**
**e-mail: vsmall@FamilyLegalServicesLLC.com**

June 23, 2010

*via Fax and Regular Mail @ 556-4046*
Stephanie P. McDonald, Esquire
Senn, McDonald & Leinbach, LLC
3 Wesley Drive
Charleston, SC 29407

Re: John G. Singletary, et al v. The City of North Charleston, et al
Civil Action No.: 2:09-cv-01612-MBS-RSC

Dear Stephanie:

Thank you for the discovery documents you made available to us on May 27, 2010. I have tried to make some sense of what you sent, but it has no order. The documents as forwarded violates Rule 26(g)(1), Rule 33 and 34 of the FRCP.

You have provided to me documents numbered 1 through 835. I have no idea which documents corresponds to which interrogatory question or which request for production demand. Therefore, I cannot tell whether the response is complete or whether I need to file a motion to compel.

Please forward your discovery answers in compliance with Rule 33 and Rule 34. As to Rule 34, please provide the documents as they are kept in the usual course of business or label them to correspond with the categories in the request. If the documents are usually kept in digital format, please provide them in like manner. Additionally, please provide all electronically stored information in digital format. If you need for me to provide a USB stick, I will be glad to do so. I would appreciate your response to this request by Monday, June 28, 2010.

Sincerely,

Veronica G. Small
VGS/sgv

cc: Scott Smith, Esquire
John Singletary

**Street Address: 1847 Ashley River Road, Suite 200, Charleston, South Carolina 29407**

PLAINTIFF'S EXHIBIT D

**John Singletary**

**From:** Veronica Small [vsmall@familylegalservicesllc.com]
**Sent:** Wednesday, November 24, 2010 5:48 PM
**To:** John Singletary
**Subject:** RE: Termination of employment

Dear John: I would take the position that the City has not cooperated with discovery at all and that no harm will be done if the expert witnesses are allowed at this time. Do your motion to allow them particularly in light of the city's action in not providind timely discovery. Good luck!

Veronica G. Small
Family Legal Services, LLC
1847 Ashley River Road, Suite 200
Charleston, SC 29407
843-763-3900 fax 843-763-5347

CONFIDENTIAL: PRIVILEGED COMMUNICATION - CONTAINS ATTORNEY WORK PRODUCT
This message is from the law firm of Family Legal Services, LLC, Veronica G. Small. This message could contain viruses and it is the responsibility of the receiver to check and delete them. If you have received this communication in error, please reply to the sender that you have received the message in error and delete the message or notify us immediately at 843-763-3900.

---

From: johnsing@knology.net
To: vsmall@familylegalservicesllc.com
CC: ssmith3352@aol.com; johnsing@knology.net; carla@singletaryphotography.com
Subject: RE: Termination of employment
Date: Wed, 24 Nov 2010 15:55:10 -0500

Hello Attorney Smalls and Smith,

Again thank you for your past assistance, I received a response from North Charleston regarding the experts. It appears that they plan on opposing the use of the experts. I recall that back in March of 2008 I requested the experts be submitted. We did exchanges several emails confirming that the name would be submitted as I requested. Since then we had several emails regarding the same subject matter. As you both know it is imperative that the experts be used in this case and they have become a focal points in the case. In the event the experts are disallowed we will have to re-visit this matter in the future. Here is the response from the opposing side. "I'm sorry to not get to work with you on this one. I will send things directly to Mr. Singletary, with a cc to you until the conent order is signed. Expert deadline expired long ago, so we will have to see what the court does with that."

Thank you ,

John Singletary

---

**From:** Veronica Small [mailto:vsmall@familylegalservicesllc.com]
**Sent:** Monday, November 15, 2010 5:17 PM

**To:** John Singletary
**Subject:** RE: Termination of employment

John, I could not open the release. Please drop a copy off to the office and I will sign and forward to you as soon as practicable. Also, you are welcome to have any of the documents I have in my file. You do not owe me anything. I came on to help the primary attorney who was out of state. Sorry it did not work out.

Veronica G. Small
Family Legal Services, LLC
1847 Ashley River Road, Suite 200
Charleston, SC 29407
843-763-3900 fax 843-763-5347

CONFIDENTIAL: PRIVILEGED COMMUNICATION - CONTAINS ATTORNEY WORK PRODUCT
This message is from the law firm of Family Legal Services, LLC, Veronica G. Small. This message could contain viruses and it is the responsibility of the receiver to check and delete them. If you have received this communication in error, please reply to the sender that you have received the message in error and delete the message or notify us immediately at 843-763-3900.

---

From: johnsing@knology.net
To: vsmall@familylegalservicesllc.com
CC: johnsing@knology.net; carla@singletaryphotography.com
Subject:
Date: Mon, 15 Nov 2010 15:06:12 -0500

Attorney Smalls:
Family Legal Services. LLC
1847 Ashley river Rd. Ste. 200
Charleston, SC 29416
Dear Attorney Smalls:

I am writing to notify you I am no longer in need of your attorney services in case 2:09-cv-01612-MBS effective 11/12/2010. Please forward complete case file to John Singletary 4321 Waterview Circle, North Charleston, SC 2948, COD by 11/22/10. In addition I request a detailed itemized bill regarding all expenditures incurred on this case. Please be specific in itemization with dates, time, party or parties conferred with and subjects discussed. I am available at 843-693-2823 to discuss any outstanding issues. Enclosed is a copy of the Notice to Release to the court. I came by your office around 2:00 to deliver the letter. I was informed that you and your secretary were out for the balance of the day.

Thank you for your services provided.

Sincerely,

John Singletary

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC, CLERK, CHARLESTON, SC
2011 JAN -7 P 3:55

John G. Singletary and Carla C. Singletary

Plaintiff(s)

v.

The City of North Charleston
City of North Charleston Building Dept.
City of North Charleston Zoning Dept.
City of North Charleston Zoning Board of Appeals
City of North Charleston Legal Dept.
R. Keith Summey, City of N.Chas., Mayor
Darbis Briggman, City of N.Chas. Chief Bldg. Official
William B. Gore, City of N.Chas. Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively

Defendant(s)

Civil Action No. C/A No.:
2:09-cv-01612-MBS

RESPONSE TO MOTION TO QUASH SUBPOENA TO PATRICK PEARCY

**RESPONSE TO MOTION TO QUASH SUBPOENA TO PATRICK PEARCY**

TO: The Honorable Margret Seymour
Unites States District Judge

The Plaintiffs file their response to the Motion to Quash Subpoena.

THE MOTION TO QUASH MUST BE DENIED:

1

The background information stated by the deponent is irrelevant to the permissible objections or request to quash subpoenas in question. The "no longer pending" phrase appeared because the subpoenas were approved to be distributed and the defendant's objection to the issuance of the subpoenas was denied.

2

The law and argument is frivolous, unfounded, and attempts to circumvent deponents duties and responsibilities in responding to the properly delivered subpoenasand has not basis in law or fact. The deponent seeks to quash yet the deponent makes no claim of issues pursuant FRCP Rule

45(3) (A) which addresses Quashingor Modifying a Subpoena. The burden of expenses mentioned by the deponent are not detailed and are only alluded to, there is no travel required. Actually, nowhere in the motion to quash does the deponent actually give a real reason WHY he wants to keep from telling the truth! Documents received through Production of Documents and admissions submitted to defendants are irrelevant to this subpoena. All data requested is relevant, within the legal boundaries of request, and pertinent to the facts of this case. We have to believe that the hearing panel in this matter wants to know the truth. It appears the deponent in uninterested in the truth and is averse to making statement under oath. To the extent the court sees fit for plaintiff to pay deponents cost above necessary and customary expenses the plaintiff will incur those cost subject to pass through to defendants for failure to provide infomation requested in the subpoena specifically addressed to the respondent Patrick Percy.

3

The defendants in this case have stated on several occasions and certified in writing under oath that they have not communicated with any third party in this case. The communication with Beresford, David Bates, Wells Fargo/Wachovia, Patrick Percy, and many others were not listed as those communicated with. It appears that some third party deponents are attempting to place themselves in tandem with North Charleston in order to corroborate the misinformation previously supplies by theCity of North Charleston. The documented motion to quash document on its face appears to have been produced or partially produced by the City of North Charleston, yet the deponent submits the documents as Pro se. Further inspection and submittal of the documents in electronic format could reveal the author of the documents, the computer from which it was generated, and other factors that would without doubt support the aforementioned suspicion. What is altogether suspect is Respondent Percy's use and exact duplication of caption character special relationships and mistakes along with theduplication of responses in this matter which are obviously related and applicable to the name defendants in this caseHence, the appearance of conspiracy and the very germ of abuse of process prohibited by rule 26 of the F.R.C.P.

4

North Charleston as in the following case hasattempted to request protective orders and suggest unduly burdensomerequest, and motions to quash court ordered subpoenas without sufficient compliance. The court obviously contra to their initial objection to the subpoenas being issued has determined the right to request the information through discovery the following case details the concept and principles similar in this case withthe reverse of positions, yet the concepts are relevant and applicable.

**Court Denies Protective Order Supported by Vague Assertions**

*U & I Corp. v. Advanced Med. Design, Inc.*, 2007 WL 4181900 (M.D.Fla. Nov. 26, 2007). In this breach of contract case, the defendant filed a second motion to compel and sought sanctions for insufficient compliance with the first motion to compel, claiming the plaintiff failed to produce numerous 2004 e-mail attachments, relevant correspondence and certain critical documents identified by Bates number. The plaintiff countered with a motion for a protective order, arguing

that the request was unduly burdensome as the parties already exchanged over six thousand pages. The court was not persuaded by the plaintiff's vague assertion and denied the motion for the protective order. The defendant also subpoenaed similar documents from a non-party who sought to quash the subpoena, claiming undue burden. The court was again not persuaded by the lack of detail provided as to the efforts required to comply and upheld the subpoena. Before ruling on the issue of sanctions, the court ordered the plaintiff to submit an affidavit from its corporate representative detailing the cause of the missing information and efforts undertaken to retrieve it.

The following are additional relevant cases that specify ruling on refusals to comply with production request and in the requested format.

Court Grants Motion to Compel Non-Party's Production but Refuses to Impose Sanctions – *In re Rule 45 Subpoena Issued to Robert K. Kochan*, 2007 WL 4208555 (E.D.N.C. Nov. 26, 2007).

Court Orders Production in Native Format upon Showing of Particular Need – *Ryan v. Gifford*, 2007 WL 4259557 (Del.Ch. Nov. 30, 2007).

This pattern of conduct exhibited by defendants erecting barriers to the free flow of information and release of information sought by plaintiff is a manifest showing ofilatory tactics evidencing bad faith and intentional breach of plaintiffs due process and equal protection rights embodied in the 14th Amendment. We believe so.

Wherefore: Plaintiffs request for the aforementioned reasons that deponent's motion to quash subpoenas be denied and this Honorable court issue an order compelling production of documents by the named deponent within five days or be held in contempt of court for failure without adequate excuse to obey the subpoena. Plaintiffs assert that "Adequate cause" for a failure to obey a subpoena is showing by virtue of Respondent Patrick Percy failure to assert any relevant or substantive cause or reason for refusal to provide the line items specified in the subpoena heretofore authorized by this court remains undefined and the non-party deponent is guilty of contempt for refusing to obey a subpoena. Plaintiffs also seeksanctions and attorney fees for the deponent filing such a frivolous motion as to impede the forward movement of this case through dilatory tactics.

DATED this 7th day of JANUARY, 2010.

CERTIFICATE OF SERVICE

I John Singletary herby certify that a true and correct copy of the RESPONSE TO MOTION TO QUASH SUBPOENA TO PATRICK PERCY was dispatched to Patrick Percy via U.S. Mail, postage prepaid and was sent to defendant on January 7th 2011. Postage prepaid.

Dated: November 24. 2010

Respectfully Submitted

John Singletary
johnsing@knology.net
(843) 693-2823
4321 Waterview Circle
North Charleston, SC 29418

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC. CLERK. CHARLESTON, SC
2011 JAN -7 P 3:55

John G. Singletary and Carla C. Singletary

Plaintiff(s)

v.

The City of North Charleston
City of North Charleston Building Dept.
City of North Charleston Zoning Dept.
City of North Charleston Zoning Board of Appeals
City of North Charleston Legal Dept.
R. Keith Summey, City of N.Chas., Mayor
Darbis Briggman, City of N.Chas. Chief Bldg. Official
William B. Gore, City of N.Chas. Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively
,

Defendant(s)

Civil Action No. C/A No.:
2:09-cv-01612-MBS

RESPONSE TO MOTION TO QUASH SUBPOENAS DUCES TECUM TO BERESFORD APPRAISAL GROUP LLC AND DAVID BATES

**RESPONSE TO MOTION TO QUASH SUBPOENAS DUCES TECUM TO BERESFORD APPRAISAL GROUP LLC AND DAVID BATES**

TO: The Honorable Margret Seymour
Unites States District Judge

The Plaintiffs file their response to the Motion to Quash Subpoena.

THE MOTION TO QUASH MUST BE DENIED:

I

The background information stated by the deponent is irrelevant to the permissible objections or request to quash subpoenas in question. The "no longer pending" phrase appeared because the subpoenas were approved to be distributed and the defendant's objection to the issuance of the subpoenas was denied. A short list that involves matters pertinent to the issues in this casewas submitted to the deponent. The FRCP defines the scope of discovery and all questions are well within the defined scope. The first instance is reasonable time to which party had 30 days. The respondent had ample time to request a delay or extension of time, but did not and is therefore

precluded from the use of time honored leverage or shelter of protection provided under FRCP Rule 26.

2

The law and argument is frivolous, unfounded, and attempts to circumvent deponents dutiesand responsibilities in responding to the properly delivered subpoenasand has not basis in law or fact. The deponent seeks to quash yet the deponent makes no claim of issues pursuant FRCP Rule 45(3) (A) which addresses Quashing or Modifying a Subpoena. The burden of expenses mention by the deponent are not detail and are only alluded to, there is not travel required. Actually, nowhere in the motion to quash does the deponent actually give a real reason WHY he wants to keep from telling the truth! Documents received through Production of Documents and admissions submitted to defendants are irrelevant to this subpoena. All data requested is relevant, within the legal boundaries of request, and pertinent to the facts of this case. We have to believe that the hearing panel in this matter wants to know the truth. It appears the deponent in uninterested in the truth and is averse to making statement under oath. <u>To the extent the court sees fit for plaintiff to pay deponents cost above necessary and customary expenses the plaintiff will incur those cost subject to past through to defendants for failure to provide information</u>

3

Instead of directing concerns to the request of the subpoena instead respondent engages at length in the artful unsolicited presentation of information tojustify dalliance. The confidentiality is not sacred within itself and is guided by the rule of reason. Theconfidentialityis not breached where as her plaintiff is the main subject of the"search and disclose" and stands to be adversely affected by the survey of his own real estate. Moreover the rule of confidentiality cannot be invoked to supplant or override the existing rule of civil procedure(26). Respondent offers no tangible reason why the rule is being invoked and thus abandons and is stripped of his protection, if any. Plaintiffs as the subject of the"survey event" is the prime and foremost beneficiary of its information and boundaries. A "short list" of readily available information sought by the plaintiffs is being magnified by respondent as if out of reach and for which or to which acess is burdensome instead of providing the same to plaintiff and allowing this court to decide its admissibility The deponent alludes to concerns and possible subpoena law violation however they list absolutely no violation. The deponent state the first appraisal was for a pre foreclosure action. Plaintiff never had a permanent loan closing only a construction loan and without a valid closing for the mortgage there can only be a breach of contract for no Certificate of Occupancy issued, not a foreclosing of a mortgage. The second appraisal as stated by the deponent was for the construction to permanent loan with special instructions. Part of the special instruction from deponent's client Wells Fargo/Wachovia is listed in(exhibit A). Clearly the information per Wells Fargo/Wachovia resulted from a call the City of North Charleston placed to Wells Fargo/Wachovia where North Charleston expounded many slanderous and unfounded untruths regarding the residence at 4321 Water view Circle. The information was then forwarded to Beresford from Wells Fargo/Wachovia with instructions to use the incorrect misinformation in order to devalue the appraisal so it could be used in Bankruptcy Court against the plaintiffs to proceed with a foreclosure do to a diminished property value. The initial claim for foreclosure from Wells Fargo/Wachovia was for failure to receive the C/O that North Charleston refused to

perform. Eventually the plaintiffs filed for Chapter 11 Bankruptcy strictly due to the financial mayhem created by the malicious acts of the City of North Charleston. This fact was stated clearly by the Bankruptcy Attorney during the Trustee Hearing in Columbia SC. The total personal and business lost exceeds fifteen million dollars in compensatory damages alone.

4

As for the time to comply each of the deponents were issued along with the subpoenas the explanation for the incorrect date and a letters instructing them to use the date received as the start date and move the due date out thirty days from that time which satisfies the time compliance Pursuant FRCP45(3)(A).

5

The deponent state an undue burden Pursuant to no FRCP in addition there is never a clear explanation of the burden as required. The distance of the comparable mentioned by the deponent is important simply because the distance used for the incorrect value of the home by the deponent is incorrect. All question posed to the deponent are legal and relevant to the facts of this case. Contrary to the deponent's claim that the plaintiff agreed to the accuracy of the deponent's appraisal value the plaintiff never agree to any such fact.

6

The deponent claims confidential appraiser-client information protected by the Universal Standard of Professional Appraisal Practice. This standard or practice does not supersede the FRCP and the United States Federal Subpoenas duties, responsibilities and obligations. In addition Pursuant Rule 45 of the FRCP 1991 Amendment subdivision (d) The provision states "A party receiving a discovery request who asserts a privilege or protection but fails to disclose that claim is at risk of waiving the privilege or protection. A person claiming a privilege or protection who fails to provide adequate information about the privilege or protection claim to the party seeking the information is subject to an order to show cause why the person should not be held in contempt under subdivision (e). Motion for such orders and responses to motions are subject to the sanctions provisions of Rules 7 and 11."

7

Per the deponents own words listed on his website www.beresfordappraisals.com in the "Coming Up With the Final Value" section (exhibit B) the deponent clearly state that the analysis is a routine part of coming up with the Fair Market Value thus no addition work is necessary nor addition written opinion for the initial goal of the Appraisal is all inclusive of the request make by the plaintiff and requires no further expert analysis, opinion, nor retainer. The deponent state he is a "small businessman working primarily on commissions" yet his profile list five to nine employees and annual sales of $1 million to $2.5 million for South Carolina under SIC Code 738913 (exhibit C).

8

The deponent misunderstands the FRCP Rule 45. The rules refers to the notification of the defendants in the case being notified not the deponent.

9

The defendants in this case have stated on several occasions and certified in writing under oath that they have not communicated with any third party in this case. The communication with Beresford, David Bates, Wells Fargo/Wachovia, Patrick Percy, and many others were not listed as those communicated with. It appears that some third party deponents are attempting to place themselves in tandem with North Charleston in order to corroborate the misinformation previously supplies by the City of North Charleston. The documented motion to quash document on its face appears to have been produced or partially produced by the City of North Charleston, yet the deponent submits the documents as Pro se. Further inspection and submittal of the documents in electronic format could reveal the author of the documents, the computer from which it was generated, and other factors that would without doubt support the aforementioned suspicion. The first page of the report states "THE APPRAISER MAKES KNOW THAT PER CONVERSATIONS WITH NORTH CHARLESTON PLANNING AND ZONING AS WELL AS THE BUILDING INSPECTION DEPARTMENT THE SUBJECT FRONT BRICK STAIRS ARE PRESENTLY NON-COMPLIANT WITH REGARD TO THE SETBACK REQUIREMENTS. Additional comments state that the subject property is an over improvement in the neighborhood yet there are several home of similar size. The appraiser state with certainty even though North Charleston has never expressed to plaintiff that the only issue preventing the issuance of the C/O is the non-compliant stairs. The appraiser also states that the plaintiff's application for variance has been denied preventing the issuance of the C/O. The appraiser also states that he has been directed by the Lender/Client to appraiser the property with no C/O. The appraiser also notes in his report incorrectly that the home has a non-conforming height status. North Charleston abandoned the height restriction claim after measurement. This is a clear example of information that deponent received from Wachovia that Wachovia received from North Charleston because this information exist in no publc record, a clear cut indication of conspiratorial actions.

North Charleston as in the following case hasattempted to request protective orders and suggest unduly burdensome request, and motions to quash court ordered subpoenas without sufficient compliance. The court obviously contra to their initial objection to the subpoenas being issued has determined the right to request the information through discovery the following case details the concept and principles similar in this case withthe reverse of positions, yet the concepts are relevant and applicable.

**Court Denies Protective Order Supported by Vague Assertions**
*U & I Corp. v. Advanced Med. Design, Inc.*, 2007 WL 4181900 (M.D.Fla. Nov. 26, 2007). In this breach of contract case, the defendant filed a second motion to compel and sought sanctions for insufficient compliance with the first motion to compel, claiming the plaintiff failed to produce numerous 2004 e-mail attachments, relevant correspondence and certain critical documents identified by Bates number. The plaintiff countered with a motion for a protective order, arguing that the request was unduly burdensome as the parties already exchanged over six thousand pages. The court was not persuaded by the plaintiff's vague assertion and denied the motion for the protective order. The defendant also subpoenaed similar documents from a non-party who sought to quash the subpoena, claiming undue burden. The court was again not persuaded by the lack of

detail provided as to the efforts required to comply and upheld the subpoena. Before ruling on the issue of sanctions, the court ordered the plaintiff to submit an affidavit from its corporate representative detailing the cause of the missing information and efforts undertaken to retrieve it.

The following are additional relevant cases that specify ruling on refusals to comply with production request and in the requested format.

Court Grants Motion to Compel Non-Party's Production but Refuses to Impose Sanctions – *In re Rule 45 Subpoena Issued to Robert K. Kochan*, 2007 WL 4208555 (E.D.N.C. Nov. 26, 2007).

Court Orders Production in Native Format upon Showing of Particular Need – *Ryan v. Gifford*, 2007 WL 4259557 (Del.Ch. Nov. 30, 2007).

This pattern of conduct exhibited by defendants erecting barriers to the free flow of information and release of information sought by plaintiff is a manifest showing ofdilatory tactics evidencing bad faith and intentional breach of plaintiffs due process and equal protection rights embodied in the 14th Amendment. We believe so.

Wherefore: Plaintiffs request for the aforementioned reasons that deponent's motion to quash subpoenas be denied and this Honorable court issue an order compelling production of documents by the named deponent within five days or be held in contempt of court for failure without adequate excuse to obey the subpoena. Plaintiffs assert that "Adequate cause" for a failure to obey a subpoena remains undefined and the nonparty deponent is guilty of contempt for refusing to obey a subpoena. Plaintiffs also seek sanctions and attorney fees for the deponent filing such a frivolous motion as to impede the forward movement of this case through dilatory tactics.

DATED this 4th day of January, 2010.

CERTIFICATE OF SERVICE

I John Singletary herby certify that the documents being sought by way of subpoena duce tecum which I am requesting be issued by the requestee are believed by me to be related to the above-captioned claim.

Dated: January 4, 2010

Respectfully Submitted

John Singletary
(843) 693-2823
4321 Waterview Circle
North Charleston, SC    29418



PLAINTIFF'S
EXHIBIT
A
tabbies

# APPRAISAL OF REAL PROPERTY

**LOCATED AT:**

4321 WATERVIEW CIR
LOT 25, BLOCK L
NORTH CHARLESTON, SC 29418

**FOR:**

WELLS FARGO BANK NA
3560 PHILLIPS HIGHWAY
JACKSONVILLE , FL 32207

**AS OF:**

03/24/2010

**BY:**

DAVID BATES
CR 3587

BERESFORD APPRAISALS GROUP, LLC
295 SEVEN FARMS DR, STE C-1 M
CHARLESTON, SC 29492

WELLS FARGO BANK NA
3583 PHILLIPS HIGHWAY
JACKSONVILLE, FL 32207

RE: PROPERTY: 4321 WATERVIEW CIR
NORTH CHARLESTON, SC 29418
BORROWER SINGLETARY, CARLA
FILE NO.: B10031267

IN ACCORDANCE WITH YOUR REQUEST, WE HAVE APPRAISED THE ABOVE REFERENCED PROPERTY. THE REPORT OF THAT APPRAISAL IS ATTACHED.

THE PURPOSE OF THIS APPRAISAL IS TO ESTIMATE THE MARKET VALUE OF THE PROPERTY DESCRIBED IN THIS APPRAISAL REPORT, AS IMPROVED, IN UNENCUMBERED FEE SIMPLE TITLE OF OWNERSHIP.

THIS REPORT IS BASED ON A PHYSICAL ANALYSIS OF THE SITE AND IMPROVEMENTS, A LOCATIONAL ANALYSIS OF THE NEIGHBORHOOD AND CITY, AND AN ECONOMIC ANALYSIS OF THE MARKET FOR PROPERTIES SUCH AS THE SUBJECT. THE APPRAISAL WAS DEVELOPED AND THE REPORT WAS PREPARED IN ACCORDANCE WITH THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE.

THE VALUE CONCLUSIONS REPORTED ARE AS OF THE EFFECTIVE DATE STATED IN THE BODY OF THE REPORT AND CONTINGENT UPON THE CERTIFICATION AND LIMITING CONDITIONS ATTACHED.

IT HAS BEEN A PLEASURE TO ASSIST YOU. PLEASE DO NOT HESITATE TO CONTACT ME OR ANY OF MY STAFF IF WE CAN BE OF ADDITIONAL SERVICE TO YOU.

SINCERELY,

DAVID BATES

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 44 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 9 of 46

Main File No. 8100312071 Page #[illegible]

# South Carolina

## Real Estate Appraisers Board

## DAVID GUSTAVE BATES

Is hereby entitled to practice as a:

**Certified Residential Appraiser**

License Number: **CR 3587**

06/30/2010

Expires:

[illegible]

Administrator

Form SCA — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

BERESFORD APPRAISALS GROUP, LLC

Main File No. B10031207 Page #3

# Uniform Residential Appraisal Report

File # B10031207

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 4321 WATERVIEW CIR City NORTH CHARLESTON State SC Zip Code 29418
Borrower SINGLETARY, CARLA Owner of Public Record SINGLETARY JOHN ALS SINGLETARY CARLA G County CHARLESTON
Legal Description LOT 25, BLOCK L
Assessor's Parcel # 408-09-00-286 Tax Year 2009 R.E. Taxes $ 1,012.47
Neighborhood Name EVANSTON ESTATES Map Reference PUB. RECORD Census Tract 31.10/2
Occupant [ ] Owner [ ] Tenant [x] Vacant Special Assessments $ NONE [ ] PUD HOA $ N/A [ ] per year [ ] per month
Property Rights Appraised [x] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [x] Other (describe) COURT. TO FORM - APPRAISE AS IS WITHOUT ISSUANCE OF CERTIFICATE OF OCCUPANCY
Lender/Client WELLS FARGO BANK NA Address 3563 PHILLIPS HIGHWAY, SUITE 400, 2ND FLOOR, JACKSONVILLE, FL 32207
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [x] No
Report data source(s) used, offering price(s), and date(s). NONE PER MLS

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. N/A

Contract Price $ N/A Date of Contract N/A Is the property seller the owner of public record? [ ] Yes [ ] No Data Source(s) N/A
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid. N/A

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
|---|---|---|---|
| Location [ ] Urban [x] Suburban [ ] Rural | Property Values [ ] Increasing [x] Stable [ ] Declining | PRICE $ (000) / AGE (yrs) | One-Unit 70 % |
| Built-Up [x] Over 75% [ ] 25-75% [ ] Under 25% | Demand/Supply [ ] Shortage [x] In Balance [ ] Over Supply | 120 Low NEW | 2-4 Unit 5 % |
| Growth [ ] Rapid [x] Stable [ ] Slow | Marketing Time [ ] Under 3 mths [ ] 3-6 mths [x] Over 6 mths | 1.2MIL High 87 | Multi-Family 5 % |
| | | 175 Pred. 30 | Commercial 18 % |
| | | | Other 2 % |

Neighborhood Boundaries THE SUBJECT IS BOUNDED NORTH AND EAST BY DORCHESTER RD, AND SOUTH AND WEST BY ASHLEY RIVER.
Neighborhood Description THE SUBJECT PROPERTY IS LOCATED IN THE EVANSTON ESTATES SUBDIVISION IN NORTH CHARLESTON, SC. THE GENERAL AREA IS CHARACTERIZED BY PRIMARILY SINGLE FAMILY HOUSING OF AVERAGE TO VERY GOOD CONSTRUCTION QUALITY. SCATTERED 2-4 UNITS ARE ALSO PRESENT AS WELL AS A FEW APARTMENT COMPLEXES. ***SEE ADDITIONAL COMMENTS***
Market Conditions (including support for the above conclusions) A REVIEW OF THE APPRAISER'S FILES, A COMPETITIVE MARKET ANALYSIS, AND AN AREA MARKET SURVEY FROM THE TRIDENT MULTIPLE LISTING SERVICE WERE DONE FOR THE SUBJECT AREA. ***SEE ADDITIONAL COMMENTS***

**SITE**

Dimensions 104.1x129.09x126.66x128.45 Area 0.34 +/- ACRES Shape Q. RECTANGULAR View MARSHVIEW
Specific Zoning Classification R-1 Zoning Description SINGLE FAMILY RESIDENTIAL
Zoning Compliance [ ] Legal [x] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe) GIVEN NEW HEIGHT RESTRICTIONS
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [x] Yes [ ] No If No, describe PRESENT USE IS HIGHEST AND BEST ALTHOUGH FRONT STAIRS REQUIRE RE-LOCATION PER N. CHAS. ZONING SET-BACKS.***SEE ADDITIONAL COMMENTS***

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [x] | [ ] | Water | [x] | [ ] | Street ASPHALT | [x] | [ ] |
| Gas | [x] | [ ] NATURAL | Sanitary Sewer | [x] | [ ] | Alley NONE | [ ] | [ ] |

FEMA Special Flood Hazard Area [x] Yes [ ] No FEMA Flood Zone AE FEMA Map # 45019C0481J FEMA Map Date 11/17/2004
Are the utilities and off-site improvements typical for the market area? [x] Yes [ ] No If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [x] Yes [ ] No If Yes, describe
THE APPRAISER MAKES KNOWN THAT PER CONVERSATIONS WITH NORTH CHARLESTON PLANNING AND ZONING AS WELL AS THE BUILDING INSPECTION DEPARTMENT, THE SUBJECT'S FRONT BRICK STAIRS ARE PRESENTLY NON-COMPLIANT WITH REGARD TO THE SET-BACK REQUIREMENTS. ***SEE ADDITIONAL COMMENTS***

**IMPROVEMENTS**

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units [x] One [ ] One with Accessory Unit | [x] Concrete Slab [ ] Crawl Space | Foundation Walls ELEV CONC BLK/SLAB/GD | Floors [illegible] |
| # of Stories THREE+ | [ ] Full Basement [ ] Partial Basement | Exterior Walls BRK/GD | Walls DRYWALL/GD |
| Type [x] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area sq.ft. | Roof Surface COMP/GD | Trim/Finish WOOD/GD |
| [x] Existing [ ] Proposed [ ] Under Const. | Basement Finish NONE % | Gutters & Downspouts OVER/GD | Bath Floor C.TILE/GD |
| Design (Style) 3STY/BRICK | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type DH VIN/GD | Bath Wainscot C.TILE/FIBGLS/GD |
| Year Built 2007 | Evidence of [ ] Infestation | Storm Sash/Insulated THERMAL/GD | Car Storage [ ] None |
| Effective Age (Yrs) 2 | [ ] Dampness [ ] Settlement | Screens YES/GD | [x] Driveway # of Cars 2+ |
| Attic [ ] None | Heating [x] FWA [ ] HWBB [ ] Radiant | Amenities [ ] Woodstove(s) # | Driveway Surface CONC/BRICK |
| [ ] Drop Stair [x] Stairs | [ ] Other Fuel ELECTRIC | [x] Fireplace(s) # 3 [ ] Fence | [x] Garage # of Cars 4 |
| [ ] Floor [ ] Scuttle | Cooling [x] Central Air Conditioning | [x] Patio/Deck WD [x] Porch STOOP | [ ] Carport # of Cars |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [ ] Pool [x] Other ELEV UNIT | [ ] Att. [ ] Det. [x] Built-in |

Appliances [ ] Refrigerator [ ] Range/Oven [ ] Dishwasher [ ] Disposal [ ] Microwave [ ] Washer/Dryer [ ] Other (describe)
Finished area above grade contains: 15 Rooms 6 Bedrooms 5F Bath(s) 7,044 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.). ***SEE ADDITIONAL COMMENTS***

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). THE SUBJECT HOME IS HIGH-END MODULAR CONSTRUCTION AND WAS CONSIDERED IN AVERAGE TO GOOD OVERALL CONDITION AT THE TIME OF INSPECTION. THE HOME CONSTRUCTION IS ESTIMATED TO BE 95% COMPLETE GIVEN THE LACK OF ANY KITCHEN EQUIPMENT, MISSING LIGHT FIXTURES IN SEVERAL LOCATIONS, THE LACK OF VANITY MIRRORS IN THE BATHROOMS, AND THE REQUIRED RE-LOCATION OF A PORTION OF THE FRONT STAIRS TO BE IN COMPLIANCE WITH LOCAL SET-BACK REQUIREMENTS. ***SEE ADDITIONAL COMMENTS***

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [x] Yes [ ] No If Yes, describe
AS NOW DUALY NOTED, THE SUBJECT HOME LACKS KITCHEN EQUIPMENT, SEVERAL LIGHT FIXTURES, AND THE REQUIRED PARTIAL STAIR RE-LOCATION TO OBTAIN THE CERTIFICATE OF OCCUPANCY. EACH OF THESE ITEMS AFFECT LIVABILITY. OTHER ITEMS MENTIONED ARE FELT TO BE COSMETIC. SOUNDNESS AND STRUCTURAL INTEGRITY ARE ASSUMED TO BE ACCEPTABLE. ***SEE ADDITIONAL COMMENTS***
Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [ ] Yes [x] No If No, describe
THE SUBJECT CONFORMS TO THE NEIGHBORHOOD IN USE AND STYLE, HOWEVER THE APPRAISER MAKES KNOWN THAT THE SUBJECT PROPERTY IS CONSIDERED AN OVER-IMPROVEMENT FOR THE NEIGHBORHOOD IN SIZE.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # B10031267

There are 33 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 559,000 to $ 1,175,000

There are 16 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 625,000 to $ 970,000

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4321 WATERVIEW CIR NORTH CHARLESTON, SC 29410 | 1304 PARKSHORE DR CHARLESTON, SC 29407 | | 1018 DOMINION DR HANAHAN, SC 29410 | | 2419 RICE POND RD CHARLESTON, SC 29414 | |
| Proximity to Subject | | 3.36 miles SE | | 5.51 miles NE | | 0.64 miles S | |
| Sale Price | $ N/A | | $ 775,000 | | $ 631,000 | | $ 850,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 126.12 sq.ft. | | $ 195.96 sq.ft. | | $ 245.59 sq.ft. | |
| Data Source(s) | | MLS#2913692/DOM 64 | | MLS#2825886/DOM 363 | | MLS#2904170/DOM 190 | |
| Verification Source(s) | | PUB RECORDS | | MLS/PUB. REC. | | MLS/PUB. REC. | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CONV | | FHA | | CONV | |
| Date of Sale/Time | | 08/19/2009 | | 10/14/2009 | | 09/30/2009 | |
| Location | AVERAGE | GOOD | -20,000 | AVERAGE | | GOOD | -20,000 |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 0.34 +/- ACRES | 1.02 +/- ACRES | -37,200 | 0.30 +/-ACRES | | 0.75 +/- ACRES | -11,200 |
| View | MARSHVIEW | PANORAMIC MARSH | -25,000 | CREEK/MARSH | -75,000 | RIVERFRONT | -225,000 |
| Design (Style) | 3STY/BRICK | 2STY/STUCCO | | 2STY/BRICK | | 3STY/BRICK | |
| Quality of Construction | VERY GOOD | VERY GOOD | | AVERAGE | +75,000 | VERY GOOD | |
| Actual Age | 2007 | 1977/RENOV | +30,000 | 1974/RENOV | +33,000 | 1989/RENOV | +18,000 |
| Condition | AVERAGE | VERY GOOD | -20,000 | GOOD | -20,000 | GOOD | -20,000 |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 15 / 6 / 5F | 13 / 5 / 5F2H | -5,000 | 8 / 3 / 3F1H | +9,000 | 9 / 4 / 3F1H | +9,000 |
| Gross Living Area | 7,044 sq.ft. | 6,145 sq.ft. | +45,000 | 3,220 sq.ft. | +191,200 | 3,461 sq.ft. | +179,200 |
| Basement & Finished | | NONE | | NONE | | NONE | |
| Rooms Below Grade | NONE | NONE | | PRVT DOCK/LIFT | -55,000 | SHARED DOCK | -30,000 |
| Functional Utility | FAIR | FAIR | | GOOD | -100,000 | GOOD | -100,000 |
| Heating/Cooling | CH&A | CH&A | | CH&A | | CH&A | |
| Energy Efficient Items | GOOD | STANDARD | +20,000 | STANDARD | +20,000 | STANDARD | +20,000 |
| Garage/Carport | 4 CAR GARAGE, STOR | 3 CAR GARAGE, CARPORT | +5,000 | 3 CAR GAR | +13,000 | 3 CAR GAR | +13,000 |
| Porch/Patio/Deck | STOOP | STOOP | | STOOP | | STOOP | |
| EXTRAS | FP/ELEV/GATE | POOL | -9,000 | 1 FP/POOL | -10,000 | 2 FP | +7,000 |
| EXTRAS | PATIO/DECK | DECK/PATIO/FENCE | -3,000 | SCPCH/PATIO/DECK | -6,000 | 2 SCPCH/DECK | -7,000 |
| KITCHEN EQUIPMENT | NONE | KITCH EQUIP | -8,000 | KITCH EQUIP | -8,000 | KITCH EQUIP | -8,000 |
| Net Adjustment (Total) | | [ ] + [X] - | $ -20,200 | [X] + [ ] - | $ 67,200 | [ ] + [X] - | $ -175,000 |
| Adjusted Sale Price of Comparables | | Net Adj. 3.6 % Gross Adj. 29.4 % | $ 748,800 | Net Adj. 10.6 % Gross Adj. 97.5 % | $ 698,200 | Net Adj. 20.6 % Gross Adj. 78.5 % | $ 675,000 |

SALES COMPARISON APPROACH

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s) MLS/PUB. RECORD

My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data Source(s) MLS/PUB. RECORD

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | NONE | NONE | NONE | NONE |
| Price of Prior Sale/Transfer | NONE | NONE | NONE | NONE |
| Data Source(s) | MLS/PUB. RECORD | MLS/PUB. RECORD | MLS/PUB. RECORD | MLS/PUB. RECORD |
| Effective Date of Data Source(s) | 01/14/2010 | 01/14/2010 | 03/11/2010 | 01/14/2010 |

Analysis of prior sale or transfer history of the subject property and comparable sales MY RESEARCH REVEALED NO SALE/TRANSFER TRANSACTIONS OF THE SUBJECT IN THE PAST THREE YEARS. NO SALE/TRANSFER TRANSACTIONS OF THE COMPARABLES HAVE BEEN RECORDED IN THE PAST YEAR.

Summary of Sales Comparison Approach ALL SALES ARE THE MOST RECENT MARKET TRANSACTIONS TO OCCUR NEAR THE SUBJECT THAT WERE SIMILAR IN DESIGN AND MARKET APPEAL. THE APPRAISER HAD EXPAND THE SEARCH RADIUS AND SALES DATE WINDOW TO INCLUDE LARGER, SIMILAR QUALITY HOMES COMPETING AREAS WITH WATERFRONT CHARACTERISTICS. SOME LOCATION ADJUSTMENTS WERE, HOWEVER, REQUIRED BASED ON MARKET DATA CALCULATIONS FOR COMPS 1, 3, 4 AND 5. COMPS 1 AND 2 ARE LOCATED IN AREAS WITH MORE CONFORMITY AND LESS DEFERRED MAINTENANCE AMONG THE PROPERTIES CREATING SUPERIOR MARKET APPEAL; COMPS 4 AND 5 ARE LOCATED IN GATED COMMUNITIES WHICH HAVE GREATER APPEAL DUE TO ADDED AMENITIES AND PRIVACY. ADJUSTMENTS WERE BASED ON PAIRED SALES ANALYSIS. COMPS 1, 3, 4 AND 5 WERE ADJUSTED FOR ACREAGE. A MARKET DERIVED ADJUSTMENT OF $30,000 PER ACRE WAS APPLIED TO ALL COMPS WITH A DIFFERENCE OF MORE THAN .20 OF AN ACRE TO ALLOW FOR SURPLUS LAND. **SEE ADDITIONAL

Indicated Value by Sales Comparison Approach $ 700,000

RECONCILIATION

Indicated Value by: Sales Comparison Approach $ 700,000 Cost Approach (if developed) $ 730,563 Income Approach (if developed) $ NO

BOTH THE MARKET DATA ANALYSIS AND THE COST APPROACH TO VALUE SUPPORTED EACH OTHER'S FINDINGS. THE INCOME APPROACH TO VALUE WAS NOT WITHIN THE SCOPE OF WORK REQUIRED TO PROVIDE A CREDIBLE ESTIMATE OF MARKET VALUE.

This appraisal is made [X] "as is", [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: **SEE ADDITIONAL COMMENTS**

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 700,000, as of 03/24/2010, which is the date of inspection and the effective date of this appraisal.

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 47 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 12 of 46

Main File No. 010031267 Page #5

# Uniform Residential Appraisal Report

File # 010031267

**ADDITIONAL COMMENTS**

THE APPRAISER MAKES KNOWN THAT THE APPRAISAL ASSIGNMENT PRESENTED TO THE APPRAISER WAS TO ESTIMATE THE MARKET VALUE OF THE FEE SIMPLE INTEREST OF THE SUBJECT PROPERTY IN THE "AS IS" CONDITION AS OF THE INSPECTION DATE, CONSIDERING THAT A CERTIFICATE OF OCCUPANCY (C/O) HAS NOT YET BEEN GRANTED GIVEN PROPERTY CHARACTERISTICS INVOLVING CONSTRUCTION SET-BACK VIOLATIONS. THE APPRAISER HEREBY SUPPLEMENTS THE SCOPE OF WORK AS DESCRIBED WITHIN THIS REPORT BY DISCLOSING AND MAKING THE EXTRAORDINARY ASSUMPTION THAT THE PROPER METHOD FOR APPRAISING THE SUBJECT "AS-IS" WOULD BE TO IDENTIFY THE FACTORS THAT PREVENT THE C/O ISSUANCE, ANALYZE THE COST TO CURE THE DEFICIENCIES, SUBTRACT THAT AMOUNT IN DOLLARS WITHIN THE CONDITION ADJUSTMENTS FOR THE SUBJECT, AND INCLUDE ANY FINANCIAL EQUIVALENT RELATING TO THE IMPACT ON MARKETABILITY GIVEN A POTENTIAL BUYER'S HESITANCY TO BECOME INVOLVED IN THE PURCHASE OF A PROPERTY UNDER THE SAME TYPE CONDITIONS. ADDITIONALLY, THE EXTRAORDINARY ASSUMPTION IS MADE THAT THE BUILDING INSPECTOR'S COMMENTS ARE ACCURATE WHICH INDICATE THAT THE STAIR RE-LOCATION IS THE ONLY ITEM PREVENTING THE C/O ISSUANCE. IF THE METHODOLOGY ASSUMPTION IS FOUND TO BE INCORRECT OR IF ADDITIONAL UNKNOWN ITEMS BECOME REQUIRED FOR THE C/O ISSUANCE, THEN THE FINAL VALUE ESTIMATE WITHIN THIS REPORT MIGHT BE NEGATIVELY AFFECTED.

"THE INTENDED USER OF THIS APPRAISAL REPORT IS THE LENDER/CLIENT. THE INTENDED USE IS TO EVALUATE THE PROPERTY THAT IS THE SUBJECT OF THIS APPRAISAL FOR A CONSTRUCTION TO PERMANENT/MORTGAGE FINANCE TRANSACTION, SUBJECT TO THE STATED SCOPE OF WORK, PURPOSE OF THE APPRAISAL, AND THE DEFINITION OF MARKET VALUE. NO ADDITIONAL INTENDED USES ARE IDENTIFIED BY THE APPRAISER."

THE APPRAISER ALSO MAKES KNOWN THAT I HAVE PROVIDED A PRIOR SERVICE ON THE SUBJECT PROPERTY WITHIN THE LAST THREE YEARS AS MADE KNOWN AT THE TIME OF ENGAGEMENT FOR THIS ASSIGNMENT.

**COST APPROACH TO VALUE (not required by Fannie Mae)**

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) ESTIMATED SITE VALUE DETERMINED USING SIMILAR VACANT LAND SALES AND LISTINGS FROM LOCAL MLS AND PUBLIC RECORDS. COMPARABLE LAND SALES IN THE SUBJECT AREA RANGE FROM $50,000 TO $129,500. SITE VALUE CONCLUSIONS WERE CONFIRMED THROUGH THE PROCESS OF EXTRACTION.

ESTIMATED [ ] REPRODUCTION OR [X] REPLACEMENT COST NEW

Source of cost data LOCAL BUILDERS & MARSHALL AND SWIFT

Quality rating from cost service VGD Effective date of cost data 02/23/2010

Comments on Cost Approach (gross living area calculations, depreciation, etc.) IMPROVEMENTS COST DATA OBTAINED FROM LOCAL BUILDERS AND MARSHALL & SWIFT COST HANDBOOK. PHYSICAL DEPRECIATION CALCULATED USING ECONOMIC AGE-LIFE METHOD. FUNCTIONAL DEPRECIATION DERIVED FROM MARKET DATA SOFT COMPARISONS. THE COST APPROACH WITHIN THIS REPORT IS NOT INTENDED TO BE USED FOR INSURANCE PURPOSES.

Estimated Remaining Economic Life (HUD and VA only) 72 Years

| OPINION OF SITE VALUE | | | | =$ | 80,000 |
|---|---|---|---|---|---|
| DWELLING | 7,044 Sq.Ft. @ $ | 110.26 | | =$ | 776,671 |
| | Sq.Ft. @ $ | | | =$ | |
| 3RD LEVEL/FPS/PATIO/DECK/EXTRAS | | | | =$ | 45,000 |
| Garage/Carport INC ABOVE Sq.Ft. @ $ | | | | =$ | |
| Total Estimate of Cost-New | | | | =$ | 821,671 |
| Less | Physical | Functional | External | | |
| Depreciation | 32,867 | 123,251 | | =$( | 156,118) |
| Depreciated Cost of Improvements | | | | =$ | 665,553 |
| "As-is" Value of Site Improvements | | | | =$ | 10,000 |
| INDICATED VALUE BY COST APPROACH | | | | =$ | 755,553 |

**INCOME APPROACH TO VALUE (not required by Fannie Mae)**

Estimated Monthly Market Rent $ N/A X Gross Rent Multiplier N/A = $ NO Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM) THE INCOME APPROACH WAS NOT WITHIN THE SCOPE OF WORK REQUIRED TO ACCURATELY ESTIMATE MARKET VALUE.

**PROJECT INFORMATION FOR PUDs (if applicable)**

Is the developer/builder in control of the Homeowners' Association (HOA)? [ ] Yes [X] No Unit type(s) [X] Detached [ ] Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project N/A

Total number of phases N/A Total number of units N/A Total number of units sold N/A

Total number of units rented N/A Total number of units for sale N/A Data source(s) N/A

Was the project created by the conversion of existing building(s) into a PUD? [ ] Yes [ ] No If Yes, date of conversion. N/A

Does the project contain any multi-dwelling units? [ ] Yes [ ] No Data Source N/A

Are the units, common elements, and recreation facilities complete? [ ] Yes [ ] No If No, describe the status of completion. N/A

Are the common elements leased to or by the Homeowners' Association? [ ] Yes [ ] No If Yes, describe the rental terms and options. N/A

Describe common elements and recreational facilities. N/A

Freddie Mac Form 70 March 2005 Page 3 of 6 Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # 810031207

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 49 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 14 of 46

Main File No. B1003 1207 Page #7

# Uniform Residential Appraisal Report

File # B1003 1207

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Freddie Mac Form 70 March 2005 Page 5 of 6 Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**APPRAISER**

Signature [signature]
Name DAVID DATES
Company Name BERESFORD APPRAISALS GROUP, LLC
Company Address 293 SEVEN FARMS DR, STE C-114, CHARLESTON, SC 29492
Telephone Number (843) 884-0806
Email Address DAVID@BERESFORDAPPRAISALS.COM
Date of Signature and Report March 26, 2010
Effective Date of Appraisal 03/24/2010
State Certification # CR 3507
or State License #
or Other (describe) State #
State SC
Expiration Date of Certification or License 6/30/2010

ADDRESS OF PROPERTY APPRAISED
4321 WATERVIEW CIR
NORTH CHARLESTON, SC 29418

APPRAISED VALUE OF SUBJECT PROPERTY $ 700,000

LENDER/CLIENT
Name ATTN
Company Name WELLS FARGO BANK NA
Company Address 3503 PHILLIPS HIGHWAY, SUITE 400, 2ND FLOOR, JACKSONVILLE, FL 32207
Email Address

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature
Name
Company Name
Company Address
Telephone Number
Email Address
Date of Signature
State Certification #
or State License #
State
Expiration Date of Certification or License

SUBJECT PROPERTY

[ ] Did not inspect subject property
[ ] Did inspect exterior of subject property from street
Date of Inspection
[ ] Did inspect interior and exterior of subject property
Date of Inspection

COMPARABLE SALES

[ ] Did not inspect exterior of comparable sales from street
[ ] Did inspect exterior of comparable sales from street
Date of Inspection

# Uniform Residential Appraisal Report

File # 810031267

**SALES COMPARISON APPROACH**

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 4321 WATERVIEW CIR NORTH CHARLESTON, SC 29410 | 4241 CLUB COURSE DR NORTH CHARLESTON, SC 29420 | | 875 PARROT CREEK WAY CHARLESTON, SC 29412 | | 5321 WATERVIEW DR NORTH CHARLESTON, SC 29405 | |
| Proximity to Subject | | 6.06 miles NW | | 11.26 miles SE | | 0.27 miles W | |
| Sale Price | $ N/A | | $ 699,777 | | $ 730,000 | | $ 849,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 130.22 sq.ft. | | $ 107.68 sq.ft. | | $ 196.62 sq.ft. | |
| Data Source(s) | | MLS#2020480/DOM 304 | | MLS#2927040/DOM 69 | | MLS#2030250/ACTIVE LISTING | |
| Verification Source(s) | | MLS/PUB. REC. | | MLS/PUB. REC. | | MLS/PUB. REC. | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CONV | | CONV | | ACTIVE LST LISTED -7% | -59,400 |
| Date of Sale/Time | | 10/16/2009 | | 01/15/2010 | | LST 11/13/2009 | |
| Location | AVERAGE | GOOD+ | -10,000 | GOOD+ | -10,000 | AVERAGE | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 0.34 +/- ACRES | 0.80 +/- ACRES | -6,600 | 0.47 +/- ACRES | | 0.62 +/- ACRES | -7,200 |
| View | MARSHVIEW | GOLF CRSE | | MARSHVIEW | | RIVERFRONT- | -175,000 |
| Design (Style) | 3STY/BRICK | 2STY/BRICK | | 3STY/BRICK | | 3STY/VINYL | +30,000 |
| Quality of Construction | VERY GOOD | VERY GOOD | | VERY GOOD | | VERY GOOD | |
| Actual Age | 2007 | 2005 | | 1995 | +13,000 | 1970/RENOV | +20,000 |
| Condition | AVERAGE | VERY GOOD | -20,000 | GOOD | -20,000 | GOOD | -20,000 |
| Above Grade Room Count (Total / Bdrms. / Baths) | 15 / 8 / 5F | 11 / 5 / 5F1H | -3,000 | 11 / 5 / 3F1H | +9,000 | 11 / 6 / 5F1H | -3,000 |
| Gross Living Area | 7,044 sq.ft. | 5,374 sq.ft. | +83,500 | 3,000 sq.ft. | +157,700 | 4,318 sq.ft. | +136,300 |
| Basement & Finished Rooms Below Grade | NONE | NONE NONE | | NONE NONE | | NONE PRVT DOCK/LIFT | -55,000 |
| Functional Utility | FAIR | AVERAGE- | -75,000 | GOOD | -100,000 | AVERAGE | -50,000 |
| Heating/Cooling | CH&A | CH&A | | CH&A | | CH&A | |
| Energy Efficient Items | GOOD | GOOD | | GOOD | | STANDARD | +20,000 |
| Garage/Carport | 4 CAR GAR(MAX) 3/B[illegible] | 3 CAR GAR | +13,000 | 3 CAR GAR | +13,000 | 2 CAR GAR | +21,000 |
| Porch/Patio/Deck | STOOP | C-FRNT | -5,000 | WRAP PRCH | -10,000 | STOOP | |
| EXTRAS | 3FP/ELEV SHAFT | 1 FP | +11,000 | 2 FP | +7,000 | 2 FP/POOL | -13,000 |
| EXTRAS | PATIO/DECK | C-PAT/FENCE | +2,000 | SCPCH | +2,000 | DECK | +5,000 |
| KITCHEN EQUIPMENT | NONE | KITCH EQUIP | -8,000 | KITCH EQUIP | -8,000 | KITCH EQUIP | -8,000 |
| Net Adjustment (Total) | | [ ] + [X] - | $ -40,100 | [X] + [ ] - | $ 23,700 | [ ] + [X] - | $ -149,300 |
| Adjusted Sale Price of Comparables | | Net Adj. 6.9 % Gross Adj. 38.2 % | $ 651,077 | Net Adj. 3.2 % Gross Adj. 52.0 % | $ 753,700 | Net Adj. 17.5 % Gross Adj. 74.4 % | $ 699,700 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

**SALE HISTORY**

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | NONE | NONE | NONE | NONE |
| Price of Prior Sale/Transfer | NONE | NONE | NONE | NONE |
| Data Source(s) | MLS/PUB. RECORD | MLS/PUB. RECORD | MLS/PUB. RECORD | MLS/PUB. RECORD |
| Effective Date of Data Source(s) | 01/14/2010 | 02/04/2010 | 01/14/2010 | 01/14/2010 |

Analysis of prior sale or transfer history of the subject property and comparable sales NONE

**ANALYSIS / COMMENTS**

Analysis/Comments COMPARABLES SIX THROUGH EIGHT ARE ACTIVE LISTINGS IN THE SUBJECT'S AREA AND ARE INCLUDED IN THE REPORT AS SUPPORTING DATA. THESE COMPARABLES ARE INDICATIVE OF COMPETING PROPERTIES IN THE AREA. LIST TO SALE PRICE RATIOS RANGED FROM 0% TO A 11% DROP. THE AVERAGE WAS ROUGHLY -7% WHICH HAS BEEN APPLIED TO THE LIST PRICES WITH THE EXCEPTION OF COMP EIGHT WHICH IS A SHORT SALE LISTING. SHORT SALE LISTINGS GENERALLY START AT A LOW/LIQUIDATION LIST PRICE AND SELL RIGHT AT AND OFTEN HIGHER THAN THE LIST PRICE. FOR THIS REASON, NO LIST TO SALE PRICE RATIO/NEGOTIATION ADJUSTMENT WAS FELT WARRENTED.

Main File No. B10031267 Page #10

# Uniform Residential Appraisal Report

File # B10031267

**SALES COMPARISON APPROACH**

| FEATURE | SUBJECT | COMPARABLE SALE # 7 | | COMPARABLE SALE # 8 | | COMPARABLE SALE # 9 | |
|---|---|---|---|---|---|---|---|
| Address | 4321 WATERVIEW CIR NORTH CHARLESTON, SC 29418 | 4795 SEBASTIAN CT NORTH CHARLESTON, SC 29405 | | 4041 ASHLEY VIEW LN NORTH CHARLESTON, SC 29405 | | | |
| Proximity to Subject | | 0.80 miles SE | | 1.00 mile SE | | | |
| Sale Price | $ N/A | | $ 1,175,000 | | $ 800,000 | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 282.45 sq.ft. | | $ 229.89 sq.ft. | | $ sq.ft. | |
| Data Source(s) | | MLS#2031080/ACTIVE LISTING | | MLS#2911408/ACTIVE LISTING | | | |
| Verification Source(s) | | MLS/PUB. REC. | | MLS/PUB. REC. | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | ACTIVE LST LISTED -7% | -82,250 | ACTIVE LST SHRT SALE LST | | | |
| Date of Sale/Time | | LST 12/3/2009 | | LST 4/25/2009 | | | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | | |
| Site | 0.34 +/- ACRES | 0.25 +/- ACRES | | 0.25 +/- ACRES | | | |
| View | MARSHVIEW | RIVERFRONT | -225,000 | TIDL CRK/RIVER VIEW | -175,000 | | |
| Design (Style) | 3STY/BRICK | 3STY/BRICK | | 3STY/CMTPLK | +30,000 | | |
| Quality of Construction | VERY GOOD | GOOD+ | +25,000 | VERY GOOD | | | |
| Actual Age | 2007 | 1992 | +15,000 | 2007 | | | |
| Condition | AVERAGE | GOOD | -20,000 | GOOD | -20,000 | | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 15 / 6 / 5F | 10 / 4 / 3F | +3,000 | 10 / 4 / 3 | +12,000 | | |
| Gross Living Area | 7,044 sq.ft. | 4,160 sq.ft. | +144,200 | 3,480 sq.ft. | +178,050 | sq.ft. | |
| Basement & Finished Rooms Below Grade | NONE | NONE PRVT DOCK/LIFT | -55,000 | NONE SML PRVT DOCK | -40,000 | | |
| Functional Utility | FAIR | AVERAGE | -50,000 | GOOD | -100,000 | | |
| Heating/Cooling | CH&A | CH&A | | CH&A | | | |
| Energy Efficient Items | GOOD | GOOD | | GOOD | | | |
| Garage/Carport | 4 CAR GAR/XL STRG | 4 CAR GAR/XL STRG | | 2 CAR GAR | +21,000 | | |
| Porch/Patio/Deck | STOOP | C-STOOP | -2,000 | C-STOOP | -2,000 | | |
| EXTRAS | 3FP/ELEV.SHAFT | 1FP/ELEV/POOL | -36,000 | 2FP | +7,000 | | |
| EXTRAS | PATIO/DECK | PAT/FENC/DCK/SCPCH | -9,000 | FENCE/DECK/SCPCH | -2,000 | | |
| KITCHEN EQUIPMENT | NONE | KITCH EQUIP | -8,000 | KITCH EQUIP | -8,000 | | |
| Net Adjustment (Total) | | [ ] + [X] - | $ -300,050 | [ ] + [X] - | $ -98,050 | [ ] + [ ] - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. 25.5 % Gross Adj. 57.4 % | $ 874,950 | Net Adj. 12.4 % Gross Adj. 74.4 % | $ 701,950 | Net Adj. % Gross Adj. % | $ |

**SALE HISTORY**

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 7 | COMPARABLE SALE # 8 | COMPARABLE SALE # 9 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | NONE | NONE | NONE | |
| Price of Prior Sale/Transfer | NONE | NONE | NONE | |
| Data Source(s) | MLS/PUB. RECORD | MLS/PUB REC | MLS/PUB REC | |
| Effective Date of Data Source(s) | 01/14/2010 | 02/03/2010 | 02/03/2010 | |

Analysis of prior sale or transfer history of the subject property and comparable sales NONE

**ANALYSIS / COMMENTS**

Analysis/Comments COMPARABLES SIX THROUGH EIGHT ARE ACTIVE LISTINGS IN THE SUBJECT'S AREA AND ARE INCLUDED IN THE REPORT AS SUPPORTING DATA. THESE COMPARABLES ARE INDICATIVE OF COMPETING PROPERTIES IN THE AREA. LIST TO SALE PRICE RATIOS RANGED FROM 0% TO A 11% DROP. THE AVERAGE WAS ROUGHLY -7% WHICH HAS BEEN APPLIED TO THE LIST PRICES WITH THE EXCEPTION OF COMP EIGHT WHICH IS A SHORT SALE LISTING. SHORT SALE LISTINGS GENERALLY START AT A LOW/LIQUIDATION LIST PRICE AND SELL RIGHT AT AND OFTEN HIGHER THAN THE LIST PRICE. FOR THIS REASON, NO LIST TO SALE PRICE RATIO/NEGOTIATION ADJUSTMENT WAS FELT WARRENTED.

Form 1004.(AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## General Text Addendum

File No. 810031267

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | |
| Property Address | 4331 WATERVIEW CIR | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State SC | Zip Code 29410 |
| Lender | WELLS FARGO BANK NA | | | | |

• URAR : Neighborhood - Description

THE COMMERCIAL PROPERTIES ARE GENERALLY LOCATED ALONG DORCHESTER RD. WENDELL B. GOODWIN ELEMENTARY IS ALSO LOCATED NEAR THE ENTRANCE TO EVANSTON ESTATES. THE HIGHER VALUED HOMES WITH THE AREA VALUE RANGE CONSIST OF THE HIGHER QUALITY WATERFRONT HOMES ALONG THE ASHLEY RIVER. CONVENIENCE TO SCHOOLS, PLACES OF WORSHIP, AND RECREATIONAL FACILITIES IS CONSIDERED GOOD.

• URAR : Neighborhood - Market Conditions

CURRENTLY, THERE ARE A FEW HOMES LISTED FOR SALE, AND SEVERAL HOMES HAVE SOLD IN THE PAST YEAR WITHIN EVANSTON ESTATES, THOUGH MOST OF THE HOMES ARE SMALLER AND LOCATED ON INTERIOR LOTS WITH A MEDIAN PRICE POINT OF $170,000 +/-. APPEAL FOR THE MARKET IS CONSIDERED AVERAGE. THERE ARE NO KNOWN ADVERSE FACTORS AFFECTING MARKETABILITY.

• URAR : Site - Highest and Best not Used

THE APPRAISER MAKES CLEAR THAT, GIVEN THE SUBJECT'S R-1 ZONING, A LEGALLY COMPLIANT SINGLE FAMILY HOME IS THE HIGHEST AND BEST USE. THE SUBJECT'S FRONT STAIRS ARE PRESENTLY CONSIDERED "NON-COMPLIANT," GIVEN SET-BACK REQUIREMENTS, BUT THAT IS A SEPARATE ISSUE THAN ANALYZING THE GENERAL PRESENT USE WHICH IS CURRENTLY CONSIDERED TO BE THE HIGHEST AND BEST USE.

• URAR : Site - Adverse Conditions or External Factors

THE REQUIRED RE-LOCATION OF THE "NON-COMPLIANT" FRONT STAIRS IS THE ONLY ISSUE PREVENTING THE ISSUANCE OF THE REQUIRED CERTIFICATE OF OCCUPANCY. THE PRESENT OWNER'S APPLICATION FOR A VARIANCE TO ACCEPT THE PRESENT LOCATION OF THE STAIRS HAS BEEN DENIED. FOR THESE REASONS, MODIFICATION/RE-LOCATION OF A PORTION OF THE STAIRS IS REQUIRED PRIOR TO OCCUPANCY. AS DESCRIBED WITHIN THE SCOPE OF WORK, THIS APPRAISAL ASSIGNMENT, AS DIRECTED BY THE LENDER/CLIENT IS TO ESTIMATE THE "AS-IS" VALUE OF THE SUBJECT PROPERTY WITHOUT THE CERTIFICATE OF OCCUPANCY.

THE APPRAISER ALSO MAKES KNOWN THAT THE LEGAL NON-CONFORMING STATUS, AS DESCRIBED UNDER ZONING COMPLIANCE, PERTAINS TO THE HEIGHT OF THE SUBJECT HOME. PER NORTH CHARLESTON PLANNING AND ZONING, THE SUBJECT HOME WAS CONSTRUCTED PRIOR TO RECENT LOCAL RE-DISTRICTING WHICH PLACED A 35 FT MAXIMUM ON CONSTRUCTION HEIGHT. THE PRESENT NON-CONFORMING DESIGNATION, AS PERTAINING TO THE SUBJECT'S HEIGHT, IS NOT FELT TO ADVERSELY AFFECT MARKETABILITY OR VALUE. THE SUBJECT'S EXISTING THIRD LEVEL, WHICH IS PRESENTLY STORAGE BUT HAS THE POTENTIAL FOR LIVING AREA (SEE ATTACHED PHOTOS.) CAN LEGALLY BE FINISHED/COMPLETED IF THE OWNER CHOSE TO DO SO. ONLY NEW EXTERNAL CONSTRUCTION ABOVE 35 FT WOULD BE RESTRICTED.

THE APPRAISER MAKES NO REPRESENTATION OF TOXIC SUBSTANCES, HAZARDOUS WASTE, OR ADVERSE ENVIRONMENTAL CONDITIONS, THOUGH NONE WERE READILY APPARENT. FINAL DETERMINATION OF FLOOD ZONE LIES IN THE SURVEY. PROPERTIES IN FLOOD HAZARD ZONES IN THIS AREA ARE COMMON. AFFECT ON MARKETABILITY IS NEGLIGIBLE.

• URAR : Improvements - Additional Features

THE SUBJECT'S ADDITIONAL FEATURES INCLUDE BRAZILLIAN CHERRY FLOORING WITH CUSTOM INLAYS, GRANITE COUNTERTOPS, A CATHEDRAL FOYER, A LARGE MASTER SUITE WITH DOUBLE SIDED FIREPLACE, A DOUBLE VANITY, DECORATIVE COLUMNS AND A JETTED TUB IN THE MASTER BATHROOM, THREE WALK-IN CLOSETS, A DRESSING AREA WITH WET BAR, CERAMIC TILE FLOORING IN ALL BATHS, UPGRADED CABINETRY THROUGHOUT, THREE TANKLESS GAS HOT WATER UNITS, CROWN MOULDING, CHAIRAIL, ARCHED DOORWAYS, A LARGE FAMILY ROOM WITH FIREPLACE AND BUILT-IN SHELVING, AN ELEVATOR SHAFT, AN ELEVATED FOUNDATION WITH 4 CAR PARKING AND AMPLE STORAGE, A LARGE FRONT RAISED PATIO WITH STAIR SURROUND AND PLUMMED FOR A COY POND, AND A LARGE REAR DECK WITH MARSH VIEWS.

• URAR : Improvements - Condition of the Property

ADDITIONAL MINOR PUNCH LIST ITEMS STILL REMAIN TO BE DONE WHICH INCLUDE MINOR DRYWALL PATCHES, TOUCH-UP PAINT, AND INSTALLATION OF HVAC DUCT REGISTERS. AS PER THE APPRAISAL ASSIGNMENT, THE APPRAISAL WAS MADE IN THE "AS IS" CONDITION. THE APPRAISER ASSUMES THAT IMPROVEMENTS ARE STRUCTURALLY SOUND AND THAT THE MECHANICAL SYSTEMS ARE IN NORMAL WORKING ORDER.

• URAR : Improvements - Physical Deficiencies or Adverse Conditions

THE APPRAISER IS NOT ACTING AS A HOME INSPECTOR WHEN PREPARING THIS REPORT. THIS APPRAISAL REPORT IS PREPARED TO PROVIDE AN OPINION OF VALUE ONLY. THIS INSPECTION IS NOT TECHNICALLY EXHAUSTIVE AND DOES NOT OFFER WARRANTIES OR GUARANTEES OF ANY KIND.

• URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach

COMPS 1, 2, 3, 6, 7 AND 8 WERE ADJUSTED FOR VIEW. COMP 1 HAS SUPERIOR PANORAMIC MARSH VIEWS AS COMPARED WITH THE SUBJECT'S MORE OBSCURED MARSHVIEW PERSPECTIVE. COMP 2 ENJOYS A TIDAL CREEK LOCATION AND MARSHVIEWS WITH A PRIVATE DOCK, COMP 3 HAS A RIVER VIEW WITH A SHARED DOCK ON DEEP WATER AND IS LOCATED BELOW A LOCAL TRAIN TRESTLE PROVIDING UNOBSTRUCTED ACCESS TO THE CHARLESTON HARBOR AND OCEAN. COMP 6 IS LOCATED ON A RIVERFRONT DEEP WATER LOT WITH A PRIVATE DOCK SITUATED ABOVE THE SAME TRAIN TRESTLE, LIMITING ACCESS TO THE CHAS. HARBOR AND THE OPEN WATERS OF THE ATLANTIC. THE TRAIN TRESTLE REFERENCED DOES OPEN DURING CERTAIN HOURS, BUT ITS PRESENCE CREATES LIMITED ACCESS TO PROPERTIES UP-RIVER. SUPERIOR VIEWS AND THE ABILITY TO ACCESS DEEP WATER HOLD A HIGHER MARKET VALUE AND APPEAL AS COMPARED TO THE SUBJECT'S MARSH VIEW.

## General Text Addendum

File No. 010031267

| | | | |
|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | |
| Property Address | 4321 WATERVIEW CIR | | |
| City | NORTH CHARLESTON | County CHARLESTON | State SC Zip Code 29418 |
| Lender | WELLS FARGO BANK NA | | |

COMPS 6 AND 8 ARE ADJUSTED FOR DESIGN. THESE COMPS HAVE INFERIOR SIDING CONSIDERATIONS WHICH HOLD A LOWER MARKET VALUE AND APPEAL AS COMPARED TO THE SUBJECT'S BRICK EXTERIOR. COMPS 2 AND 7 ARE ADJUSTED FOR QUALITY. THE APPRAISER UTILIZED MLS PHOTOS AND AGENT NOTES TO DETERMINE THE COMPS' INTERIOR QUALITY AND CONDITION. APPROPRIATE ADJUSTMENTS WERE MADE AS REQUIRED BASED ON CONSTRUCTION COSTS AND THE IMPACT ON MARKETABILITY FOR EACH PROPERTY TO BRING THEM IN LINE WITH THE SUBJECT. THE MORE DATED COMPS WERE ADJUSTED FOR AGE. AN ADJUSTMENT OF $1,000 PER YEAR WAS APPLIED TO THESE COMPS TO ALLOW FOR DEPRECIATION.

CONDITION ADJUSTMENTS WERE ALSO MADE AS REQUIRED PER PROPERTY DESCRIPTIONS. AS MENTIONED, THE SUBJECT IS FELT TO BE 95% COMPLETE GIVEN THE LACK OF KITCHEN EQUIPMENT, MISSING FIXTURES, PUNCH LIST ITEMS, AND THE REQUIRED STAIR-RELOCATION. THE LACK OF KITCHEN EQUIPMENT WAS ADJUSTED AS A SEPARATE LINE ITEM LUMP SUM AT THE BOTTOM OF THE COMPARABLE GRIDS. THE COMPLETION COSTS FOR THE MISSING FIXTURES AND PUNCH LIST ITEMS IS ESTIMATED AT $3,000. COST MANUALS AND LOCAL CONTRACTORS INDICATE THE REQUIRED STAIR DEMOLITION AND RELOCATION TO COST $5,000. IN ADDITION TO ACTUAL COSTS, THE IMPACT ON MARKETABILITY FOR THE INCOMPLETE STATE OF THE HOME IS ESTIMATED AT $12,000. THESE ADJUSTMENT CONSIDERATIONS HAVE ALL BEEN MADE UNDER CONDITION ADJUSTMENTS TO EACH COMP TO ALLOW FOR THE "AS-IS" STATE OF THE SUBJECT HOME.

THE APPRAISER AGAIN NOTES THE SUBJECT HOME IS CONSIDERED AN OVER-IMPROVEMENT FOR THE NEIGHBORHOOD, AS THE SQUARE FOOTAGE GREATLY EXCEEDS THE AVERAGE HOME SIZE FOR THE AREA. THE APPRAISER REDUCED THE PRICE PER SQUARE FOOT ADJUSTMENT AMONG THE COMPS TO AVOID DISTORTION FROM ADJUSTMENT AND ADDITIONALLY APPLIED VARYING ADJUSTMENTS FOR FUNCTIONAL UTILITY. COMP 1 WAS SIMILARLY FELT TO BE AN OVER-IMPROVEMENT FOR ITS AREA AND REQUIRED NO FUNCTIONAL UTILITY ADJUSTMENT. OTHER COMPS WERE ADJUSTED AS NEEDED GIVEN THEIR RELATIVE CONFORMITY TO THEIR IMMEDIATE AREAS.

WITH REGARD TO THE DOCK ADJUSTMENTS, THE APPRAISER MAKES KNOWN THAT MANY VARIABLES EXIST WHICH MUST BE CONSIDERED, AND APPROPRIATE ADJUSTMENTS MADE ACCORDINGLY. SOME TRACTS EXIST WHICH OFFER ONLY MARSH OR WATERFRONT VIEWS WHERE NO DOCK PERMIT WOULD BE GRANTED. OTHER WATERFRONT TRACTS EXIST WHICH WOULD BE GRANTED A PERMIT, BUT THE PERMIT IS NOT YET IN HAND. THEN THERE ARE WATERFRONT TRACTS WITH DOCK PERMITS ALREADY IN HAND WHICH INCREASES MARKETABILITY. THE NEXT LEVEL WOULD BE WATERFRONT TRACTS WITH EXISTING DOCKS IN PLACE. EXISTING DOCKS CAN BE COMMUNITY DOCKS, SHARED DOCKS (GENERALLY SHARED BY TWO ADJACENT PARCELS.) AND PRIVATE DOCKS. EXISTING DOCKS ALSO HAVE DIFFERING QUALITY LEVELS WHICH MAY INCLUDE DOCK LENGTH, MATERIALS USED, COVERED PIERHEADS, PRIVATE FLOATING DOCKS, JET DOCKS, MOORING STATIONS, AND/OR BOATLIFTS. EACH OF THE POTENTIAL VARIABLES MENTIONED IMPACTS VALUE WHEN CONSIDERING THE SPECIALIZED WATERFRONT MARKET. THE COMPS WITHIN THIS REPORT WERE ANALYZED AND ADJUSTED AS REQUIRED GIVEN THEIR VARYING CHARACTERISTICS. ADJUSTMENT SIZES WERE BASED ON CONTRUCTION COSTS IN CONCERT WITH THE IMPACT ON MARKETABILITY.

ENERGY EFFICIENCY ADJUSTMENTS WERE ALSO MADE AS NEEDED FOR THE OLDER COMPS WHICH LACKED MODERN CONSTRUCTION EFFICIENCY FEATURES (THERMAL WINDOWS, TANKLESS GAS HOT WATER, INSULATION UPGRADES, ETC.) VARIOUS OTHER AMENITY ADJUSTMENTS WERE ALSO MADE AS NEEDED BASED ON THE IMPACT ON MARKETABILITLY. AFTER DUE CONSIDERATION, EQUAL EMPHASIS WAS AWARDED TO ALL COMPARABLES. THE APPRAISER IS AWARE OF FANNIE MAE GUIDELINES PERTAINING TO DATE OF SALE, GROSS AND NET ADJUSTMENT PERCENTAGES, AND DISTANCE. HIGH GROSS AND NET ADJUSTMENT PERCENTAGES WERE UNAVOIDABLE DUE PRIMARILY TO THE DIFFERENCES IN VIEWS, SQUARE FOOTAGE, AND UTILITY. THE DISTANCE GUIDELINE WAS EXCEEDED TO LOCATE THE MOST SIMILAR COMPARABLES TO THE SUBJECT IN REGARDS TO SQUARE FOOTAGE, QUALITY, AND CONDITION. THE SALES UTILIZED WERE THE MOST SIMILAR COMPARABLES AVAILABLE AND, AS ADJUSTED, ARE CONSIDERED ACCURATE INDICATORS OF VALUE AND VALID SALES FOR COMPARISON.

Main File No. B1003 1267 Page # 13

# Market Conditions Addendum to the Appraisal Report

File No. B1003 1267

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

Property Address: 4321 WATERVIEW CIR City: NORTH CHARLESTON State: SC ZIP Code: 29418

Borrower: SINGLETARY, CARLA

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

## MARKET RESEARCH & ANALYSIS

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 7 | 8 | 1 | [ ] Increasing | [X] Stable | [ ] Declining |
| Absorption Rate (Total Sales/Months) | 1.17 | 2.67 | 0.33 | [ ] Increasing | [X] Stable | [ ] Declining |
| Total # of Comparable Active Listings | UNAVAILABLE | UNAVAILABLE | 33 | [ ] Declining | [ ] Stable | [ ] Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | UNAVAILABLE | UNAVAILABLE | 100.0 | [ ] Declining | [ ] Stable | [ ] Increasing |
| **Median Sale & List Price, DOM, Sale/List %** | **Prior 7–12 Months** | **Prior 4–6 Months** | **Current – 3 Months** | **Overall Trend** | | |
| Median Comparable Sale Price | 548,400 | 662,785 | 730,000 | [ ] Increasing | [X] Stable | [ ] Declining |
| Median Comparable Sales Days on Market | 277 | 216 | 63 | [ ] Declining | [X] Stable | [ ] Increasing |
| Median Comparable List Price | UNAVAILABLE | UNAVAILABLE | 756,122 | [ ] Increasing | [ ] Stable | [ ] Declining |
| Median Comparable Listings Days on Market | UNAVAILABLE | UNAVAILABLE | 218 | [ ] Declining | [ ] Stable | [ ] Increasing |
| Median Sale Price as % of List Price | 91.7 | 97.2 | 96.5 | [ ] Increasing | [X] Stable | [ ] Declining |
| Seller-(developer, builder, etc.) paid financial assistance prevalent? [X] Yes [ ] No | | | | [ ] Declining | [X] Stable | [ ] Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.). BASED ON THE APPRAISER'S EXPERIENCE IN THE AREA AND A LARGE SAMPLE OF RECENT MARKET DATA, SELLER CONTRIBUTIONS IN THE FORM OF SELLER PAID CLOSING COSTS AND PREPAIDS RANGING FROM 2-6% ARE COMMON IN THIS MARKET ON ROUGHLY 50% OF THE PURCHASES, DEPENDING ON FINANCING RESTRICTIONS. SELLER BUYDOWNS ARE UNCOMMON IN THIS MARKET. PRE-PAID CONDO FEES ARE SOMETIMES OFFERED AS MARKETING INCENTIVES.

Are foreclosure sales (REO sales) a factor in the market? [ ] Yes [X] No If yes, explain (including the trends in listings and sales of foreclosed properties).
THE APPRAISER MAKES KNOWN THAT THERE ARE A FEW FORECLOSURE SALES IN THE AREA THOUGH NOT IN NUMBERS GREAT ENOUGH TO AFFECT THE OVERALL MARKET.

Cite data sources for above information. CHARLESTON MLS HISTORY, LOCAL AGENTS, AND THE APPRAISERS FILES.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
THE APPRAISER'S LOCAL MLS IS UNABLE TO SEARCH PRIOR LISTING INFORMATION AND THEREFORE SOME DATA (AS INDICATED ABOVE) IS UNAVAILABLE AND CONCLUSIONS ON TRENDS IN THESE CATEGORIES WERE UNABLE TO BE REACHED. THE APPRAISER ANALYZED ACTIVE LISTINGS, CONTINGENT SALES, PENDING SALES, AND CLOSED SALES SIMILAR TO THE SUBJECT. THE DATA ABOVE, BY ITSELF, IS INSUFFICIENT TO DRAW A CONCLUSIVE OPINION ON TRENDS IN THE AREA. BASED ON THE LIMITED DATA ABOVE, IN CONCERT WITH THE APPRAISER'S EXPERIENCE IN THE AREA AND DATA IN THE APPRAISER'S FILES, ALL CATEGORIES ARE FELT TO BE CURRENTLY STABLE. A LARGER SAMPLE OF SALES DATA ALSO INDICATED LIST TO SALE PRICE RATIOS TO CURRENTLY BE -7%.

## CONDO/CO-OP PROJECTS

If the subject is a unit in a condominium or cooperative project, complete the following: N/A Project Name: N/A

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | N/A | N/A | N/A | [ ] Increasing | [ ] Stable | [ ] Declining |
| Absorption Rate (Total Sales/Months) | N/A | N/A | N/A | [ ] Increasing | [ ] Stable | [ ] Declining |
| Total # of Active Comparable Listings | N/A | N/A | N/A | [ ] Declining | [ ] Stable | [ ] Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | N/A | N/A | N/A | [ ] Declining | [ ] Stable | [ ] Increasing |

Are foreclosure sales (REO sales) a factor in the project? [ ] Yes [ ] No If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties. N/A

Summarize the above trends and address the impact on the subject unit and project. N/A

## APPRAISER

| | |
|---|---|
| Signature [signature] | Signature |
| Appraiser Name: DAVID BATES | Supervisory Appraiser Name |
| Company Name: BERESFORD APPRAISALS GROUP, LLC | Company Name |
| Company Address: 205 SEVEN FARMS DR, STE C-114, CHARLESTON, SC | Company Address |
| State License/Certification #: CR 3567 State: SC | State License/Certification # State |
| Email Address: DAVID@BERESFORDAPPRAISALS.COM | Email Address |

Main File No. B10031267 Page #14

## SUBJECT PHOTOS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

**SUBJECT FRONT**

4321 WATERVIEW CIR

| | |
|---|---|
| SALES PRICE | N/A |
| GROSS LIVING AREA | 7,044 |
| TOTAL ROOMS | 15 |
| TOTAL BEDROOMS | 6 |
| TOTAL BATHROOMS | 5F |
| LOCATION | AVERAGE |
| VIEW | MARSHVIEW |
| SITE | 0.34 +/- ACRES |
| QUALITY | VERY GOOD |
| AGE | 2007 |

**SUBJECT REAR**

**SUBJECT STREET**

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 57 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 22 of 46

Main File No. 010031267 Page #15

**PHOTOGRAPH ADDENDUM**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

SIDE VIEW

(FRONT STAIR PERSPECTIVE)

REAR VIEW 2

SIDE VIEW 2

Form GPICPIX — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 23 of 46

## PHOTOGRAPH ADDENDUM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

STREET SCENE 2

MARSH VIEW ACROSS ADJACENT LOT

BACKYARD PENINSULA AREA
DOG PEN

## PHOTOGRAPH ADDENDUM

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State SC | Zip Code 29410 |
| Lender | WELLS FARGO BANK NA | | | | |

KITCHEN - NO APPLIANCES INSTALLED

FAMILY ROOM

DINING RM

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 60 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 25 of 46

Main File No. [illegible] Page # [illegible]

# PHOTOGRAPH ADDENDUM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

LIVING RM

MASTER BEDROOM

MASTER BATH

Form GPICPIX — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## PHOTOGRAPH ADDENDUM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

MASTER BATH - JETTED TUB

MASTER BATH - SHOWER

WET BAR AREA WITHIN MASTER BEDROOM SITTING RM

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 62 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 27 of 46

Main File No. B10031267 Page #20

# PHOTOGRAPH ADDENDUM

| | | | |
|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | |
| Property Address | 4321 WATERVIEW CIR | | |
| City | NORTH CHARLESTON | County CHARLESTON | State SC Zip Code 29418 |
| Lender | WELLS FARGO BANK NA | | |

MASTER WALK-IN CLOSET

SECOND FLOOR BATH 2

SECOND FLOOR BATH 3

Form GPICPIX — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Main File No. 8100312071 Page #21

## PHOTOGRAPH ADDENDUM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

BEDROOM

SUN ROOM

FIRST FLOOR GUEST BEDROOM

Main File No. B10031207 Page #22

**Photograph Addendum**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

GUEST BATH

BRAZILLIAN CHERRY WITH CUSTOM INLAY

MISSING FLOOR REGISTER

CUSTOM FRONT DOORS

**Photograph Addendum**

| | | | |
|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | |
| Property Address | 4321 WATERVIEW CIR | | |
| City | NORTH CHARLESTON | County CHARLESTON | State SC Zip Code 29418 |
| Lender | WELLS FARGO BANK NA | | |

VIEW FROM THE UNFINISHED THIRD LEVEL WINDOW

INTENTIALLY UNFINISHED THIRD LEVEL - ELECTRIC IN PLACE - DUCTWORK EASILY ACCESSIBLE - IF FUTURE COMPLETION WAS DESIRED - PRESENTLY CONSIDERED STORAGE

INTENTIALLY UNFINISHED THIRD LEVEL - RIGHT SIDE

Main File No. 0100312671 Page #24

## Photograph Addendum

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | |
| City | NORTH CHARLESTON | County CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | |

REAR DECK

VIEW OF VACANT ADJACENT LOT TO THE NORTHEAST

HIGH CEILING IN FOYER - FIXTURES - INCOMPLETE AS WELL AS SOME TRIMWORK AND PAINT

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 67 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 32 of 46

Main File No. 01003120 Page #25

## Photograph Addendum

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

EXAMPLE OF TOUCH-UP PAINT REQUIRED IN MASTER BEDROOM

EXAMPLE OF MISSING FIXTURE AND LACK OF VANITY MIRRORS IN MASTER BATH

MISSING LIGHT FIXTURES IN MASTER BEDROOM

Form GPICPIX — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## COMPARABLE PHOTOS 1-3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29410 |
| Lender | WELLS FARGO BANK NA | | | | | | |

### COMPARABLE 1

1394 PARKSHORE DR

| | |
|---|---|
| PROX. TO SUBJECT | 3.30 miles SE |
| SALES PRICE | 775,000 |
| GROSS LIVING AREA | 6,145 |
| TOTAL ROOMS | 13 |
| TOTAL BEDROOMS | 6 |
| TOTAL BATHROOMS | 5F2H |
| LOCATION | GOOD |
| VIEW | [illegible] |
| SITE | 1.62 +/- ACRES |
| QUALITY | VERY GOOD |
| AGE | 1977/RENOV |

### COMPARABLE 2

1010 DOMINION DR

| | |
|---|---|
| PROX. TO SUBJECT | 5.51 miles NE |
| SALES PRICE | 631,000 |
| GROSS LIVING AREA | 3,220 |
| TOTAL ROOMS | 8 |
| TOTAL BEDROOMS | 5 |
| TOTAL BATHROOMS | 3F1H |
| LOCATION | AVERAGE |
| VIEW | CREEK/MARSH |
| SITE | 0.30 +/- ACRES |
| QUALITY | AVERAGE |
| AGE | 1974/RENOV |

### COMPARABLE 3

2419 RICE POND RD

| | |
|---|---|
| PROX. TO SUBJECT | 0.04 miles S |
| SALES PRICE | 650,000 |
| GROSS LIVING AREA | 3,481 |
| TOTAL ROOMS | 9 |
| TOTAL BEDROOMS | 4 |
| TOTAL BATHROOMS | 3F1H |
| LOCATION | GOOD |
| VIEW | RIVERFRONT |
| SITE | 0.75 +/- ACRES |
| QUALITY | VERY GOOD |
| AGE | 1989/RENOV |

Main File No. B10031267 Page #27

## COMPARABLE PHOTOS 4-6

| | |
|---|---|
| Borrower/Client | SINGLETARY, CARLA |
| Property Address | 4321 WATERVIEW CIR |
| City | NORTH CHARLESTON County CHARLESTON State SC Zip Code 29418 |
| Lender | WELLS FARGO BANK NA |

**COMPARABLE 4**

4241 CLUB COURSE DR

| | |
|---|---|
| PROX. TO SUBJECT | 6.96 miles NW |
| SALES PRICE | 899,777 |
| GROSS LIVING AREA | 5,374 |
| TOTAL ROOMS | 11 |
| TOTAL BEDROOMS | 5 |
| TOTAL BATHROOMS | 5F1H |
| LOCATION | GOOD+ |
| VIEW | GOLF CRSE |
| SITE | 0.60 +/-ACRES |
| QUALITY | VERY GOOD |
| AGE | 2005 |

**COMPARABLE 5**

875 PARROT CREEK WAY

| | |
|---|---|
| PROX. TO SUBJECT | 11.25 miles SE |
| SALES PRICE | 730,000 |
| GROSS LIVING AREA | 3,890 |
| TOTAL ROOMS | 11 |
| TOTAL BEDROOMS | 5 |
| TOTAL BATHROOMS | 3F1H |
| LOCATION | GOOD+ |
| VIEW | MARSHVIEW |
| SITE | 0.47 +/- ACRES |
| QUALITY | VERY GOOD |
| AGE | 1995 |

**COMPARABLE 6**

5321 WATERVIEW DR

| | |
|---|---|
| PROX. TO SUBJECT | 0.27 miles W |
| SALES PRICE | 840,000 |
| GROSS LIVING AREA | 4,318 |
| TOTAL ROOMS | 11 |
| TOTAL BEDROOMS | 6 |
| TOTAL BATHROOMS | 5F1H |
| LOCATION | AVERAGE |
| VIEW | RIVERFRONT- |
| SITE | 0.62 +/- ACRES |
| QUALITY | VERY GOOD |
| AGE | 1970/RENOV |

## COMPARABLE PHOTOS 7-9

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | |
| Property Address | 4921 WATERVIEW CIR | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State SC | Zip Code 29419 |
| Lender | WELLS FARGO BANK NA | | | | |

### COMPARABLE 7

4795 SEBASTIAN CT
PROX. TO SUBJECT 0.80 miles SE
SALES PRICE 1,175,000
GROSS LIVING AREA 4,160
TOTAL ROOMS 10
TOTAL BEDROOMS 4
TOTAL BATHROOMS 3F..H
LOCATION AVERAGE
VIEW RIVERFRONT
SITE 0.25 +/- ACRES
QUALITY GOOD+
AGE 1992

### COMPARABLE 8

4641 ASHLEY VIEW LN
PROX. TO SUBJECT 1.00 miles SE
SALES PRICE 800,000
GROSS LIVING AREA 3,483
TOTAL ROOMS 10
TOTAL BEDROOMS 4
TOTAL BATHROOMS 3
LOCATION AVERAGE
VIEW [illegible] VIEW
SITE 0.25 +/- ACRES
QUALITY VERY GOOD
AGE 2007

### COMPARABLE 9

PROX. TO SUBJECT
SALES PRICE
GROSS LIVING AREA
TOTAL ROOMS
TOTAL BEDROOMS
TOTAL BATHROOMS
LOCATION
VIEW
SITE
QUALITY
AGE



Main File No. 310031207 Page #29

## Building Sketch

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | |
| City | NORTH CHARLESTON | County CHARLESTON | | State SC | Zip Code 29418 |
| Lender | WELLS FARGO BANK NA | | | | |

**Area Calculations Summary**

| Living Area | | Calculation Details | | |
|---|---|---|---|---|
| First Floor | 3583 Sq ft | 10.8 × 3 | = | 32.4 |
| | | 70.8 × 24.9 | = | 1762.92 |
| | | 20.2 × 16 | = | 323.2 |
| | | 45.2 × 32.4 | = | 1464.48 |
| Second Floor | 3461 Sq ft | 70.8 × 24.9 | = | 1762.92 |
| | | 20.2 × 16 | = | 323.2 |
| | | 32.4 × 22.8 | = | 738.72 |
| | | 22.4 × 24.1 | = | 539.84 |
| | | 8.3 × 11.6 | = | 96.28 |
| **Total Living Area (Rounded):** | **7044 Sq ft** | | | |
| **Non-living Area** | | | | |
| Stairs/Raised Patio | 830.6 Sq ft | 11.1 × 7.5 | = | 83.25 |
| | | 34.2 × 19.8 | = | 677.16 |
| | | 11.6 × 3 | = | 34.8 |
| | | 11.8 × 3 | = | 35.4 |
| Deck | 404.2 Sq ft | 16.2 × 24.9 | = | 403.38 |
| | | 0.5 × 16.2 × 0.1 | = | 0.81 |

# Building Sketch

| | | | |
|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | |
| Property Address | 4321 WATERVIEW CIR | | |
| City | NORTH CHARLESTON | County CHARLESTON | State SC Zip Code 29418 |
| Lender | WELLS FARGO BANK NA | | |

**Area Calculations Summary**

| | | |
|---|---|---|
| **Non-living Area** | | |
| Ground Floor/Garage | 4507 Sq ft | 10.8 x 3 = 32.4<br>70.8 x 24.9 = 1762.92<br>20.2 x 16 = 323.2<br>45.2 x 32.4 = 1464.48 |
| STRG | 1993.4 Sq ft | 6.7 x 4.5 = 30.15<br>70.8 x 12.7 = 899.16<br>6.7 x 4.5 = 30.15<br>6.7 x 4.5 = 30.15<br>6.7 x 4.5 = 30.15<br>4.6 x 5.8 = 26.68<br>45 x 21 = 945 |

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 73 of 211

2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 38 of 46

Main File No. 0130312071 Page #31

## Location Map

| Borrower/Client | SINGLETARY, CARLA | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

a la mode, inc.
Comparable # 4
4241 CLUB COURSE DR
6.96 miles NW
Subject
4321 WATERVIEW CIR
Comparable # 2
1018 DOMINION DR
5.51 miles NE
Comparable # 6
5321 WATERVIEW DR
0.27 miles W
Comparable # 7
4795 SEBASTIAN CT
0.80 miles SE
Comparable # 8
4611 ASHLEY VIEW LN
1.00 mile SE
Comparable # 3
2119 RICE POND RD
0.64 miles S
Comparable # 1
1394 PARKSHORE DR
3.36 miles SE
Comparable # 5
875 PARROT CREEK WAY
11.29 miles SE
Goose Creek
St Andrews
Charleston
Charleston AFB
Mark Clark Expy
Savannah Hwy
Ashley River Rd
Dorchester Rd
St James Ave
Camp Rd
Folly Rd
2.5 miles

Form MAP.LOC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Main File No. 010031262 Page #32

**PLAT MAP**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | SINGLETARY, CARLA | | | | | | |
| Property Address | 4321 WATERVIEW CIR | | | | | | |
| City | NORTH CHARLESTON | County | CHARLESTON | State | SC | Zip Code | 29418 |
| Lender | WELLS FARGO BANK NA | | | | | | |

NOTES & REFERENCES:
ACCORDING TO FEMA FLOOD INSURANCE RATE MAP 45019C 0481J, DATED 11/17/05, THIS PROPERTY LIES IN FLOOD ZONE AE (8')
REFERENCE PLAT BY HAROLD J. LEONARD RECORDED IN THE CHARLESTON CO. RMC OFFICE IN PLAT BOOK AJ PAGE 45.
SETBACKS:
FRONT - AVERAGE ALIGNMENT OF EXISTING BUILDINGS
SIDES - 5'
REAR - 15% OF DEPTH OF LOT (19.5')
MAGNETIC
FINAL SURVEY
5323 WATERVIEW CIRCLE
TMS 408-09-00-286
LOT 25 BLOCK L
EVANSTON SUBDIVISION
PREPARED FOR TRINITY INSPECTION SERVICES, LLC
NORTH CHARLESTON
CHARLESTON COUNTY, SC
DATE: APRIL 13, 2010 SCALE: 1" = 20'
ATLANTIC SURVEYING, INC.
GRAPHIC SCALE
( IN FEET )
1 inch = 20 ft.
WATERVIEW DRIVE 50' R/W
S 64°48'42" W
104.59'
LOT 24
LOT 26
N 25°22'03" W
128.75'
S 25°08'50" E
129.09'
2 STORY BRICK
PORCH
PORCH
DECK
19.5' REAR SETBACK
LOT 25
13,452 SQ.FT.
0.309 ACRES
N 65°00'08" E
104.10'
CONCRETE IS APPROX. 6.5' OVER PROPERTY LINE
CONCRETE IS APPROX. 8.0' OVER PROPERTY LINE
CONCRETE IS APPROX. 5.0' OVER PROPERTY LINE
MARSHES OF THE ASHLEY RIVER
SOUTH CAROLINA CERTIFICATE OF AUTHORIZATION
ATLANTIC SURVEYING, INC.
SOUTH CAROLINA REGISTERED LAND SURVEYOR
JAMES KELLY
9758
I HEREBY STATE THAT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF, THE SURVEY SHOWN HEREON WAS MADE IN ACCORDANCE WITH THE REQUIREMENTS OF THE MINIMUM STANDARDS MANUAL FOR THE PRACTICE OF LAND SURVEYING IN SOUTH CAROLINA, AND MEETS OR EXCEEDS THE REQUIREMENTS FOR A CLASS A SURVEY AS SPECIFIED THEREIN; ALSO THERE ARE NO VISIBLE ENCROACHMENTS OR PROJECTIONS OTHER THAN SHOWN.

PLAINTIFF'S
EXHIBIT
B
Beresford Appraisals Group, LLC
Serving Charleston, Berkeley, Dorchester, Colleton & Orangeburg Counties
Residential/FHA/Commercial/Industrial

Home | Contact Us | Order an Appraisal | Client Login | FHA Approved | About BAG

BERESFORD
APPRAISALS

- Charleston Appraisal Experts
- Our Service Area
- FAQ
- Appraisal Info
- About Mercury Network
- Residential Investment
- Assessment Appeal Service
- Foreclosure/REO Appraisal
- Condemnation Appraisal
- Relocation Appraisal
- Appraisal Reviews
- Estate
- Date of Death Valuations
- Expert Witness
- Divorce
- Farm Appraisals

- Three Approaches to Value
- What is USPAP?
- Appraiser Ethics
- Appraiser Licensing
- Appraiser Jargon
- Mfg vs Modular Homes

- For Buyers
- Foreclosure Listings
- Mortgage Calculators
- For Homeowners
- Home Seller Services
- How to Prepare
- PMI Video
- Pre-Listing Appraisals
- Appraisal Video

- Staff Profiles

## Home Appraisals: A Primer

Buying a home is the most significant transaction many of us will ever consider. Whether it's a primary residence, a second vacation home or an investment, the purchase of real property is an involved transaction that requires multiple people working in concert to see it through.

**To learn more about appraising, click here to see a short video or call us today to talk about your specific property.**

The majority of the people involved are quite familiar. The most familiar entity in the exchange is the real estate agent. Next, the lender provides the money required to fund the transaction. The title company makes sure that all aspects of the transaction are completed and that a clear title transfers to the buyer from the seller.

So what party is responsible for making sure the value of the property is consistent with the purchase price? *In comes the appraiser.* We provide an unbiased opinion of what a buyer could expect to pay - or a seller receive - for a parcel of real estate, where both buyer and seller are informed parties. A professional South Carolina licensed appraiser from Beresford Appraisals will ensure you as an interested party are informed.

**Inspecting the subject property**

Our first responsibility at Beresford Appraisals is to inspect the property to determine its true status. We must actually view features, such as the number of bedrooms and bathrooms, the location, living areas, etc., to ensure they really are present and are in the shape a reasonable person would expect them to be. To ensure the stated size of the property has not been misrepresented and convey the layout of the property, the inspection often requires creating a sketch of the floor plan. Most importantly, the appraiser looks for any obvious features - or defects - that would affect the value of the house.

Once the site has been inspected, an appraiser employs two or three approaches when determining the value of the property: sales comparison and, in the case of a rental property, an income approach.

**Replacement Cost**

This is where the appraiser gathers information on local construction costs, labor rates and other factors to ascertain how much it would cost to construct a property comparable to the one being appraised. This estimate often sets the upper limit on what a property would sell for. The cost approach is also the least used method.

**Sales Comparison**

Appraisers are intimately familiar with the neighborhoods in which they appraise. We thoroughly understand the value of particular features to the homeowners of that area. Then, the appraiser researches recent transactions in the vicinity and finds properties which are 'comparable' to the property in question. Using knowledge of the value of certain items such as square footage, additional bathrooms, hardwood floors, fireplaces or view lots (just to name a few), we adjust the comparable properties so that they

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 77 of 211

The significance of an appraisal from Beresford Appraisals - 843.884.0505 Page 2 of 2
2:09-cv-01612-MBS -RSC Date Filed 01/07/11 Entry Number 101 Page 42 of 46

more accurately portray the features of subject property.

- Say, for example, the comparable has an extra half bath that the subject doesn't, the appraiser may deduct the value of that half bath from the sales price of the comparable.
- However, if the subject has an extra half-bathroom and the comparable does not, the appraiser might add a certain amount to the comparable property.

A true estimate of what the subject might sell for can only be determined once all differences between the comps and the subject have been evaluated. The sales comparison approach to value is usually awarded the most weight when an appraisal is for a real estate purchase.

**Valuation Using the Income Approach**

In the case of income producing properties - rental houses for example - the appraiser may use a third approach to value. In this situation, the amount of income the real estate produces is factored in with income produced by comparable properties to derive the current value.

**Coming Up With the Final Value**

Analyzing the data from all applicable approaches, the appraiser is then ready to put down an estimated market value for the subject property. The estimate of value at the bottom of the appraisal report is not always the final sales price even though it is likely the best indication of what a property could sell for in an open market. There are always mitigating factors such as the seller's desire to get out of the property, urgency or 'bidding wars' that may adjust an offer or listing price up or down. But the appraised value is often employed as a guideline for lenders who don't want to loan a buyer more money than they could get back in case they had to sell the property again. The bottom line is: An appraiser from Beresford Appraisals will help you attain the most fair and balanced property value, so you can make wise real estate decisions.

295 Seven Farms Dr, Ste C-114 Charleston, SC 29492
Phone: 843.884.0505 Toll Free Phone: 866.350.3334 Cell: 843.442.0625 Fax: 843.884.5878 E-mail: david@beresfordappraisals.com

Staff Profiles | Contact Us | Appraisal Info | Client Login | Order an Appraisal | Home | Charleston Appraisal Experts | About Mercury Network

Copyright © 2011 Beresford Appraisals
Portions Copyright © 2011 a la mode, inc.
Another XSite by a la mode, inc. | Admin Login| Terms of Use| Site Map

http://www.beresfordappraisals.com/AppraisalInfo 1/4/2011

PLAINTIFF'S
EXHIBIT
C

Exclusive Online Offer

HBO

$100

Comcast

manta

Sign In New to Manta? Join Free What is Manta?

Search more than 60 million companies:

Browse Companies: U.S. Worldwide
Find Resources: Business Topics U.S. Jobs Videos

U.S. ~ Mount Pleasant, SC ~ Real Estate ~ Real Estate Agents and Managers ~ Real Estate Appraisers ~ Beresford Appraisals LLC

Company Profile Reports Map Web Results

## Beresford Appraisals LLC

Is this your company?

672 Marina Drive
Charleston, SC 29492-8093 map
Charleston-N Charleston, SC Metro Area

**Phone:** (843) 884-0505
**Website:** Information not found

Ads by Google

Hiring Great Appraisers Lincoln Appraisal Mgmt - 50 States! Experienced Appraisers Paid Quickly

The ads are not affiliated with Beresford Appraisals LLC

### About Beresford Appraisals LLC

Is this your company? Claim This Profile

Beresford Appraisals LLC is a private company categorized under Real Estate Appraisers and located in Charleston, SC. Our records show it was established in 2005 and incorporated in South Carolina. Current estimates show this company has an annual revenue of $1 to 2.5 million and employs a staff of approximately 5 to 9.

### Business Categories

Appraisers in Charleston, SC
Real Estate Agent/Manager
All Other Professional & Technical Svcs
View newly formed U.S. businesses

### Company Contacts

Is this your company? Claim This Profile

David Bates
Manager

Search for more contacts

### Beresford Appraisals LLC Business Information

| | |
|---|---|
| Location Type | Single Location |
| Annual Sales (Estimated) | $1 to 2.5 million |
| Employees (Estimated) | 5 to 9<br>2 ·· |
| SIC Code | 738913, Appraisers |
| NAICS Code | 541990, All Other Professional & Technical Svcs |
| Products, Services and Brands | Information not found |
| State of Incorporation | South Carolina |

Company Profile Options
Add this company to a list
Print this page
Share this page
0

Manta Members Connected to this Company

Do you work here? Add this company to your member profile.

Manta Members Who Viewed This Company Profile

YOU
Sign In or Register to Join Manta

Donate now
Her New Year's wish...

St. Jude Children's Research Hospital

Related Searches

Other companies that match "beresford llc"
Jobs in Mount Pleasant, SC
All U.S. Real Estate Appraisers

Related Companies

Rainwater Appraisal Service
Real Estate Appraisers in Florence, SC

Florence Appraisal Inc
Real Estate Appraisers in Florence, SC

Appraisal Group
Real Estate Appraisers in Florence, SC

Christopher, Robert M
Real Estate Appraisers in Florence, SC

B L S Rl Est & Appraisals Llc
Real Estate Appraisers in Charleston, SC

Related Products

Companies in this category usually offer:



Years in Business 5

Find A Real Estate Appraiser
Appraisal Of Real Estate
Real Estates Appraiser
Free Real Estate Appraisal
Real Estate Appraisal Services
Real Estate Property Appraisal
Certified Real Estate Appraisers
Licensed Real Estate Appraisers
Realestate Appraisers
Residential Real Estate Appraisers

Related Categories

People looking for this company were also interested in:

Property Valuation Services
Land Appraisal Services

Click on the reports tab at the top of the page to research company background, detailed company profile, credit and financial reports for Beresford Appraisals LLC. Reports often include a complete predictive and historical analysis with payment and financial information; information on the identity, operations, profitability and stability of Beresford Appraisals LLC; Details on the company's history, the business background of its management, special events and recent company news. Download Beresford Appraisals LLC financial and company reports.

Companies by Location: Charleston, SC

**Business Topics**
Small Business
Sales Expertise
Human Resources
Travel
Franchise
Technology

**Browse Companies**
U.S.
Australia
Canada
UK
Worldwide

**Resources**
Videos
Jobs
Reports
White Papers

**Manta Links**
About Manta
Contact Manta
Media Resources
FAQ
Advertise With Us
Site Map

Copyright © Manta Media Inc. All rights reserved Privacy Policy Note: Our Terms & Conditions have changed 12/28/10 Custom Access
Blog Twitter Facebook News Updates




Beresford Appraisals Group, LLC

Serving Charleston, Berkeley, Dorchester, Colleton, & Orangeburg Counties

Residential/FHA/Commercial/Industrial

Home | Contact Us | Order an Appraisal | Client Login | FHA Approved | About PMI

BERESFORD APPRAISALS

Charleston Appraisal Experts
Our Service Area
FAQ
Appraisal Info
About Mercury Network
Residential Investment
Assessment Appeal Services
Foreclosure/REO Appraisal
Condemnation Appraisal
Relocation Appraisal
Appraisal Reviews
Estate
Date of Death Valuations
Expert Witness
Divorce
Faster Appraisals

Three Approaches to Value
What is USPAP?
Appraiser Ethics
Appraiser Licensing
Appraiser Jargon
Mfg vs Modular Homes

For Buyers
Foreclosure Listings
Mortgage Calculators
For Homeowners
Home Seller Services
How to Prepare
PMI Video
Pre-Listing Appraisals
Appraisal Video

Staff Profiles

**David Bates**

David G. Bates has lived and worked in the Charleston and surrounding areas for over 35 years and has been appraising real estate for the past 11 years. Mr. Bates graduated the College of Charleston with a BA in English. He began his postgraduate real estate studies at the Citadel in 1998 and has since passed the SC State exam for the Certified General Real Estate appraiser designation. With a strong knowledge of the local market and an insistence on the best customer service, Mr. Bates has grown his appraisal firm, Beresford Appraisals Group, from a one man operation to an experienced group of ten excellent appraisers. The Beresford Appraisals team provides quality reports with the best turn-times for property types ranging from vacant land, to residential, to commercial and smaller industrial developments.

Mr. Bates lives in Ravenel, SC with his wife Lori and two daughters Cali and Ashlyn. Mr. Bates believes that faith and integrity are key in life and business, and one must always strive to help others and give back to the community.

David Bates
295 Seven Farms Dr, Ste C-114
Charleston, SC 29492
Phone: (843) 884-0505
Fax: (843) 884-5878
E-mail: david@beresfordappraisals.com

Staff Directory

- David Bates
- Scott Stanley
- Caroline B. Rossi
- Ryan M. Earnest
- James M. DeMarco
- Brittany Soldano
- Jeffrey Healy
- Steve DeMarco

295 Seven Farms Dr, Ste C-114 Charleston, SC 29492
Phone: 843.884.0505 Toll Free Phone: 866.350.3334 Cell: 843.442.0625 Fax: 843.884.5878 E-mail: david@beresfordappraisals.com

Staff Profiles | Contact Us | Appraisal Info | Client Login | Order an Appraisal | Home | Charleston Appraisal Experts | About Mercury Network

Copyright © 2011 Beresford Appraisals
Portions Copyright © 2011 a la mode, inc.
Another XSite by a la mode, inc. | Admin Login| Terms of Use| Site Map

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

RECEIVED
USDC, CLERK, CHARLESTON, SC

2010 DEC 23 P 3:53

John G. Singletary and Carla C. Singletary, )

Plaintiff(s) )

v. )

The City of North Charleston

City of North Charleston Building Dept.

City of North Charleston Zoning Dept.

City of North Charleston Zoning Board of Appeals

City of North Charleston Legal Dept.

R. Keith Summey, City of NC Mayor

Darbis Briggman, City of NC Chief Bldg. Official

William B. Gore, City of NC Zoning Director

Rick Williams, Bldg. Inspector

Mary Cohen, Zoning Inspector

Adrienne Williams, Zoning Board of Appeals Secretary

Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively and other s to be named

Defendant(s)

Civil Action No. C/A No.: 2:09-cv-01612-MBS

**Request for Recusal**

**Magistrate Judge Honorable Robert Carr**

# Request to Recuse

# Magistrate Judge Honorable Robert Carr

Now comes Plaintiff's respectfully request Pursuant to FRCP Rule 73 and 28 USCS Sec. 455, and Marshall v Jerrico Inc., 446 US 238, 242, 100 S.Ct. 1610, 64 L. Ed. 2d 182 (1980),, 28 U.S.C. §§144 and 455(a)...." Honorable Judge Robert Carr to recuse himself from the above case.

The Honorable Judge Robert Carr is required to determine whether a reasonable person might question his impartiality--given strong statements he made during the first Rule 27 his disqualification was required by 28 U.S.C. Sec. 455(a). "The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law." The above is applicable to this court by application of Article VI of the United States Constitution and Stone v Powell, 428 US 465, 483 n. 35, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). Federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law."

The clerk recommended court proceedings be held however the Honorable Judge Robert Carr denied any pre-litigation hearing and denied the request. The Plaintiff's clearly stated that the City had violated the FOIA Laws Federal, State FREEDOM OF INFORMATION ACT. SECTION 30-4-10, and Municipal. And the 14th amendment.

A person aware of the facts might reasonably entertain a doubt that the judge would be able to render an impartial judgment upon the issues presented in a case as a neutrally detached jurist or be impartial and should reframe from sitting or ruling in this case. If a reasonable person would entertain doubts concerning the judge's impartiality, disqualification is mandated. To insure that proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person. This standard indicates that the decision is not based on the judge's personal view of his own impartiality, and also suggests that the litigants' necessarily partisan views do not provide the applicable frame of reference. Rather, the judge ought to consider how his participation in a given case looks to the average person on the street.

In this connection the Honorable Robert Carr failed to address plaintiffs pinpointed and crystal clear assertion of the irrebutable refusal of the defendants (City of North Charleston) refusal to provide pertinent information pursuant to the FOIA.

The City of North Charleston has established a habitual pattern and practice of violating the FOIA request submitted to them over the years. Court rules on Snowden 911 tapes. North Charleston should have released tapes in police shooting case. Published on 04/05/05

BY DAVID SLADE
Of The Post and Courier Staff

In a decision that strengthens the public's right to access government-held information in South Carolina, the state Supreme Court ruled Monday that evidence in prospective criminal trials is not automatically exempt from Freedom of Information Act requests.

At issue was North Charleston's refusal in 2001 to release to The Post and Courier a 911 tape related to the controversial fatal police shooting in 2000 of Edward Snowden. Ninth Circuit Solicitor Ralph Hoisington had decided not to prosecute two officers who shot Snowden based on information from the recordings.

According to police and witness accounts Snowden, a 35-year-old black Army veteran, had been attempting to escape an attack by four younger, white men at North Village Plaza on Dorchester Road the evening he was killed.

Snowden was legally carrying a handgun at the time, and fired a warning shot in the plaza parking lot, then the gun jammed and he fled into a video store, pursued by the other men. The two white police officers who arrived at the scene saw Snowden holding the gun and shot him four times.

The 911 tape, which was introduced at the trial of Snowden's alleged attackers, showed that police dispatchers had been told there was a fight at the plaza and that a black man had a gun — not that the black man was the person being attacked.

Hoisington, after deciding not to charge officers Anthony Youngblood and Michael Morgan with a crime in the racially charged atmosphere following the killing, advised North Charleston not to release the tape prior to the trial of the men accused of attacking Snowden.

Jimi Jackson, Jessi Jackson, Christopher Schmidt and Jerry H. Smith initially were charged with attacking Snowden. Charges against Smith were dismissed, and a trial of the three other men ended in a hung jury.

The three men later were indicted, but Hoisington announced in November that the charges would be dropped because he felt the case could not be won.

North Charleston earlier paid $69,950 to Snowden's family to settle a wrongful death lawsuit.

Although the 911 tape became public in 2002 at the first trial, the Freedom of Information Act case continued because the case would be precedent-setting. If the city won, a wide exemption would have been carved out of the act for potential trial evidence, and that might have kept 911 recordings and any possible evidence out of sight for years.

Lawyers for The Post and Courier maintained the 911 recordings could have given readers insight into why Hoisington chose not to prosecute the officers, at the time of the decision.

North Charleston argued that the tape was evidence and exempt from the Freedom of Information Act. Also, the city argued it would cause pretrial publicity that could force the city to spend money on a change of venue.

Ninth Circuit Judge Gerald Smoak sided with the city in 2001, and his ruling was upheld by a three-judge appellate panel composed of 9th Circuit Judge Deadra L. Jefferson, 7th Circuit Judge Donald W. Beatty and Court of Appeals Judge William L. Howard.

The Supreme Court saw the issue differently.

"The city was required to prove that it would suffer particular harm, and the city did not meet its burden," Justice Costa M. Pleicones wrote in the unanimous opinion. "The city's non-disclosure therefore violated FOIA."

The Supreme Court sent the case back to circuit court to see if "further relief" is in order. The state's Freedom of Information Act allows parties that sue for information and win to seek attorney's fees, but imposes no fines for violating the law, according to John J. Kerr, who represented The Post and Courier in the case.

"There was no reason to deny us a look at these 911 tapes," Kerr said. "It was just the government's knee-jerk reaction."

Hoisington could not be reached for comment.

"The city is obviously disappointed that the Supreme Court disagreed with the position of the city and the courts below," said Derk Van Raalte, who argued North Charleston's case before the Supreme Court. "However, we remain committed to serving the public, and honoring the FOIA, and we appreciate the guidance provided by the court's opinion."

Kerr said he didn't know if The Post and Courier's parent company, Evening Post Publishing Co., would seek attorney's fees from North Charleston.

"What (the decision) means is that the newspaper takes its duty to the public very seriously," he said.

Bill Rogers, executive director of the South Carolina Press Association, said the decision benefits the general public because it overturned a potential limit on public oversight of police departments.

"It's a citizen matter, too, but realistically it's the press that typically requests the tapes," he said. "The average citizen wouldn't have the money to have fought for them up to the Supreme Court."

Post and Courier Editor Barbara S. Williams said the newspaper believed the issue was important enough to warrant the four-year court fight.

"It now should be clear that 911 tapes are indeed public records unless the government involved can provide some compelling reason they should be kept secret," she said. "The presumption should always be on the side of open government and, fortunately, we have a Supreme Court that agrees with that principle."

Evening Post Publishing Company v. City of North Charleston, 357 S.C. 59, 591 S.E.2d 39 (Ct. App. 2003), **CONCLUSION**

The City's denial of the Post's request for a copy of the 911 tape violated FOIA. The tape was not exempt from disclosure pursuant to South Carolina Code section 30-4-40(a)(3)(B). The Court of Appeals' decision is reversed, and the case is remanded to the circuit court for a determination whether any further relief should be granted

In addition a recent showcase article of the very same attitude and actions of defiance and disregard for the FOIA Law in the Post and Courier. North Charleston council broke FOIA law last year, says court. Published on 06/29/95

BY SYBIL FIX
The Post and Courier

Members of North Charleston City Council would have been better off forgetting about city business on Easter Sunday last year.

The S.C. Court of Appeals ruled this week that they broke the state's Freedom of Information laws when they met in their attorney's office to sign a subpoena away from the public and without public notice or a proper meeting.

The refusal to specifically review and dispose of the all too important federal constitutional right and statutory right embodied in the "FOIA" per se raises serious concerns about Honorable Judge Carr's ability to render fair and impartial deliberation about the issues in this case such recusal is warranted. The City of North Charleston as in the past and presently in this case as habitually established a pattern and practice of flagrantly disregarding the Federal, State, Municipal FOIA laws. Taken a step further the City of North Charleston is know in violation of a direct order from Honorable Federal District Judge Seymour to produce and surrender FOIA request that they in fact agreed to do so by consent.

A preliminary review by the assigned law clerk and plaintiff's request for pre authorization deposition was also denied by Judge Carr and for no justifiable reason

The sole two rulings by Honorable Judge Carr involving the defendant North Charleston Mayor Summey have been pro Summey which two the two matters involved similar constitutional matters. Thus Plaintiff's are persuaded that Judge Carr cannot make an impartial ruling.

All of the forgoing facts place a chilling affect upon the plaintiff's. thus the entrenched predisposition favorable to the defendants North Charleston an anti-plantiffs makes it impossible for plaintiff's t get an impartial judgment or ruling before this jurist which can only be removed by his recusal.

In addition the defendants attempt to reintroduce the circuit judge's statement of order in order have case remanded back to the State Court. The Plaintiff filled two separate lawsuits in the Federal Court. The first has never been brought in any action in state curt and was a constitutional issue. The second was to remove and join the state action to the first because of the same nucleus of facts present in both cases. Even if the removal was remanded the first federal case would still be resident and housed in the Federal Court.

WHEREFORE: Plaintiff's pray that Honorable Judge Carr's recusal is warranted and he recuses himself from participating in this case.

DATED this 23th day of December, 2010.

CERTIFICATE OF SERVICE

I John Singletary herby certify that the above document has been mail to the opposing council.

Dated: December 23. 2010

Respectfully Submitted

John Singletary

(843) 693-2823

4321 Waterview Circle

North Charleston, SC 29418

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

John G. Singletary and Carla C. Singletary, )
)
Plaintiff(s) )
)
v. )
) Civil Action No. C/A No.: 2:09-cv-01612-MBS
The City of North Charleston )
City of North Charleston Building Dept. )
City of North Charleston Zoning Dept. ) Request to reverse case referal
City of North Charleston Zoning Board of Appeals )
City of North Charleston Legal Dept.
R. Keith Summey, City of NC Mayor
Darbis Briggman, City of NC Chief Bldg. Official
William B. Gore, City of NC Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively and other s to be named

Defendant(s)

**REQUEST TO REVERSE CASE REFERAL**

Movant, Plaintiff, John G. Singletary Jr. request for the following reasons to have the case places under Judge Margret Seymour in Columbia.

1 A predisposition OF Judge Robert Car prohibiting Rule 27 in this matter when no reason existed to disallow

2 Clerk has not allowed case to move forward instead allows defendants to object to the issuance of subpoenas prior to issuance of same. FRCP allow for the person to whom the subpoena is served to object prior to answering and for the opposing party to object to the use of the information prior to admitting as evidence, but not opposing party prior to issuance of the subpoena. FRCP rule 45(a)(3) Issued by Whom. The clerk must issue a subpoena, signed but otherwise in blank, to a party who request it.

3 Cover letter in initial filing declined Consent to the Exercise of Jurisdiction by a United Stated Magistrate Judge Magistrate Judge.

4 All subsequent case filings with occur in Columbia SC.

DATED this 10th day of December, 2010.

CERTIFICATE OF SERVICE

I John Singletary herby certify that the above document has been mail to the opposing council.

Dated: December 10, 2010

Respectfully Submitted

John Singletary

(843) 693-2823

4321 Waterview Circle

North Charleston, SC 29418

AO 85 (Rev. 8/98) Notice, Consent, and Order of Reference — Exercise of Jurisdiction by a United States Magistrate Judge

# UNITED STATES DISTRICT COURT

District of South Carolina

, Plaintiff

v.

, Defendant

NOTICE, CONSENT, AND ORDER OF REFERENCE — EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE

Case Number:

USDC, CLERK, CHARLESTON, SC RECEIVED 2009 JUN 18 P 3:

## NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION

In accordance with the provisions of 28 U.S.C. 636(c), and Fed.R.Civ.P. 73, you are hereby notified that a United States magistrate judge of this district court is available to conduct any or all proceedings in this case including a jury or nonjury trial, and to order the entry of a final judgment. Exercise of this jurisdiction by a magistrate judge is, however, permitted only if all parties voluntarily consent.

You may, without adverse substantive consequences, withhold your consent, but this will prevent the court's jurisdiction from being exercised by a magistrate judge. If any party withholds consent, the identity of the parties consenting or withholding consent will not be communicated to any magistrate judge or to the district judge to whom the case has been assigned.

An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of a district court.

## CONSENT TO THE EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all further proceedings in this case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings.

| Party Represented* | Signatures | Date |
|---|---|---|
| | | |
| | | |
| | | |

***NOTE:**
**THE UNITED STATES ATTORNEY FOR THE DISTRICT OF SOUTH CAROLINA BY STANDING MISCELLANEOUS FILING [3:04mc5005] HAS CONSENTED IN ALL SOCIAL SECURITY CASES TO DISPOSITION BY A UNITED STATES MAGISTRATE JUDGE.**

## ORDER OF REFERENCE

IT IS ORDERED that this case be referred to The Honorable ______________________, United States Magistrate Judge, to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c), Fed.R.Civ.P. 73.

________________ ______________________________
Date United States District Judge

NOTE: RETURN THIS FORM TO THE CLERK OF THE COURT ONLY IF ALL PARTIES HAVE CONSENTED ON THIS FORM TO THE EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE.

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

John G. Singletary and Carla C. Singletary,

Plaintiff(s)

v.

The City of North Charleston

City of North Charleston Building Dept.

City of North Charleston Zoning Dept.

City of North Charleston Zoning Board of Appeals

City of North Charleston Legal Dept.

R. Keith Summey, City of NC Mayor

Darbis Briggman, City of NC Chief Bldg. Official

William B. Gore, City of NC Zoning Director

Rick Williams, Bldg. Inspector

Mary Cohen, Zoning Inspector

Adrienne Williams, Zoning Board of Appeals Secretary

Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively and other s to be named

Defendant(s)

Civil Action No. C/A No.: 2:09-cv-01612-MBS

**Motion to Join Additional Defendants**

# MOTION TO JOIN ADDITIONAL DEFENDANTS

Movant Pursuant Rule 20 "Permissive Joinder of Parties" request to add the following defendants:

Wachovia Mortgage and Beresford Appraisal Group LLC, David Bates, Smith Appraisers, and Christine Fransisco, Individuals have engaged in Civil Conspiracy to Deny Civil Rights.

Plaintiffs request to join in one action the additional defendants due to

(1) Plaintiff's assert a right to relief jointly, severally, with respect to and arising out of the same transaction, occurrence, or series of transactions or occurrences; and nucleus of facts.
(2) Questions of law and facts common to all plaintiffs will arise in the action
(3) Will avoid extended litigation and expedite issues common to the resolution of the pending litigation

DATED this 13th day of December, 2010.

CERTIFICATE OF SERVICE

I John Singletary herby certify that the above document has been mail to the opposing council.

Dated: December 13. 2010

Respectfully Submitted

John Singletary

(843) 693-2823

4321 Waterview Circle

North Charleston, SC   29418

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

John G. Singletary and Carla C. Singletary,

Plaintiff(s)

v.

The City of North Charleston

City of North Charleston Building Dept.

City of North Charleston Zoning Dept.

City of North Charleston Zoning Board of Appeals

City of North Charleston Legal Dept.

R. Keith Summey, City of NC Mayor

Darbis Briggman, City of NC Chief Bldg. Official

William B. Gore, City of NC Zoning Director

Rick Williams, Bldg. Inspector

Mary Cohen, Zoning Inspector

Adrienne Williams, Zoning Board of Appeals Secretary

Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively and other s to be named

Defendant(s)

Civil Action No. C/A No.: 2:09-cv-01612-MBS

**REQUEST FOR ORDER OF PRESERVATION OF DOCUMENTS AND TANGIBLE THINGS,**

**SPECIAL MASTER FORENSIC COMPUTER ANALYSIS**

**SANTIONS FOR ABUSE OF PROCESS**

**SPOILATION TAMPERING WITH EVIDENCE**

**FRAUD OF THE COURT**

**AND A DEFAULT JUDGEMENT**

**REQUEST FOR ORDER OF PRESERVATION OF DOCUMENTS AND TANGIBLE THINGS PURSUANT RULE 34 (b)(E)(i), RULE37, RULE 26(5)(A), AND RULE 26(g)**

**SPECIAL MASTER FORENSIC COMPUTER ANALYSIS PURSUANT RULE 53**

**SANTIONS FOR ABUSE OF DISCOVERY PROCESS PURSUANT RULE   37 (B)(1), RULE 37 (A)(4), RULE 11, RULE 26 INCLUDING AMEMDMENT 1970 SUBDIVISION (a)(3), AND SECTION 1927 OF 28 U.S.C**

**SPOILATION AND TAMPERING WITH EVIDENCE PURSUANT RULE 11, RULE 26, AND RULE 37**

**FRAUD OF THE COURT AGAINST OPPOSING ATTORNEYS FOR VIOLATION OF SECTION 1927 OF 28 U.S.C. and "SARBANES-OXLEY ACT OF 2002" (SOX)   SECTION 802 CHAPTER 73 OF TITLE 18 USC 1519, SECTION 902 CHAPTER 63 OF TITLE 18 USC 1349, SECTION 1102 CHAPTER 1512 OF TITLE 18 USC 1102**

**AND A REQUEST FOR DEFAULT JUDGEMENT**

Movant, Plaintiff, John Singletary Jr. Pursuant to the rules listed above hereby petition this court for an order requiring defendants to show cause before this court why sanctions and the imposition of cost and attorneys fees should not be ordered by this court for failure to respond to or otherwise provide discovery responses to Plaintiff within the time required including but not limited to:

1   answers to FOIA request submitted to the City of North Charleston

2   request and demand for production of documents

3   supplemental question replacing question not understood by defendants and by order required to answer

Accordingly Plaintiff verily believes that Defendant behavior warrants an order for immediate monetary sanctions and a default judgment.

The Defendants refusal to submit court ordered FOIA and Production of Documents Request and defendants direct written admission to poor records management and inconsistent records retention "Unfortunately, taping errors do occur and, at times, it is difficult to understand or to transcribe these audio recordings." And" there have been other test with different questions, but these are generally not retained". These anomalies and their farfetched privilege claims coupled with their admission of errors and with plaintiff's identification of several defendants implied admissions, incidental admission, admission by silence, and quasi-admission, actions (or failures to act) which would result a destruction of critical, pertinent, and relevant evidence gives concern regarding the protection of evidence. The defendants undoubtedly has forgotten one defendants written statement to another instruction him to listen to the tape and predicated upon the outcome of listening to the zoning meeting tape he should then and only then perform certain actions. As instructed the defendant performed the actions requested by the initial defendant proving the unaltered, successful, functioning tape existed at one point after the meetings. Know the defendants and their internal and external attorneys have emphatically stated the tapes have malfunctioned, are unsuccessful, and distorted rending them hard to hear.

Wherefore Plaintiff prays that this court issues the rule as hereinabove sought directing defendants to show cause at the time, date and place fixed at the pleasure of this court.

## REQUEST FOR ORDER OF PERSERVATION OF DOCUMENT AND TANGIELE THINGS

As the prejudiced parties our request is to be made whole through the award of sanctions and a default judgment. In addition to the Business Interruption Lost, Contract Lost, and many other types of compensatory damage loses the Forensic Expert in this case has Identified losses in the tens of millions of dollars a final evidentiary hearing request to determine to total damages is sought. The Expert Surveyor has substantiated the compliance of the home to the City of North Charleston Ordinances, and the Land and Building Expert along with the City of North Charleston have confirmed the compliance of the home to the North Charleston adopted ICC Regulations with not reason known that a Certificate of Occupancy should not be issued. Recently, Plaintiff's have incurred more than $320,000.00 as a direct result of acquiring evidence to gather evidence in order to prove the defendants tampering, abuse, and the other malicious actions of this motion. The impact of the delays North Charleston has caused by delaying discovery. The increase cost of gathering of this evidence resulted from the dilatory tactics used by the City of North Charleston.

The city of North Charleston and it Attorney have exhibited the most egregious misconduct possible. The purposeful evasion, malicious and will full evasion of their duty to answer. The city has after a court order flagrantly disregarded its duty to preserve and issue a Litigation Hold Notification after repeat request to do so. The City of North Charleston and its attorneys have deliberately resisted and destroyed evidence that could have been preserved without undue burden. This bad faith destruction of documents has prejudice the Plaintiffs in this case. Out of more than five tapings the city has admitted in writing that the tapes have malfunction or been unsuccessful. Yet they refuse to surrender the malfunctioned or unsuccessful tapes so that the part that did not malfunction or was successful could be examined by an audio preservation solutions specialist and the remainder sent to a Lab for restoration or analysis. *See* Canton v. Kmart Corp., No. 1:05-cv-143, 2009 WL 2058908, at *1–3 (D.V.I. July 13, 2009), ); Buckley v. Mukasey, 538 F.3d 306, 323 (4th Cir. 2008),

The city of North Charleston has Failed to preserve; Failed to Produce; Delayed Production; Misrepresented the Completeness of Production, and Failed to perform adequate searches for information. In addition the City of North Charleston has intentionally altered documents and implied admissions to tampering with evidence during this Federal Proceeding a clear violation of the The Sarbanes-Oxley Act.

# SPECIAL MASTER: FORENSIC COMPUTER ANALYSIS

As a result for the following action and inaction of the defendants the plaintiffs in this case request an order for Special Master Forensic Computer Analysis Pursuant to FRCP Rule 53 and submit the following two forensic computer companies.

Pinkerton Forensic Computer    1707-4273557

- 1201 Roberts Blvd.

- 30144 Kennesaw

Diversified Investigative Services and Computer Forensics Inc.

8138 2nd Street, Downey, CA 90241

Office: (562) 319-0411

Because of the noted integrity, reputation, and experience on other cases the plaintiff suggest the previous companies.   The plaintiffs attest to having no person connection with either company and understand the responsibility of the company and report is for an unbiased report to go to the court and each party.   The duty of the company is to assist the court in a technical way based upon its expertise.   Plaintiff also request that in the event any documents are retrieved that defendant withheld that is material in this case the cost of reconstruction and repair of such information should be absorbed by the defendant plus attorney fees and cost.

- Defendant attorney failed to issue a written litigation hold even after requested by plaintiffs on more than one occasion;

- Defendant failed to identify all of the key players and to ensure that their electronic and paper records are preserved, such as tapes from April, May, June, July, and Nov. 2008 even after requested by plaintiff

- Defendant stated emails, letters, and documents known to both parties were non-existent and failed to cease the deletion of email or to preserve the records of former employees and employees that are in a party's possession, custody, or control

- Defendants failed to preserve backup tapes when they are the sole source of relevant information related to key players, when they were fully aware that relevant information maintained by those players is not obtainable from any other readily accessible sources." Defendants claim digital files are not attainable.

The request for this order comes after plaintiff can unequivocally establish evidence of spoliation and require proof that: (a) the party had control over the evidence and an obligation to preserve it at the time it was lost or destroyed; (b) acted with a culpable state of mind; and (c) the lost or destroyed evidence was not only relevant to the innocent party's claims or defenses, but also that party suffered real prejudice as a result. Plaintiff notes that E-discovery sanctions have been granted in many civil rights cases. In the interest of preserving the integrity of the information presented to the court plaintiffs pray the court would order a Special Master, Forensic Computer Analysis Pursuant to Rule 53 of the FRCP to search, collect, restore, restructure, reconstruct, inspect, copy and report all files connected to this case under the control of the defendants, their agents, or third parties in which defendants should have access to data.

Swofford v. Eslinger, 671 F. Supp. 2d 1274 (M.D. Fla. 2009)

Zubulake v. UBS Warburg LLC (*Zubulake V*), 229
F.R.D. 422 (S.D.N.Y. 2004)

Qualcomm Inc. v. Broadcom Corp., No. 05cv1958-B (BLM), 2008 WL 66932 (S.D.
Cal. Jan. 7), *vacated in part*, 2008 WL 638108 (S.D. Cal. Mar. 5, 2008)

## SANTIONS FOR ABUSE OF DISCOVERY PROCESS

First, City of North Charleston Has admitted to inefficient, sloppy, and carless, processes for document storage, retention and retrieval. All of which will result in inefficiently high discovery expenditures. A prime example is the fact that on numerous occasions from the City of North Charleston and of their attorney it has been requested ,to their admittance, that they provide information in digital format as requested in the production of documents and as stated in the FRCP. Instead they provide information that has been copied or scanned. This is the most inefficient means of producing the documents. The direct copying of a digital file has minimum cost especially when the USB media has been supplied by the opposing party, as I have done in this case. Instead the City chooses to the process of printing the document from a digital file, then scanning the document wasting paper, time, and valuable resources, then copying the document or requiring to be copied by the opposing party as I have had to do even though the FRCP states the cost is to be absorbed by the opposing party. The only logical explanations to this public waste and less than logical thinking would be if the city did not know and could not understand how inefficient their processes are in wasting tax payer dollars or if they had something to hide by not surrendering the critically important metadata files that would be embedded into the documents digital file. The metadata file would clearly show a history and origin of the documents in order that a time frame could be established to test the truth of each statement made regarding when items were produced and could be delivered. The metadata file and its 5 layers are akin to a person's DNA on a forensic level and tell the unequivocal truth by the numbers, about dates, times, originator, etc. As the prejudiced parties our request is to be made whole through the award of sanctions and a default judgment against the defendants.

Pursuant to Rule 26(g) the city of North Charleston has refused to submitted requested discovery and when submitted did so without the Attorney of record signing the documents. Pursuant to Rule 34 (b) (E) (i) the city has adamantly refused to produce documents as they are kept in the usual course of business or to organize and label them to correspond to the categories in the request. Pursuant to 37(b) the City of North Charleston and its Attorney has failed to obey a direct court order to deliver FOIA responses and Production of Documents, egregious actions that should be treated as contempt of court since they have with stiff neck dogmatically refused to surrender request for more than 1000 days on the FOIA and over 8 months for the production of documents, even after consenting to and have a direct order from a Federal Judge. This type of action would shock the conscious of the American public who would wonder if Rule 35 would be in order. Pursuant to Rule 37(c) the City of North Charleston and its Attorney of record has refused to issue the supplemental response stated in the court order. Pursuant to Section 1927 of 28 U.S.C., titled "Counsel's liability for excessive costs," also provides authority to sanction any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously." The plaintiffs in this case have repeatedly requested cost efficient digital file copies to no avail and even provided a 320 gigabyte USB media item for storage. When the requirements of the rules or statute are not met, federal courts still have sanctioned parties for e-discovery

violations, deriving their sanctioning power from the court's inherent authority. This inherent power arises from courts' authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

1. A court must impose sanctions under Rule 26(g) against the party, its counsel, or both, when the party fails to meet its disclosure obligations under Rule 26. FED. R. CIV. P. 26(g)(3). The completeness and accuracy of these disclosures must be certified by an attorney of record. *Id.* 26(g)(1). This certification requirement includes an obligation to conduct a reasonable inquiry into the disclosures. *Id.* Sanctions may include the imposition of expenses and attorneys' fees incurred by the opposing party due to the violation. *Id.* 26(g)(3).

2. Rule 37(b) provides for sanctions against a party for violations of a discovery order. *Id.* 37(b). It lists potential sanctions ranging from dismissal to evidentiary preclusion to a stay of proceedings until the order is stayed. *Id.* 37(b)(2)(A). These sanctions include

   (i) directing that matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order, except an order to submit to a physical or mental examination.

*Id.* Additionally, the court must require that the noncompliant party, its attorneys, or both, "pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." *Id.* 37(b)(2)(C).

1. The court may sanction a noncompliant party under Rule 37(c) if the party does not make the required disclosure under Rule 26(a) or properly supplement its disclosures. *Id.* 37(c). Under Rule 37(c)(1), the court may prevent the use of the evidence or witnesses not provided. *Id.* 37(c)(1). The court may also require the payment of reasonable expenses and attorneys' fees, inform the jury of the party's failure, and impose any of the other sanctions at the court's disposal under Rule 37. *Id.*

2. Should a party fail to respond or object to a request under Rule 34, the court may choose to sanction the party with any of the sanctions available under Rule 37(b). *Id.* 37(d)(3). The court may also require that the sanctioned party, its attorney, or both pay the reasonable expenses associated with the motion. *Id.*

3. The court may sanction only attorneys under this provision. 28 U.S.C. § 1927 (2006). The court may impose as a sanction the payment of the excess costs and attorneys' fees that result from the offending attorney's conduct. *Id.*

4. Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (citing Link v. Wabash R.R. Co., 370

The Defendants have flagrantly and willfully exhibited a failure to preserve ESI, clearly, sanctionable conduct. These malicious actions committed by the defendants are a combination of multiple types of misconducts failure to preserve ESI, a clear cut basis for sanctions. Their Failure to produce even after a Federal Court Order is deplorable, despicable, and a direct disobedience the Court and the Honorable Judge's direct order. They have for eight months under discovery duties willfully delayed the production of documents and has totally and flagrantly disregarded FOIA request in violation of Federal, State, and their own Municipality ordinances which state that responses are generated in 15 days. North Charleston and its Attorney have failed to preserve and failure to produce request production of documents, FOIA Request since 2008. Well over 1000 days old (North Charleston requirement states a 15 day response). This dogmatic disobedience and flagrant disregard for the law would certainly shock the conscious of English speaking Americans.

Plaintiff's requested sanctions for these most serious violations if moved forward to trial, a requested to include adverse inference to the jury, a prohibition of cross examination of experts, and imposed monetary awards for such serious e-discovery lapses.

1. Sterle v. Elizabeth Arden, Inc., No. 3:06 CV 01584(DJS), 2008 WL 961216, at *10, *14 (D. Conn. Apr. 9, 2008)*See* Great Am. Ins. Co. v. Lowry Dev., LLC, Civil Action Nos. 1:06CV097 LTS-RHW, 1:06CV412 LTS-RHW, 2007 WL 4268776, at *4 (S.D. Miss. Nov. 30, 2007)
2. *See* Juniper Networks, Inc. v. Toshiba Am., Inc., No. 2:05-CV-479, 2007 WL 2021776, at *4 (E.D. Tex. July 11, 2007) *See id.*
3. *See* Preferred Care Partners Holding Corp. v. Humana, Inc., No. 08-20424-CIV, 2009 WL 982460, at *10 (S.D. Fla. Apr. 9, 2009
4. Hahn v. Minn. Beef Indus., Inc., No. 00-2282 RHKSRN, 2002 WL 32667146, at *4 (D. Minn. Mar. 8, 2002

North Charleston has admitted to failing to preserve evidence even after they knew and should have known and been acutely aware of their obligation to preserve the information in this case. When defendants intentionally seek to under mind the purpose and good face replication of discovery items pertinent to the pursuit of plaintiff's claim sanction are in order. These actions constitute vexation that is an inhibitor to the plaintiff's right to discovery.

1. *See* Qualcomm Inc. v. Broadcom Corp., No. 05cv1958-B (BLM), 2008 WL 66932, at *18–19 (S.D. Cal. Jan. 7)
2. *See* Claredi Corp. v. Seebeyond Tech. Corp., No. 4:04CV1304 RWS, 2007 WL 735018, at *4 (E.D. Mo. Mar. 8, 2007)
3. Wachtel v. Health Net, Inc., 239 F.R.D. 81, 111 (D.N.J. 2006); Nat'l Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 559 (N.D. Cal. 1987)

1. Tech. Recycling Corp. v. City of Taylor, 186 F. App'x 624 (6th Cir. 2006);
2. Computer Task Grp., Inc. v. Brotby, 364 F.3d 1112 (9th Cir. 2004);
3. Crown Life Ins. Co. v. Craig, 995 F.2d 1376 (7th Cir. 1993
4. Ridge Chrysler Jeep, LLC v. DaimlerChrysler Servs. N. Am. LLC, No. 03 C 760, 2006 WL 2808158 (N.D. Ill. Sept. 6, 2006), *aff'd sub nom.* Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Ams. LLC, 516 F.3d 623 (7th Cir. 2008); *In re*
5. Telxon Corp. Sec. Litig., Nos. 5:98CV2876, 01:01CV1078, 2004 WL 3192729 (N.D. Ohio July 16, 2004);

The collective consideration of North Charleston's failure to preserve ESI or produce ESI in tandem with misrepresentations and far-fetched explanations to the court regarding how spoliation of data had occurred is preposterous and warrants sanctions. In addition to the claims of privilege for information that is public information. The claims of attorney client privilege for information discussed with third parties or information that was generated prior to the Attorney's involvement and finally the defendants have made the preposterous claim that the ZBA secretary notes from the zoning meetings were unsuccessful.

1 Arista Records, L.L.C. v. Tschirhart, 241 F.R.D. 462, 465 (W.D. Tex. 2006).
2 MeccaTech, Inc. v. Kiser, No. 8:05CV570, 2008 WL 6010937, at *9 (D. Neb. Apr. 2, 2008).
3 Ameriwood Indus. v. Liberman, No. 4:06CV524-DJS, 2007 WL 5110313, at *7 (E.D. Mo. July 3, 2007).
4 Grange Mut. Cas. Co. v. Mack, 270 F. App'x 372 (6th Cir. 2008) (per curiam *See, e.g.*, *Grange Mut.*, 270 F. App'x at
5 *Koninklike Philips*, 2007 WL 3101248, at *
6 *Perez-Farias*, 2007 WL 2327073, at

Plaintiff seeks the Order of Preservation to minimize the written admission by the Defendants that critical data and evidence has not been maintained paramount to this case while in the complete control of the Defendant who allowed the destruction to occur while defendant was in full knowledge of their duty to preserve. Defendants have also in writing attested to the sloppiness and poor management of its own data management document storage and retrieval systems. This gives many windows of opportunity for willful misconduct which typically involved the modification or destruction of data through automated and manual file deletions or physical tampering with computer systems and in some cases deliberate and knowing actions to destroy data. This clearly characterizes the conduct as willful, intentional, and sinister. This type of contumacious bad faith should be met with daily sanctions for engaging in the blatant effort to prevent plaintiffs form proving their case against The City of North Charleston.

1. *See, e.g.*, Arista Records, L.L.C. v. Tschirhart, 241 F.R.D. 462, 465 (W.D. Tex. 2006
2. Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc., 133 F.R.D. 166, 170 (D. Colo.

1990)

3.  *See Gamby*, 2009 WL 127782, at *3

4.  ; *Kucala*, 2003 WL 21230605, at *7

Use of many of the software deletion programs are a concern.   Programs such as "Evidence Eliminator,""Wipe & Delete", "Disk Investigator", "Delete Doctor", "and   "GhostSurf" which constitute aggressively, willful and, intentional misconduct if used.

The court inherent power in combination with Rule 37, Rule 26, and Rule 41 to grant a Default Judgment on the part of the Plaintiff in this case. At a minimum the court should render an Adverse inference and a prohibition of cross examination for the malicious, willful, and bad faith, action exhibited by the City of North Charleston and its Attorney's in house and external.

1. Se. Mech. Servs., Inc. v. Brody (*Brody II*), 657 F. Supp. 2d 1293 (M.D. Fla. 2009)
2. . 2001); Swofford v. Eslinger, 671 F. Supp. 2d 1274 (M.D. Fla. 2009);; KCH
3. Servs., Inc. v. Vanaire, Inc., No. 05-777, 2009 WL 2216601 (W.D. Ky. July 22, 2009); Goodman
4.     Johnson v. Wells Fargo Home Mortg.,

Tantivy Commc'ns, Inc. v. Lucent Techs. Inc., No. Civ.A.2:04CV79 (TJW), 2005 WL 2860976 (E.D. Tex. Nov. 1, 2005)

Tantivy Commc'ns, Inc. v. Lucent Techs. Inc., No. Civ.A.2:04CV79 (TJW), 2005 WL 2860976 (E.D. Tex. Nov. 1, 2005)

Tantivy Commc'ns, Inc. v. Lucent Techs. Inc., No. Civ.A.2:04CV79 (TJW), 2005 WL 2860976 (E.D. Tex. Nov. 1, 2005)

330 Sheppard v. River Valley Fitness One, L.P., 203
    F.R.D. 56 (D.N.H. 2001), *adopted in part and rejected in part by* No. Civ.
    00-111-M, 2004 WL 102493 (D.N.H. Jan. 22, 2004), *aff'd in part and
    vacated in part*, 428 F.3d 1 (1st Cir. 2005)

293 Pioneer Hi-Bred Int'l, Inc. v. Monsanto Co., No. 4:97CV01609 ERW, 2001 WL
    170410 (E.D. Mo. Jan. 2), *amended by* 2001 WL 34127923 (E.D. Mo. Feb. 20,
    2001)

243 MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc., 422
    F. Supp. 2d 724 (N.D. Tex. 2006)

203 Koninklike Philips Elecs. N.V. v. KXD Tech., Inc., No.
    2:05-cv-1532-RLH-GWF, 2007 WL 3101248

150 Hawaiian Airlines, Inc. v. Mesa Air Grp., Inc. (*In re* Hawaiian Airlines, Inc.),
    Bankr. No. 03-00817, Adv. No. 06-90026, 2007 WL 3172642 (Bankr. D. Haw.
    Oct. 30, 2007)

Courts have used a variety of different rules, statutes, and powers to sanction parties for e-discovery violations. The overt and covert rank actions of the defendants in this case have reached an all time high and should not go unpunished to the full extent of the law. To purposefully attempt to provide misleading information, false statements, and altered documents to the court and the Trier of fact whether judge or jury is as low as a professional can stoop rather than argue a case on its merits. Again, such actions should be punished by the full extent of the law. The Plaintiff in this case request sanctions, in the amount of $320,000.00 and a default judgment.

1. Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc., 347 F. App'x 275 (9th Cir. 2009);
2. Grider v. Keystone Health Plan Cent., Inc., 580 F.3d 119 (3d Cir. 2009);
3. O'Brien v. Ed Donnelly Enters., 575 F.3d 567 (6th Cir. 2009);
4. Ibarra v. Baker, 338 F. App'x 457 (5th Cir. 2009); Wong v. Thomas, 341 F. App'x 765 (3d Cir. 2009
5. Procter & Gamble Co. v. Haugen, 427 F.3d 727 (10th Cir. 2005);
6. Koken v. Black & Veatch Constr., Inc., 426 F.3d 39 (1st Cir. 2005);

The sanctioned monetary awards for conduct equivalent to what North Charleston has exhibited ranged from in the hundreds of dollars to over eight million dollars. The plaintiffs in this case are requesting to have sanction imposed of $320,000.00 and an evidentiary hearing upon a default judgment to determine based upon the CFFA Forensic Analyst's compensatory damages report the final monetary award which the plaintiff is request a thirty to one (30:1) ratio.    Recently, a simple defamation case in SC resulted in a ninety one (71:1) $6.5 million in punitive damages, a Beaufort real estate agent falsely accused of child molestation has been ordered to negotiate with the defendant to pare down the settlement.

A Beaufort County jury sided Friday with Matthew McAlhaney, a founding partner of Town and Country Real Estate, who sued Richard McElveen Sr., his wife, Linda, and their son, Richard Jr. McAlhaney claimed the McElveens conspired in March 2004 to have him brought up on child molestation charges to help win a custody dispute with the woman he was dating at the time. The juryawarded McAlhaney more than $91,000 in actual damages and $6.5 million in punitive damages from McElveen Sr.

The Tronzo v. Biomet Inc., 236 F.3d 1342 (2001). **38,000** to1 punitive damages ratio and got approval.   North Charleston as committed slander of title by calling and

relaying unfounded, negative, and damaging information to Wachovia the plaintiff's mortgage company. Wachovia intern, solely on the bases of The City of North Charleston false statements and comments, demanded another appraisal. Then Wachovia relayed and ,according to the appraiser in writing, instructed him to use the information and contact the City of North Charleston. The damaging information and instructions use by the appraisal company Beresford Appraisals Group, LLC and its appraiser David Bates was damaging. The conferences held between the appraiser and the city Planning, Zoning, and Building Departments resulted in a damaging, devalued appraisal. The appraiser made comments and valuations he otherwise would not have made without Wachovia's instructions and North Charleston Comments. The mortgage company division resides in Jacksonville FL. North Charleston and the defendants refuses to answer or divulge how they knew the name and number of the non-published construction loan department and the exact person.

North Charleston's slanderous and libel conduct coupled with defamation by publishing that the plaintiff was in contempt of court without a court order and with no authority given to the ZBA by statue to do so, no valid Circuit Judge order for contempt has ever been issued even up until this present day constitutes malicious, intentional governmental overreaching and conspiratorial behavior. The collective and concerted actions of the defendants and the third parties have been so irreprehensible that they warrant drastic measure to prevent such judicial vulgarity from ever reoccurring

1 Grange Mut. Cas. Co. v. Mack, 270 F. App'x 372 (6th Cir. 2008) (per curiam)
2 Qualcomm Inc. v. Broadcom Corp., No. 05cv1958-B (BLM), 2008 WL 66932 (S.D. Cal. Jan. 7), *vacated in part*, 2008 WL 638108 (S.D. Cal. Mar. 5, 2008)
3 Pioneer Hi-Bred Int'l, Inc. v. Monsanto Co., No. 4:97CV01609 ERW, 2001 WL 170410 (E.D. Mo. Jan. 2), *amended by* 2001 WL 34127923 (E.D. Mo. Feb. 20, 2001)
4 Wachtel v. Health Net, Inc., 239 F.R.D. 81 (D.N.J. 2006); Wachtel v. Health Net, Inc., Civ. Nos. 01-4183, 03-1801, 2007 WL 1791553 (D.N.J. June 19, 2007) 5 S. New Eng. Tel. Co. v. Global NAPs, Inc., 251 F.R.D. 82 (D. Conn. 2008), *aff'd*, No. 08-4518-cv, 2010 WL 3325962 (2d Cir. Aug. 25, 2010)

6 Hawaiian Airlines, Inc. v. Mesa Air Grp. (*In re* Hawaiian Airlines, Inc.), Bankr. No. 03-00817, Adv. No. 06-90026, 2007 WL 3172642 (Bankr. D. Haw. Oct. 30, 2007); Hawaiian Airlines, Inc. v. Mesa Air Grp. (*In re* Hawaiian Airlines, Inc.), Bankr. No. 03-00817, Adv. No. 06-90026, 2008 WL 185649 (Bankr. D. Haw. Jan. 22, 2008)

7    United States v. Philip Morris USA Inc., 327 F. Supp. 2d 21 (D.D.C. 2004).

8    z4 Techs., Inc. v. Microsoft Corp., No. 6:06-CV-142, 2006 WL 2401099 (E.D. Tex. Aug. 18, 2006), *aff'd*, 507 F.3d 1340 (Fed. Cir. 2007) Kipperman v. Onex Corp., 260 F.R.D. 682 (N.D. Ga. 2009)

9        SI Inv. Partners II, L.P. v. Cendant Corp., 507 F. Supp. 2d 384 11(S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009) *E*Trade*, 230 F.R.D. at 586; *Zubulake V*, 229 F.R.D. at 433.

# SPOLIATION AND TAMPERING WITH EVIDENCE

Spoliation is the destruction, significant alteration, or non-preservation of evidence relevant to pending or reasonably foreseeable litigation. Universally recognized as impermissible, spoliation of evidence may occur when litigants or potential litigants are charged with the duty "to preserve property for another's use as evidence in pending or future litigation. Evidence destruction "undermines two important goals of the judicial system – truth and fairness. Although courts may impose sanctions on spoilating parties, before any such sanctions are imposed courts must determine initially whether a duty to preserve evidence exists. If such a duty exists, then courts will examine the nature of the evidence lost or destroyed and whether the evidence was destroyed intentionally or negligently.

The duty to preserve evidence arises from at least three different sources. First, the duty may arise by statute or regulation, or by ethical duties of a profession. Second, a duty may also arise if a party voluntarily assumes such duty. Finally, a duty may arise when litigation is filed, is imminent or is common or frequent in a particular industry. Courts decide the question of whether a party has a duty to preserve evidence on a case-by-case basis, and generally refuse to find a duty to preserve evidence where the litigation possibility is too remote or speculative. The extent of the duty to preserve evidence varies depending upon whether a party is a litigant or non-litigant. The duty to preserve attaches to litigants when they are served with either an administrative or judicial complaint. In at least one instance, the Eighth Circuit has held that the duty to preserve evidence even extends to evidence third parties control.

1 *See Rambus* discussion *infra* at 8 -10.

2 *See, e.g., Stevenson v. Union Pacific Railroad,* 354 F.3d 739, 748 (8th Cir. 2004); *Dillon v. Nissan Motor Co. Ltd.,* 986 F.2d 263, 267 (8th Cir. 1993); *Lewy v. Remington Arms Co., Inc.,* 836 F.2d 1104,1112 (8th Cir. 1988); *see also Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216, 92 Fair Empl. Prac. Cas. (BNA) 1539 (S.D.N.Y. 2003).

3 *Fed Mut. Ins. Co. v. Litchfield Precision Components Inc.*, 456 N.W.2d 434, 436 (Minn. 1990); *see also* Black's Law Dictionary 1132 (7th ed. 2000).

4 Lawrence B. Solum & Stephen J. Marzen, *Truth & Uncertainty: Legal Control of the Destruction of Evidence,* 36 **EMORY L.J.** 1085, 1138 (1987).

5 Lauri Kindel & Kai Richter, *Spoliation of Evidence: Will the New Millennium See a Further Expansion of Sanctions for the Improper Destruction of Evidence?,* 27 **WM. MITCHELL L. REV**. 687, 689 (2000).

6 *See infra* at 8 -15.

7 Note, *Linking the Culpability and Circumstantial Evidence Requirements for the Spoliation Inference,* 51 **DUKE L.J.** 1803, 1807-08 (2002).

8 Note, 51 **DUKE L.J.** at 1808 n. 35, 36, 37.

9 Jeffrey S. Kinsler & Anne R. Keyes MacIver, *Demystifying Spoliation of Evidence,* 34 **TORT & INS. L.J.** 761, 763-64 (1999).

10 *Id.* at 764.

# FRAUD OF THE COURT

Realizing that "Fraud of the Court" is a very serious charge and is one that should not be taken lightly, used prematurely, or frivolously yet as a result of the defendants attorneys in house and external attorneys disingenuous actions it is necessary. Sanctions are effective when dealing with cheaters who engage in such, lowdown, underhanded, despicable, skullduggery tactics.  Recent decisions, including Destafano v. State Farm Mutual Automobile Insurance Co., 28 Fla. L. Weekly D1077 (Fla. 1st DCA April 28, 2003), and Long v. Swofford, 805 So. 2d 882 (Fla. 3d DCA 2003), have been more favorably disposed to affirm dismissals and when appropiate default judgments with prejudice for serious, palpable "fraud on the court." When is conduct sufficiently egregious to distinguish it from arguable forgetfulness or misunderstanding? How much bad conduct is enough? Does one terrible and indisputable untruth about a fact central to the case suffice or does it require numerous as the defendants Attorneys have done? What about a whole series of untruths which make it difficult for the opposing party to ferret out the true facts What if the misconduct is entirely procedural, involving repeated deliberate attempts to obstruct discovery by failing to comply with court orders as North Charleston has routinely exhibited contumacy.   By the physical altercation of data and documents presented to the public, the opposing party, the court, and the judge, the defendants in this case have committed fraud at its best.   Contrary to request to updates o any changes in evidence, the defendants under the watchful discovery management and control of their attorneys have altered site plan requirements, front yard setback requirements, zoning requirements, definitions, forms, and many documents that are paramount and specific to the critical and direct subject matters of this lawsuit without informing the opposing party of any such changes.   These actions go as far as requiring third party vendors such as Muni-code to alter documents that are presented to the public, the courts and the judge. Many of the changes have been performed without proper authorized approval process being followed and absolutely no updates to plaintiff's as requested in the request for production of documents.   The ZBA based upon minutes has not issued an order for plaintiff to perform any action or refrain from any action, yet the Legal Department concocted a document ordering the plaintiff to comply with a phantom code that is not stated and does not exist.   The tapes have been said to have been unsuccessful.   Defendants claim says they cannot be used for verification of anything. The destruction had to occur after Bill Gore retrieved the notice information in the recording and after the minutes were transcribed.   This can be established based upon the defendants clear written statements.   The notes from the public ZBA meetings taken by the recorder according to the defendant's external attorney "were not successful" and the staff attorney "malfunctioned" not due to operator error but defective equipment, yet they used the same defective equipment for all 5 tapes requested or all recorders for the city of North Charleston are defective. The defendants written statements clearly support the clarity and the functionality of the tapes after the ZBA meeting.   I still fail to understand how an individual's notes could be

unsuccessful when requested as discovery as the defendant's have claimed for the ZBA regarding secretary written notes.

MUNICIPAL SECURITIES RULEMAKING BOARD RECEIVES APPROVAL FROM SECURITIES AND EXCHANGE COMMISSION ON MUNICIPAL BOND DISCLOSURE PROPOSALS

**Alexandria, VA** – The Municipal Securities Rulemaking Board (MSRB) has received approval from the Securities and Exchange Commission (SEC) on proposals for additional disclosure related to municipal bonds. Within 12 months, underwriters of municipal securities will be required to provide – and municipal securities issuers will be able to provide voluntarily – information to assist investors and other market participants in assessing the availability of ongoing disclosures made by issuers through the MSRB's Electronic Municipal Market Access (EMMA) website. Also within 12 months, issuers will be permitted to disseminate pre-sale disclosures through the EMMA website, which provides free, centralized public access to all new issue disclosure documents for the municipal securities market.

"We are pleased that the SEC continues to value the importance of disclosure in the municipal bond market," said MSRB Executive Director Lynnette Kelly Hotchkiss. "Our goal is to facilitate the flow of information from issuers to investors and the general public in a manner that respects the unique role of state and local governments. The changes approved by the SEC enhance the required disclosures from issuers and ensures even more disclosures about material events for investors."

The SEC's approval was in conjunction with its adoption of amendments to SEC Rule 15c2-12 on municipal securities disclosure.

The Sarbanes-Oxley (SOX) ACT is relevant to any company that has regulation by the SEC and when municipalities issue bonds they become regulated by the SEC. Being regulated by the SEC subjects and entity, municipality included to the SEC regulations hence the SOX act is also relevant for fraud and tampering charges against the City of North Charleston and its attorneys and employees who have violated the SOX Act.

Even more despicable the City engaged in a State augmented process to deny civil rights. This action is a clear cut case of civil conspiracy to deny civil rights, the difference between a badge of slavery and American Citizenship. On Dec. 18th, 2008 a so call hearing was held in the Circuit Court without the knowledge or scheduling of the administrative clerk. Only this non-jury session was held in Charleston County. All administrative clerks scheduled non jury sessions were held in Berkeley County due to the alternating arrangement between the two counties. This case was scheduled directly by the judge who according to the administrative clerk is not suppose to happen. Hence why the clerk, the stenographer, and the clerk administrative supervisor had no record of the hearing. The hearing was scheduled in the middle of a three day

jury trial. The hearing lasted for fifteen minutes with a prohibition to discuss the merits of the case. The City of North Charleston Attorney asked of the judge (Roger Young) would the merits of the Case be discussed and the judge replied and affirmative "no". The Judge's friend Brady Hair and North Charleston Attorney gave North Charleston's other attorney Tim Amey a memorandum that was passed directly to the judge and never seen by the opposing party, eventually several days later after repeated request John Singletary was given a copy of the memorandum. The memorandum included many disingenuous statements and absolutely no cases dealing with the case at hands true subject matter "area variance". The brief dealt with zoning land use variances exclusively with was a clear misapplication of the law. Judge Roger Young stated clearly that he had a jury waiting and could only devote fifteen (15) minutes to the hearing indicating a follow-up hearing would have to take place. The stenographer resisted delivering the transcript after denying the hearing ever took place after persistence from John Singletary and a call to the court administrator in Columbia the transcript was issued. The administrative clerk found the hearing on no docket. The Court Management Supervisor, Don Michal, resisted giving any docket or scheduling information, until I asked if I needed to request a subpoena from the federal court clerk to obtain the information. There is no record of any notice of the order until one of the defendants sends a letter state I the appeal date had passed and the judge ruled in their favor. Initial inquires for the proof service for the notice were met with opposition until finally the answer that the notice was sent from a contract service in Atlanta GA and they had no record of the notice was given. The stenographer has ignored request for the transcript case 2007-cp-10-2937. Eventually the fifteen minutes was up and the staged hearing was abruptly ended. I requested the judge recuse himself from the case and he denied. This judge (Roger Young) has heard 21 zoning cases for North Charleston and either found in their favor or dismissed each case, he has never ruled against them. This same judge refused to recuse himself from the case stating that he had no relationship with any one at North Charleston. This same Judge who played Little League Dixie Youth Baseball, with the present City Attorney Brady Hair for years. Here is the article from the associated press and a little history of North Charleston' Dixie Youth Baseball Team.

# Youth baseball league battles past, flourishes as integrated program

**Published:** Sunday, August 07, 2005

ASSOCIATED PRESS

AUBURN, Ala. (AP) - Dixie Youth Baseball was founded on racism, when dozens of all-white teams formed their own league to escape integration.

Fifty years later, as the league's World Series begins this weekend in Alabama, its leaders say it's all about kids, not color.

Rather than play an all-black team that entered a state tournament during the days of legalized segregation, 61 all-white teams from South Carolina bolted the Pennsylvania-based Little League organization and held their own tournament in 1955 - no minorities allowed.

Associated Press

Glenn Lucas with Southern Athletic Fields paints the Dixie Youth World Series logo on one of the fields Thursday in Auburn, Ala.

That act of defiance planted the seed that became Dixie Youth. As white opposition to integration spread across the Deep South, the lily-white league grew like kudzu after a summer shower.

Today, Dixie Youth Baseball has hundreds of leagues in 11 Southern states. And although it banished racial restrictions decades ago, it still has its critics. Players of any color or ethnicity are now welcome, as are both boys and girls, and the program is flourishing as the nation's No. 2 youth baseball program.

"Everything has changed," said 81-year-old Matt Goyak, the league co-founder and longtime president. "We've got everyone including girls in the World Series."

The league still stresses local autonomy, a reminder of the "states' rights" cries of Southern opponents of integration a half-century ago. And it got rid of what some saw as a symbol of open defiance - the Confederate battle flag on its official insignia - but not until 1994.

Gus Holt, who serves as a spokesman and historian for the all-black South Carolina team that the white Little League teams wouldn't play in 1955, has little use for Dixie Youth Baseball, then or now.

"I don't think too much of it," Holt said. "No one is saying it is a bad organization, but there is a legacy and a stigma behind it."

As 24 teams converged on the east Alabama town of Auburn for the 50th anniversary Dixie Youth World Series, which begins today with opening ceremonies, Goyak said today's organization bears little resemblance to the original incarnation.

About 400,000 players participate in Dixie Youth Baseball, second only to the much larger Little League, which holds its better-known World Series in Williamsport, Pa., beginning Aug. 19. Little League has more than 7,400 programs in over 100 countries.

But in the Deep South, Dixie Youth Baseball is the only kids' league that many people know. Shortstops field grounders in dusty parks where their dads once played, and entire communities turn out for district tournaments leading to state competitions.

It all started because of 14 black kids who could really play ball.

In 1955, as blacks and progressive whites began challenging legalized segregation, the Cannon Street YMCA in Charleston, S.C., fielded an all-black Little League team and entered the state tournament, which had always been for whites only.

Rather than playing and possibly losing to blacks, 61 white teams quit Little League and started Little Boys Baseball Inc., which became Dixie Youth Baseball a few years later. Goyak was city recreation director in Georgetown, S.C., at the time and withdrew his town's team.

"We all dropped out and played our own tournament," Goyak said. "The next year we went to six states, then eight and eventually 11. None of them wanted to play blacks, anywhere in the South.

"Michael Jordan played in North Carolina in Dixie Youth. Bo Jackson played in Alabama," Goyak said. "He's going to be one of the speakers this year at the World Series."

But the team that started Dixie Youth Baseball simply by being black never took the field.

The Cannon Street All Stars were declared the state winner by default when the whites quit, but rules prevented a team from participating in the Little League World Series unless it had played in a tournament. That kept the boys off the field at Williamsport.

The black players, however, did get an expenses-paid trip to Pennsylvania, where they stayed with other teams and watched the Little League World Series. The surviving Cannon Street All Stars were honored at the Little League tournament in 2002.

At least one member of Cannon Street All Stars had a son who played in a Dixie Youth program. Leroy Major, a pitcher and center fielder back in '55, said other members of the team have razzed him about his son, who's now 25, participating in the program.

"Somebody told me, 'Man, I can't believe you let your son play in that league. They're the ones who discriminated against you,'" Major said. "I didn't know the history at the time."

Major said Dixie Youth Baseball has never apologized for what happened 50 years ago. But last year some of the Cannon Street players did get to meet players from one of the all-white teams that wouldn't play them.

"We don't have any animosity toward them," he said. "It was an adult thing, not a kid thing. We all just wanted to play ball."

More History:

## *A History of Dixie Youth Baseball*

In late summer of 1955, a group of men in South Carolina met for the principal purpose of forming an organization which would provide a complete program of supervised baseball

for pre-teen boys. These men continued to meet and work throughout the winter of 1955-56, bringing in additional youth leaders to lay plans for the first summer of play.

It was 1956. The national debt was only $272 billion, Richard Nixon was Vice President, and Don Larsen pitched the perfect game in the World Series. But also taking place was a group of Southern leaders starting a new youth baseball organization then to be known as Little Boys Baseball, Inc. In 1962 the name was changed to Dixie Youth Baseball, Inc. because the Little League organization challenged the right to use the word "Little" in the name. The first game in the program took place in North Charleston, South Carolina, the home of the first commissioner, the late, beloved Danny Jones. The catcher to handle the first pitch was Mendel J. Davis, who served in the Congress for several terms from South Carolina's First Congressional District.

**Today North Charleston still honors Danny Jones on a recreation facility primarily played by African Americans in North Charleston.**

This same judge who attended Stall High School and played baseball with Brady Hair in High School, This same Judge who was a Judge in North Charleston, This same Judge who was once the City Attorney for North Charleston with all Departments including Zoning under him, This same Judge who when it was brought to his attention state he forgot about those things. This same Judge whose order simply said he agreed with the ZBA with no instructions to do anything.

Why have City Attorneys continuously refused to surrender production of documents regarding Officer Tommy Wallace and his partner who held John Singletary at gun point in his own home located at 4321 Waterview Circle? North Charleston SC 29418. This type of mafia rule mentality has no place in the American Government System. When Governmental overreaching marries mafia rule it becomes the beginning of the end of our Democratic Society. Even the clerk has refused to issue subpoenas to the plaintiff in this case in order to obtain third party information, yet the defendants attorney is free to issue countless subpoenas without court approval, as the law stipulates, and free from objection. The problem is that the FRCP states that the clerk must issue the subpoenas and it has not happened placing the plaintiffs at a debilitating disadvantage in acquiring evidence for trial.

Attorney Richard Lingenfelter for the City of North Charleston promised a copy of the Zoning meeting and when requested through letter and FOIA has refused to surrender the tape. He simply says the tapes malfunctioned. The same tapes city Attorney Stephanie McDonald says were unsuccessful. How much was successful and did not malfunction. Was it operator error or mechanical error. They have answered mechanical error on the tapes and operator error on the secretary notes yet she must have constructed the minutes from the notes if the tapes malfunctioned. However the written not by one of the defendants clearly state that the tapes exist. Why did they continue to use the same malfunctioning recorder for all five ZBA meetings in question. Why did they use the same secretary and note taker who had unsuccessful notes? Only they can explain these anomalies and abnormalities. There are hundreds of contradicting statements and scenarios in this case and without the requested discovery the questions will never be answered. Questions like why did County Council Women Miller who is not connected to the ZBA in any way take a personnel interest in have the plaintiff's property rezoned after the approval of the site plan. The Oct. 8 article in the post in courier makes it clear. Why is the plaintiff only of all residents in North Charleston being required to adhere to new zoning laws that are being retroactively applied only to them in this case? The plaintiffs property was zoned R-2 not R-1 and R-2 at that time listed no front yard setback in the ordinance as of the site plan approval date. Why has the City not addressed the more than hundreds of houses in R-1 subdivisions closer than the plaintiffs that the plaintiff have given addresses to the Zoning Department for investigation. Why does the Mayor's entire neighborhood and the Mayor's Wife's subdivision Hyde Village violate all R-1 zoned ordinances with no repercussions? Why is a home being built on the very same street as the plaintiff's presently with steps closer than the plaintiff's home? Who was the Post & Courier News Paper participant that made the statement "who does that black man think he is building a home like that in North Charleston." And why.

The basic standards governing fraud on the court are reasonably straightforward. As set forth in Cox v. Burke, 706 So. 2d 43, 47 (Fla. 5th DCA 1998):

> The requisite fraud on the court occurs where "it can be demonstrated, clearly and convincingly, that a party has deliberately set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the Trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989).... The trial court has the inherent authority, within the exercise of sound judicial discretion, to deal with an action when a party has perpetrated a fraud on the court, or where

a party refuses to comply with court orders. Kornblum v. Schneider, 609 So. 2d 138, 139 (Fla. 4th DCA 1992). In this case the Defendants attorney's have committed fraud of the court by willfully giving misleading and malicious false statements concerning the facts of the case and refusing to comply with a Federal Judge's Order to produce FOIA documents and production of documents.

The evidence necessary to support a finding of fraud on the court must be "clear and convincing," a higher burden than a mere "preponderance of the evidence." The defendants in this case have through answers and statements explicitly make statement that are fraudulent

Aoude v. Mobil Oil, 892 F.2d 1115, 1118 (1st Cir. 1989), on which Cox heavily relied, described the appellate court's role in applying the abuse of discretion standard of review:

Oil and Chemical Workers of Quincy, Inc.
v. Procter & Gamble Mfg. Co., 864 F.2d
927, 929 (1st Cir. 1988

As reiterated in Baker v. Myers Tractor Services, Inc., 765 So. 2d 149, (Fla. 1st DCA 2000):

Fraud on the court as described in this situation is both substantive and procedural, misconduct--although the line between the two can be blurry. What is clear is that sanctions and a default is available for both substantive and procedural misconduct. That is, in addition to encompassing false testimony and information about the facts of the case more conventionally considered to be fraud on the court, the sanction is also proper for repeated refusals to comply with court orders or otherwise obstructing or interfering with the ability of the opposing party and the court to fairly and expeditiously adjudicate the claim. "The trial court has the inherent authority, within the exercise of sound judicial discretion, to handle defiant actions when a party has perpetrated a fraud on the court, or where a party refuses to comply with court orders."

The nature of the defendant's attorney's actions clearly and directly subverts the judicial process. The integrity of the judicial system had been sufficiently challenged by such willful disobedience to a court order.

Telling the untruth about facts central to the case simply cannot be tolerated and, the court should not detain justice in applying sanctions and declaring a default judgment in favor of the plaintiff.

In Destafano v. State Farm Mutual Automobile Insurance Co., 28 Fla. L. Weekly D1077 (Fla. 1st DCA April 28, 2003

Defendants willful concealment and calculated misrepresentations does not constitute "truthful disclosure," and defendants conflicting testimony regarding several facts suggests intent to deceive. Regrettably, North Charleston and its attorney's did not consider telling the untruth about the nature and extent of their

actions and the facts of this case pertinent to this lawsuits to be egregious misconduct. To many times it is simply the way the game is played. "Everybody does it," according to this questionable train of thought, "so how bad can it possibly be?" the misconduct should not go unpunished.   Some of the more clever untruths such as unsuccessful tapings and malfunctioned recording, unsuccessful notes should be punished more severely than simple untruths such as the steps are not ICC compliant ( without measuring) are detrimental to the public and a safety hazard when the steps are more than twenty feed into the plaintiff's property and completely ICC compliant.   The public would have to trespass to come in contact with the steps.   Some individual's moral compass view the concept of "a little white untruth," vs "the Big Black untruth" as tolerable however factual evidence in the court of law requires the truth, the whole truth, and nothing but the truth.   My grandmother's saying was "son a half truth is a whole lie".

*In re* Intel Corp. Microprocessor Antitrust Litig., 258 F.R.D. 280, 282 n.5 (D. Del. 2008) (refusing to apply the Rule 37(f) safe harbor even though it was cited by the defendants in a letter to the court describing its email system's auto-delete function ); Orrell v. Motorcarparts of Am., Inc., No. 3:06CV418-R, 2007 WL 4287750, at *7 (W.D.N.C. Dec. 5, 2007) (ordering, in an employment case, that the plaintiff, who had "wiped" her laptop and was found to have served deficient discovery responses, serve complete responses and provide her home computer to defendants for forensic examination, and citing Rule 37(e), even though sanctions were neither sought nor awarded); Disability Rights Council v. Wash. Metro. Transit Auth., 242 F.R.D. 139, 146 (D.D.C. 2007) (holding that Rule 37(e) was inapplicable because no sanctions were sought and because of the "indefensible" failure to disable "auto-delete" during the course of litigation).
Aoude v. Mobil Oil Corp., 892 F.2d 1115, 15 Fed. R. Serv. 3d 482 (1st Cir. 1989) ("Because corrupt intent knows no stylistic boundaries, fraud on the court can take many forms.")
Lazare v. Weiss, 437 So. 2d 211 (Fla. 3d D.C.A. 1983) (Extreme sanction of striking defendant's answer and entering a default against him could not be imposed without first having afforded defendant an opportunity to be heard on the issue of whether his failure to appear at scheduled depositions was willful.); Austin v. Papol, 464 So. 2d 1338 (Fla. 2d D.C.A. 1985) (Trial court, which dismissed plaintiff's complaint with prejudice and entered default judgment against him on defendant's counterclaim, erred in imposing such extreme sanctions without first affording plaintiff opportunity to be heard on question whether his failure to appear at scheduled depositions was willful or in bad faith.)

Cox v. Burke, 706 So. 2d 43, 47 (Fla. 5th D.C.A. 1998)
see Swofford, 805 So. 2d at 884.

Rule 37(E)'s save harbor should be prohibited as shelter for the defendants and their attorney in this case.

Rule 37(e), adopted on December 1, 2006, contains a safe harbor for certain conduct relating to the preservation and production of ESI. The Rule provides: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."[151]

The drafters intended the rule to provide only "limited protection against sanctions."[152] Its purpose was to protect against sanctions arising solely from the loss of ESI through the routine operation of electronic systems that automatically discard information.[153] The rule was never intended to provide protection for all manner of missteps in the broad range of e-discovery activities performed by parties and their counsel—such as failure to search and failure to produce on schedule.

1 FED. R. CIV. P. 37(e). When adopted, the safe harbor provision was contained in Rule 37(f). The 2007 edition of the Federal Rules moved the safe harbor provision from Rule 37(f) to Rule 37(e) with no changes to the rule's text. *Compare id., with* FED. R. CIV. P. 37(f) (2006).

2 ADVISORY COMM. ON THE FEDERAL RULES OF CIVIL PROCEDURE, REPORT OF THE CIVIL RULES ADVISORY COMMITTEE 83 (May 27, 2005), *available at* http://www.uscourts.gov/ us courts/RulesAndPolicies/rules/Reports/CV5-2005.pdf. The Committee noted that the proposed new rule would afford "limited protection against sanctions" for the loss of information as a result of the routine operation of an electronic information system. The Committee recognized (1) that automated features in many electronic systems "automatically create, discard, or update information without specific direction from, or awareness of" system users; (2) that "such automatic features are essential to the operation of electronic information systems"; and (3) that "suspending or interrupting these features can be prohibitively expensive and burdensome." *Id.* The Committee noted that electronic information systems present issues for businesses that are absent from traditional, paper-based systems and that efforts to suspend automatic electronic processes risk disrupting business operations: "[i]t is unrealistic to expect parties to stop such routine operation of their computer systems as soon as they anticipate litigation."

## MANDAMUS

The defendants in this case have collectively band together in order to prevent the plaintiffs from occupying a home that was built in 2007, all required inspection have

been performed and passed by the City of North Charleston with all permanent utilities approved by the city to all utility companies and turned on and maintained since February 2008. The city's own delay inspection clause in the ordinance clearly states that the refusal of the final Certificate of Occupancy inspection give right to the Certificate if the inspection is not performed. After several request, willfully, North Charleston refused to perform the final requested inspection even though they were mandated to do so based upon the North Charleston adopted ICC Code and the City's own ordinance which deems it as unnecessary and not needed after refusal. There has been no revocation of permits or stop work orders against the location. Justice requires a cancellation of the city eviscerating behavior and mandamus be issued compelling the City of North Charleston Building Department to issue an official Occupancy Certificate to the plaintiff's. Wherefore the Plaintiffs in this case pray the court applies "careful scrutiny" and issue a writ ordering the City of North Charleston to produce and surrender the Official Certificate of Occupancy to the Plaintiffs immediately.

## DEFAULT JUDGEMENT

Wherefore Plaintiffs pray for immediate monetary sanctions and a default judgment as a result of the collective and concerted, malicious, bad faith, egregious actions, dilatory tactics, and conspiratorial efforts of the defendants their defiant attitude of disobedience of the court order to surrender FOIA information and production of documents.

DATED this 13th day of December, 2010.

CERTIFICATE OF SERVICE

I John Singletary herby certify that the above document has been mail to the opposing council.

Dated: December 13. 2010

Respectfully Submitted

John Singletary

(843) 693-2823

4321 Waterview Circle

North Charleston, SC     29418

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC. CLERK. CHARLESTON. SC
2011 FEB 18 P 4: 29

John G. Singletary and Carla C. Singletary,

Plaintiff(s)

v

The City of North Charleston
City of North Charleston Building Dept.
City of North Charleston Zoning Dept.
City of North Charleston Zoning Board of Appeals
City of North Charleston Legal Dept.
R. Keith Summey, City of N.Chas., Mayor
Darbis Briggman, City of N.Chas. Chief Bldg. Official
William B. Gore, City of N.Chas. Zoning Director
Rick Williams, Bldg. Inspector
Mary Cohen, Zoning Inspector
Adrienne Williams, Zoning Board of Appeals Secretary
Donald Schaeffer, Zoning Board of Appeals Vice Chairman all individually and collectively

Defendant(s)

Civil Action No. C/A No.: 2:09-cv-01612-MBS

**SUPLEMENTAL OBJECTION TO THE REPORT OF JUDGE CARR**

**SUPLEMENTAL OBJECTION TO THE REPORT OF JUDGE CARR**

TO: The Honorable Margret Seymour
Unites States District Judge

Plaintiffs (John & Carla) supports their previous objections to Judge Carr's Recommendation with the following. Judge Carr's actions are contrary to the essence, spirit, and constraints of Title 28 section 144 titled Bias or Prejudice of Judge. Pro se plaintiffs timely filed a motion for recusal of judge Robert Carr and of which he was cognizant of the same yet persisted in ruling in the matter even though plaintiffs filed their belief of bias and objection on 12/23/2010. Title 28 section 144 mandate dictates recusal. Plaintiffs believe the instinctively judge Carr's awareness of plaintiffs objection to his further consideration of the matter pending so provoked him that he hastily made an adverse finding against plaintiffs without a careful reading of the record. Notice that he ruled based on one sided references to defendants conjecture alone although defendants refused to comply with the order imposed by the US District Judge Docket Number 72 of 11/15/2010.

This is an atypical case with intrinsic facts a motive of nepotism that is briefly explained below:

This case arises from a property encroachment dispute between two neighbors John Singletary located at 4321 Waterview Circle and Patrick Percy residing at 4319 Waterview in North Charleston SC. Patrick Percy believing that John Singletary was encroaching onto his property informed John Singletary at the completion of the Singletary's home construction that he Patrick Percy thought the Singletary's driveway was staked incorrectly for pouring the concrete. John Singletary suggested the two have their respective surveyor's decide the matter. Patrick Percy's surveyor the first to arrive informed Patrick Percy that he Patrick Percy was in fact encroaching onto the Singletary's land. This was confirmed by the Singletary's surveyor. Patrick Percy then attempted to get the Singletary's to leave things as they were; However the Singletary's insisted the correction be made. Patrick Percy was reluctant and sought council. The Percy's fence was in need of repair and the Singletary refused to allow the fence vendor to repair the fence as long as it was on the Singletary's property. The Singletary's informed the vendor and the Percy's that the repair could only be made if the fence were to be relocated to the Percy's property otherwise the vendor would be trespassing. The Percy's eventually reluctantly removed their encroaching fence, their encroaching sprinkler system and their encroaching shrubbery from the Singletary's property. It appears that Patrick Percy's then along with a friend of his Smokie, Gary Thomas, who flaunts his close friendship to the Mayor, and draws the mayors name as if it is a weapon began to conspire with the aid of the city resources through the mayor to vindicated their egos through preventing the plaintiffs moving into their home and to intentionally create a financial nightmare for the plaintiffs. All indication is that through the efforts of the Mayor and Council Women Phoebee Miller of North Charleston, and draws it like a weapon, embarked upon a vindictive retaliation scheme. Through their close relationship with the Mayor the city of North Charleston resources were used to further their scheme. The local city government who had already inspected and passed every required inspection became belligerent, abusive, and ominous. A deluge of governmental abusive, coercive, threatening, overreaching and overarching actions ensued. The apparent conspiracy that used and misused municipal resources to further the disparate treatment of the plaintiffs (John & Carla Singletary) had begun and coming into full swing.

As a brief overview, the Singletary's purchased a lot and built a home in one of North Charleston's oldest longstanding affluent white neighborhoods. Over the years the neighborhood has transitioned to a mixed neighborhood accept along the scenic Waterview Circle closest to the water. After passing all required inspections, the Singletary's applied for a Certificate of Occupancy inspection. The City of North Charleston after scheduling the inspection refused to make inspection on the residence located at 4321 Waterview Circle. After repeated request over a two year period of time the Singletarys were still left with no inspection and to this date there has been no inspection by the City of North Charleston, the only case which the city has refused to perform a mandated inspection for over four years with no valid reason. After being held by city

police at gun point (by Officer T. Wallace in his partner) in his own home without just cause and without notice or warning John Singletary (plaintiff) was coerced under threats and duress by city police and 9 City Officials to go immediately to City Hall and apply for a variance minutes before the ZBA hearing in April, 2008. The city has characterized the manner in which they dealt with John Singletary as "non-traditional". These "non-traditional" coercive methods were use to force the Singletarys to apply for a variance directly to the Zoning Board of Appeals with no ticket, warning, or notice ever issued of any violation. The plaintiff was threatened and coerced into filing for a variance for a R-1 Subdivision when in fact the plaintiff's property was not zoned R-1. The city later changed the Singletary's property to a R-1 status from its original R-2 status in order to retroactively apply the false claim against the plaintiffs. This was done in direct disregard to state mandate law. The plaintiff's original point of entry into the process was the ZBA court of appeals the day of the meeting, less than an hour before the ZBA court hearing. No prior notice as mandated in the City and State Code of any violation was ever given to plaintiff. The Singletary's brings a 1983 claim against Defendants in their official capacity and individually for a violation of the 13th amendment, the 14th amendment, disparity of treatment, inverse condemnation, and due process after recent investigations conspiracy against civil rights, FOIA violations, defamation of character, and slander of title will be added.

The vexatious events in this case have been carried out through an intricate web of conspiratorial actions predesigned to frustrate the plaintiffs and the judicial process causing malicious persecution and unlawful prosecution to the plaintiffs and their family. An exorbitant number of "non-traditional" conjured up violations have been charged to the plaintiffs and their family to include the latest where the brother was given a ticket and the father was then sued in a North Charleston kangaroo court. The court ordered and unjustly published to condemn and tear down family rental property. On the face of the order the document is incorrect. The city of North Charleston admits on the face of the document that the person they sued is not the person the property is registered to, **exhibit** A nor the person they issued a ticket to. Other family members have experience harassing tickets and undue pressure from North Charleston City to include unjust incarceration for alleged grass violations.

The ZBA bylaws clearly state that a 3 vote concurring majority was needed and the ZBA board only had 2 votes during the May ZBA meeting were they denied the variance that was not even needed based upon the code.

**<u>Section 7-7.2.</u> - Board of zoning appeal; officers, rules and procedures:**

**(a)**

The board of appeals shall elect a chairman from its members who shall serve for one year or until reelected or until their successors are elected. The board shall appoint a secretary, who may be a city officer, an employee of the city, a member of the planning commission or a member of the board of appeals. Meetings of the board must be held at the call of the chairman and at such other times as the board may determine. Meetings shall be open to the public and public notice of all meetings of

the board of appeals shall be provided by publication in a newspaper of general circulation in the municipality or county. In cases involving variances or special exceptions, conspicuous notice shall be posted on or adjacent to the property affected with at least one such notice being visible from each public thoroughfare that abuts the property. The chairman, or in his or her absence, the acting chairman, may administer oaths and compel the attendance of witnesses by subpoena. The board shall keep minutes of its proceedings, showing the vote of each member upon each question, or in the absence of failing to vote, indicating that fact, and shall keep records of its examinations and other official actions, all of which must be immediately filed in the office of the board and must be a public record.

**(b)**

Decisions of the board of appeals. **The concurring vote of three (3) members of the board of appeals shall be necessary** to reverse any order, requirement, decision or determination of the zoning administrator or to decide in favor of the applicant on any matter upon which it is required to pass under the article or to affect any variation of this article.

**(c)**

Appeals to the board of zoning appeals shall be initiated by filing with the zoning administrator and with the board of appeals notice of said appeal specifying the grounds thereof and accompanied by an application fee of seventy-five dollars ($75.00) to cover administrative costs (advertising). The zoning administrator shall forthwith transmit to the board all papers constituting the record upon which the action appealed from was taken.

***(Ord. No. 1998-81, 9-24-98)***

The lack of a concurring majority makes the vote unworthy to carry the motion yet the ZBA did so in opposition of its own bylaws, **exhibit** B. The original motion did not receive a second and the ZBA and the city attorneys took a recess and went into the hallway in order to conjure up a scheme in order to railroad a vote through. The police surveillance tape of the lobby for city hall will reveal this a true. The Agenda, **exhibit** C, for the April meeting has the Singletary's on the Agenda as number 11 yet the Singletary's were moved up to number one as shown in the minutes, **exhibit** D. This is surprising given the fact that there was no application for the variance properly filed according to the North Charleston Code for the April 2008 meeting. No order was ever issued by the ZBA during the meeting only a denial as proven by the minutes, **exhibit** C. The ZBA has admitted that the tapes from the meeting are not in their original condition, **exhibit** B & D. The legal department conjured an order not issued by the ZBA during the meeting, **exhibit** E. More than 11 pages of detailed minutes, **exhibit** B, were transcribed from the tapes prior to the malfunctioning state that the city claims they are presently in. The City now claims that the tapes malfunctioned, **exhibit** G. Question 32 in the Production of Documents Request shows that instead of providing documents as requested the defendants intentionally or inadvertently filed answers but did not surrender and digital documents with metadata files as

requested. In question 32 the defendants also state that they have no tape recordings. In response to question 34 they claim the tapes are attorney client privileged, and the notes from the secretary were unsuccessful? The city has never once provided any measurement to sustain its position regarding the violation it alleges the plaintiffs violate. Instead they have made a desperate attempt to conceal their wrong doing. The city states in writing that the city ordinances in which it alleges the plaintiff violates do not exist, exhibit H Despite their own ordinance which mandates, in section 7-1 the city holds to the untruth that the code is a "rolling code" and it is impossible for it to be reconstructed.

**Section 7-1. - Administration and enforcement:**

The zoning administrator is hereby designated and duly charged with the authority to administer and enforce the provisions of this ordinance.

The zoning administrator shall accept and examine all applications for construction, land use or reuse, and shall issue permits where such applications are in accord with the provisions of this ordinance and applicable building codes. He/she shall direct parties in conflict with this ordinance, and cause to be kept records and files of any and all matters referred to him/her.

Through discovery from a third party the S. C. department of Archives and History as provided an official document verifying in fact that the city signed an assurance statement guaranteeing in writing along with an admission that they would in fact retain the front yard setback code and all its updates in the office at City Hall at all times, **exhibit** H. The State FOIA Act allows the public access to this document, but the city refused to surrender claiming it does not exist.

It appears through strong evidence that the city has attempted to backdate documents. The letter from Zoning Administrator William Gore was allegedly sent to the ZBA board members on April 1, 2008. According to North Charleston's true response to question 62 of the pleading this is prior to the plaintiff even knowing of the need for a variance or anything about the ZBA.

[redacted]: *At no time prior to April 7, 2008 did the plaintiff's receive any written notice of a violation of any city ordinance in the construction of his home. Prior to April 7, 2008 Plaintiffs did not believe they needed a variance to construct the steps lending to their home and would not have requested same, but for the threats made to him by the City of North Charleston officials. Admit that no written notice was provided when defendants were unaware of the violations. Deny that any threats ever occurred."*

Yet Mr. Gore details with pinpoint accuracy a future conversations that had not occurred to the ZBA Board members, **exhibit** J. the date of the letter from William Gore to the Zoning board of Appeals is dated April 1, 2008. In question 62 above the city admits that the first time the Singletary's were aware of the need for a variance was the date of the meeting April 7, 2008.

The Singletary's have already stated they did not fill out an application prior to the coercion on the date of the meeting April 7th so how could he have constructed the letter. It appears that the letter has been back dated.

The letters from Mayor Keith Summey and William Gore clearly indicate and establish that the tapes from the meeting existed. Actions predicated upon the review of the tapes were followed precisely with no additional conversation regarding any malfunction or distortion of any of the tapes, **exhibi**ts H & I. Astonishingly, the city attorneys state with vigor that the tapes are privilege documents and they do not exist in usable form because they were "unsuccessful" in question 17 in the first Production of Documents Request and **exhibit** G the attorneys state the tapes malfunctioned contrary to statements from Zoning Administrator William Gore and North Charleston Mayor Keith Summery. They would have one believe that the secretary penned 11 pages of detailed meeting notes from the first item with no tape and sketchy notes, exhibit K for April and no notes for the May ZBA meeting according to North Charleston. remembering every detail. Ironically the parts against the city were conveniently left out. The three votes in favor of the plaintiffs were left out, the recess to devise the plan was left out, the chair attempting to make a motion, second it and vote on it was left out, the absence of any order being issues was left out and other pertinent evidence were thrown into oblivion.

The city with malice aforethought and clear calculated bad faith, in order to block a $2,800,000.00 signed contract that the plaintiffs had with a major motion picture studio to use the home for a movie production, put pen to paper to draft a letter to plaintiffs restricting them from using the residence to fulfill a movie contract involving the home at 4321 Waterview Circle. Even though the TV production "Army Wives" film less than 1/2 mile from the plaintiffs home continuously and in many vacant homes with no Certificate of Occupancy issues, **exhibit** L. This does not include the more than $15,000,000.00 business interruption loss sustained by the plaintiffs throughout this vexing ordeal that has lead to a complete financial mayhem. In addition ,unsolicited by the plaintiffs, the neighborhood petition the city to approve the steps, **exhibit** M. The neighborhood also attended the May, 2008 ZBA meeting and voted three times, at the request of the ZBA chair, and each time the vote was in favor of the plaintiffs, the Singletary's all caught on tape, but know unavailable according to North Charleston attorneys. Even more critical the neighborhood President, Tommy Garrick who signed the required neighborhood approval to build the home, makes a clear public statement in the Post & Courier Article Monday, October 8, 2007 that "Singletary's house meets all the current regulations." Many of the third parties, while contradicting themselves, who now request to have their subpoenas quashed have claimed they have made not comments regarding this case, yet they are quoted in this article referred to in the Blogs, and in the minutes for the board meetings, **exhibit** N. The plaintiff who is a member of the Home Owner Association answered questions posed by some of the individuals subpoenaed. The Building Department after completing all required final inspections, then approving and notifying the public utilities companies in 2007 to turn on the plaintiffs permanent utilities, and scheduling, the final Certificate of Occupancy Inspection was prohibited via "non-traditional" means , a prohibition letter from North Charleston Legal Department as a subtle threat to the Building Official. North Charleston has never issued a stop work order nor any revocations, nor any tickets to 4321 Waterview Circle or its residence during this building process. The requested inspection is mandated by the North Charleston and ICC

code section R 109.4 and section R110.3. The North Charleston Building Official was present at the residence prior to the April 7th ZBA meeting issued no tickets nor found any violation contrary to the required code yet North Charleston refused to issue the Certificate of Occupancy instead they coerced a variance application with no tickets or violation or legal grounds. If the April 7 presence of the Building Official constitutes an inspection then no tickets or violations noted should require the granting of the C/O. Contrary to its own adopted ICC and local codes the refusal has rendering the home useless and fulfills all requirements of an inverse condemnation regulatory taking. The Building Official has made the statement "the house meets all Building Code requirements" and in fact the building department has approved all required building inspections. Again the city's legal department stepped in to manhandle this leg of the conspiracy in order to further the damage and the conspiracy.

The ZBA's final attempt to defame the plaintiff and administer a debilitating blow to justice was to hold the plaintiff in contempt of court after the plaintiff's case had been effectively removed to the Federal Court on June 18, 2009 a case was filed in Federal Court. Following this filing the state case was joined to the already filed case due to the same nucleus of facts and issues, the case paperwork was submitted to the state court and clocked in and then the defendants signed the service to them rendering the case effectively removed all prior to the June 2008 ZBA meeting. There was a zoning board member at the meeting who enquired as to whether the proceeding was in fact illegal because of the removal and the attorneys (Tim Amey and Richard Lingenfelter) suggested proceeding with the meeting in spite the removal. The minutes from the meeting clearly indicated that this information is in fact true. Effective removal requires no court order signed by a judge, but (1) filing the claim, (2) state notification, and (3) proper service all of which occurred prior to the meeting and the City was informed yet in their dogmatic attitude to injure the plaintiff went forward with the contempt hearing and published the John Singletary was in fact in contempt even though state law does not give the ZBA the authority to hold any one in contempt, **exhibit** O,P, & Q Their findings must go to a circuit judge who must then fully adjudicate the matter according to state law title 6 chapter 29 800 (e). The adjudication never occurred. In addition the state law requires that the resident for a rezoning be notified and given ten day notice for opportunity comment this never occurred.

**SECTION 6-29-760**. Procedure for enactment or amendment of zoning regulation or map; notice and rights of landowners; time limit on challenges. [SC ST SEC 6-29-760]

(A) Before enacting or amending any zoning regulations or maps, the governing authority or the planning commission, if authorized by the governing authority, shall hold a public hearing on it, which must be advertised and conducted according to lawfully prescribed procedures. If no established procedures exist, then at least fifteen days' notice of the time and place of the public hearing must be given in a newspaper of general circulation in the municipality or county. In cases involving rezoning, conspicuous notice shall be posted on or adjacent to the property affected, with at least one such notice being visible from each public thoroughfare that abuts the property. If the local government maintains a list of groups that have expressed an interest in being informed of zoning proceedings, notice of such meetings must be mailed to these groups. No change in or departure from the text or maps as recommended by the local planning commission may be made pursuant to the hearing unless the change or departure be first

submitted to the planning commission for review and recommendation. The planning commission shall have a time prescribed in the ordinance which may not be more than thirty days within which to submit its report and recommendation on the change to the governing authority. If the planning commission fails to submit a report within the prescribed time period, it is deemed to have approved the change or departure. When the required public hearing is held by the planning commission, no public hearing by the governing authority is required before amending the zoning ordinance text or maps.

(B) If a landowner whose land is the subject of a proposed amendment will be allowed to present oral or written comments to the planning commission, at least ten days' notice and an opportunity to comment in the same manner must be given to other interested members of the public, including owners of adjoining property.

(C) An owner of adjoining land or his representative has standing to bring an action contesting the ordinance or amendment; however, this subsection does not create any new substantive right in any party.

(D) No challenge to the adequacy of notice or challenge to the validity of a regulation or map, or amendment to it, whether enacted before or after the effective date of this section, may be made sixty days after the decision of the governing body if there has been substantial compliance with the notice requirements of this section or with established procedures of the governing authority or the planning commission

The plaintiffs while in circuit court was again denied due process by a former city employee who served as a judge with the city and as the city attorney and refused to recuse himself from the case. The former city employee ended the case without full adjudication listening to absolutely no merits not one concerning the case even after hearing of the city restriction of evidence through FOIA and informal request for information. The former employee Judge Young later gave plaintiff delayed notification past the required date for notification in order to file a timely appeal, refused recusal and reconsideration for recusal, and even stated in writing that he " forgot about it" meaning his time as a judge in North Charleston, Serving a North Charleston's City Attorney and his long relationship with Brady Hair, the judge states "I have formed no relationships that affect my judgment in this case and do not recognize the name of any persons whose names appeared in the record as members of the North Charleston Board of Zoning Appeals. All North Charleston attorneys work for the Law Offices of Brady Hair and Brady Hair even entered the court room on Dec. 18th to give Attorney Tim Amey, his underling a memorandum for the judge that I only received weeks later. The memorandum itself is a clear misapplication of the law. It applies to land use cases dealing with rezoning a residential neighborhood for a business. This case is clearly about an area variance the two are totally different. No rezoning is necessary this case deals with buildable area issue the burden of proof is totally different and the evidence is different. An area variance requires proof of practical difficulties and that the board look a the impact of the regulation on the applicant to the extent the variance impacts on neighboring parcels obviously the petition form the majority of the neighbors and the fact that the applicant owns the adjoining parcel minimized the public detriment concern. The city has proven no detriment to the public whatsoever and has given no

bases for this claim. The Use variance the city supports is to allow unpermitted land use otherwise not permitted and requires proof of unnecessary hardship the effect on the ordinance is more drastic and the standard of proof is consequently higher. The property was always zoned to permit the construction of the residential home under its original R-2 status and the newly changed R-1 status. The erroneous cases used is what judge Young the former North Charleston employee support his decision with which happens to be almost verbatim to the document submitted by North Charleston's city Attorney Brady Hair in the memorandum that I would not receive until almost two weeks after they submitted it to the judge even though the opposing party the Singletary's had requested the document be copied and given to them in the courtroom. In addition Brady Hair is the City Legal Attorney and as such is a key player and a major part of the Zoning Board of Appeals, none of these things which would have been addressed had I not spent considerable time, money and effort to uncover, **exhibit** R & S. Clearly the conspiratorial efforts are becoming clear to anyone who understands how the system should work in terms of rising above a hint of impropriety. The court hearing for the plaintiff was scheduled not by the administrative clerk but by the judge himself (initially the clerk of court had no record of the hearing at all) in the middle of a three day multimillion dollar accident case on the 18th of December 2008 during a recess for less than 15 minutes, the judge claims to adjudicate the case that the stenographer and court management supervisor initially denied happened, **exhibit** T & U. Judge Roger Young finally admitted to his close relationship with the defendants and said he simply forgot about his employment and long history with present city attorney Brady Hair, **exhibit** V. Also initially the stenographer had no record of the case and attempted to convince me that I had the wrong judge and date.

The city has categorically denied conversations with any third party despite the quotes made in the Post & Courier article of Nov. 7 of 2008 to reporter Warren Wise, **exhibit** N. In addition quotes made to Appraisal David Bates in his appraisal report, **exhibit** W. The number of third parties that have been proven to have had conversations with North Charleston are far too great to mention in this limited supplement or to display the hundreds of document regarding this case. The Post and Courier now claims no connection to North Charleston and that a simple variance that the resident did not apply for came to reporter Warren Wise from out of the blue and he picked it off the agenda to do a full story with massive interviews. Many of the facts stated in the article are untrue and minimal investigative effort in public records would have revealed the information published as incorrect. In addition information the Post and Courier had full control over that has become a part of their daily business records and is discoverable they purport to not have. Witnesses willing to testify in court to being interviewed by Warren Wise who are not mentioned in the article contradict his statements and some who he mentioned has denied speaking with him. The City of North Charleston's conversation with Wachovia is worthy of note. The city of North Charleston per Wachovia, who left the recorded message on the answering machine of the Singletary's the same tape that will be presented at trial, took the initiative and contacted Wachovia contacting the exact Wachovia personal representative for the Singletary's in another state, who's information was not published in any public record, and provided derogatory information regarding 4321 to Wachovia. The City of North Charleston contacted the exact personal representative for the plaintiffs in another state in order to maliciously and in bad faith provide erroneous information that is simply unfounded defamatory, untrue, and with intent to harm financially and more critically to restrict "fair housing". This

information was shared with other entities by Wachovia and became a catalyst to unjust undue pressure from Wachovia to succumb to the ill wishes of the City of North Charleston. The appraiser David Bates appraisal states clearly that he makes know the conversations with North Charleston Planning Zoning and Building stating that the property does not confirm to the neighborhood even the plans were approved by the city and there are many other homes that are equal in square footage and have sold for more some in excess of $1,300,000.00. The appraiser admits on page 5 to homes appraised in the area for more than the subject property The subject property is one of the larger homes in the neighborhood, but certainly not overbuilt as stated. Often time homes in the later section are larger than the initial homes in the subdivision. Appraiser states on page 5 of the report that his assignment included information from Wachovia that came from North Charleston including the Building inspectors comments that the house is building compliant and only needs the step clearance in order to have the C/O issued. This information has never been provided to the plaintiffs. The appraiser now seeks to quash the subpoena to him in order to suppress the truth that only he can tell. North Charleston already admits that many other homes in North Charleston R-1 and in this neighborhood have steps that are closer than the subject property. North Charleston has even approved houses 5 houses down from the subject property in 2010 with no opposition even though the steps and structure is closer than the plaintiffs property and many in other subdivisions such as Hyde Park Village, Oak Terrace, and The Mixon to name a few. The entire Spaniel Subdivision (where the Mayor lives) have steps closer than the plaintiffs under the exact same guidelines. The defendant has meticulously with camouflaged chicanery eluded justice like a fugitive in its natural habitat. The defendant has managed to commit acts against the plaintiff constitutional rights with no repercussions while acting under color of law and only because they were action under color or law for the without their veil of law the acts would and could not have occurred. They have masterfully protected there wrong doing and the conspiratorial efforts of their accomplices through motions to quash subpoenas without just cause or legal grounds. The defendants have managed to disobey the order of a District Judge to surrender discovery eventually eluding the order with half truths and whole untruths, **exhibit** H, I, J and X culminating in an unjust order for a motion to quash and a taking refuge under a protective order to hide their calculated skullduggery indescressions , and inequities. Attorney McDonald was in full knowledge of and intentionally attempted to mislead the trier facts that she attempted to meet and confer when she in fact did not. She gave a date then conveniently could not meet on her own date and claimed it was the pro se plaintiff who could not meet, very underhanded. Final elevation certificate was presented to North Charleston in 2008 to North Charleston indicating no problems, **exhibit** Y. Picture in **exhibit** Z shows the subject home even with others on the street as the North Charleston front yard setback requires. Plans and finished pictures show how the home was built to inspected and approved plans.

> "In such cases the average alignment of the existing buildings shall be the minimum setback line" as stated in section 6-1 of the North Charleston code. The rezoning of the property and the redesign of the Ashley Scenic District places the property in a class according to Section 4-2 of the North Charleston code different that R-1 . In addition clearly the Evanston Estates is one of the oldest neighborhoods in North Charleston with covenants prior to the incorporation of the city and with its history dating back to the time when it was owned by the

Dupont Family when my neighborhood big brother would come to the very same location as my home sits and stay with his uncle who was the caretaker for the Dupont Plantation now known as Evanston Estates. The historic section of the code reads as follows "Setbacks in the area are generally less than the current zoning laws require, with side yard setbacks ranging from two (2) to ten (10) feet, and front yard setbacks ranging from ten (10) to twenty-five (25) feet. The facts cannot be denied that North Charleston has tampered with the code of ordinances in order to attempt to justify their wrong doing and retroactively apply a phantom code to the subject property. Yet in all their convoluted explanations it is clear that 4321 was in complete compliance of the code when it was built otherwise why change the code and then claim the old code does not exist, cannot be found, or reconstructed even though the City is mandated to maintain such. No citizen should have to endure such a heartless, malicious, intentional, conspiracy by its local government to prevent fair housing in a free country with a constitution that is suppose to guarantee certain inalienable rights. This country is ruled with special laws that must be afforded to the people to give them the life that they truly need. It is mandatory that we hold on to these laws to secure democracy among the governed. It is the duty of the government to secure every resident his or her right. It is the right of every person in the country with the power of a government to be secured of their homes and that is an inalienable right of every person. This right gives the person a opportunity to have a decent place where he or she may dwell with contentment which is the ultimate goal of every government. It is very important that this rule be known to every person living in the land including those who govern.

In AA Attorney McDonald (now Circuit Judge) has intentionally cut of a part of the document and sent to the Judge to mislead the evidence and to claim that she attempted to meet and confer when she in fact scheduled the meeting, then would not agree to it, refused to reschedule, then claimed she attempted to meet and confer. Presenting this half truth became a whole untruth. She claimed attorney client privilege and privilege documents to items she knew were discussed with third parties and items that were generated prior to her involvement and purported to the Judge she surrendered FOIA and discover information when she knew such statements were false, misleading, disingenuous, and abusive to the discovery process.

Third Party Post & Courier states with certainty that the bloggers identification is unidentifiable even though, from a factual bases the identity of the blogger can be obtained based upon the IP address from the blogger through the Post & Courier or either of their (ISP) Internet Service Providers. Presidence has been set and followed in many recent cases making social networking information to include passwords etc discoverable for civil cases. The Post & Courier also has stated that they did not issue a litigation hold notification even though reporter Warren Wise was informed at the Nucor Steel class action discrimination press conference at the International Longshoreman's Hall in Charleston SC during his conversation with John Singletary that it would be requested of him and his company to supply information in a lawsuit concerning the article and regarding the 4321 Residence that he reported. The Post & Courier also answered that they listed all individuals they interviewed. Warren Wise interviewed individuals who will

testify under oath that he did in fact interview them and they are not listed in the article. In addition information listed from the building department is listed even though no one from the building department is listed in the article. The agenda that they claim they received says nothing concerning who it was it was received from or why a simple and routine request for a zoning change without any mention of 4321 Waterview Circle when 65 unnamed homes were at issue would be singled out and generate such interest by the paper and a need to interview so many people when no variance application was submitted by the plaintiff for the rezoning. The article gives direct contradiction to the subpoena answers form the Post & Courier. How would he know prior to the resident of the property know. Singling John Singletary out of 65 residence for an ordinance that does not affect him and then printing statements that are denied by the purported interviewee, and claiming not to interview individuals who will testify to the contrary, and printing false statements that could readily be verified with public information is slanderous,, libelous, defamatory, not to mention the P & C controlled blogs that they participated in listing discriminatory remarks. The article states several facts that are untrue items in which minimal effort through public records would have revealed the correct answers. It appears that proper due diligence for reporter investigations were ignored. Again, this deponent attempts to determine what is relevant and discoverable information rather than supply the information and allow this honorable court to determine the relevancy at the appropriate time. Reference: Equal Employment Opportunity Commission v. Simply Storage Management, LLC and O.B. Management Services No. 1:09-cv-1223-WTL-DML(SC Ind. May 11, 2010). The court compelled production of relevant content from social media sites. Reference Romano v Steelcase Inc. 210 WL 3703242 (NY Sup. Ct. Sept. 21, 2010). In this case the judge allowed total social medial discovery of the entire social media site. The Post & Courier frequently use the posting of bogs in their daily business routine and the documents have become a part of their daily business routine making them discoverable as a business document. Reference: In Ledbetter v Wal-Mart face book and MySpace information was produced in a civil action. In the Leon v IDX Systems Corporation case bad faith was assigned to familiar statements of "the documents no longer exist" that have become standard for the defendants and deponents in this case.

Exhibits AA, BB, CC all list deponents that have refused to properly answer questions. The deponents have made comments in ZBA meetings, the P &C article, and Civic board meetings that they are now denying exist. This overall refusal to tell the truth enlarges the scope and members of the conspiracy to cover up vital information and evidence to this case that will lead to or directly prove material facts. Several third parties state there were no conversations or exchange of information regarding the case however the minutes from the ZBA meeting clearly show and denote comments to the contrary of their statements not to mention the third parties forgot they made public statement in the published Post & courier Article Nov. 7 2008. Third parties have also demonstrated that ongoing conversations have transpired between defendants their attorneys and third parties. For example the total number of production of documents and admissions that have been mentioned by the third parties have not been available in any public record for them to know that could only come from a conversation with the defendants, their attorney, or another third party in either case it would be hersay information and a total contradiction of there responses concerning no communication with others and confirming

support of plaintiffs claim that they have been in communication with others regarding the information in this case. The heading for the third parties also give rise to constant communication because the caption on the documents for several of the third parties misspell the exact same words in the same location and the data points for special relationships footprint on the captions of the documents indicate they came off of the same printer and by the same computer. No third party has been request to perform any travel only documentation at this point. Thus far each third party that has responded with documentation has provided information that has shed additional light on fact in this case. Municode supplied code that the City of North Charleston claims did not exist anywhere. Knology supplied information confirming the ghosting of the plaintiffs account and erasure of emails that were unauthorized by the plaintiff. Plaintiff also received the documents regarding mandatory records retention from the State Archive Department for Records and Retention that North Charleston in writing stated were nonexistent. Not only would this be a violation of state law but since we know they existed at one point in North Charleston because plaintiff purchased several copies from North Charleston it would constitute destruction of evidence during the discovery process by the defendants under the full knowledge and supervision of the internal and external attorneys after refusal to issue the litigation hold notification. Exhibits DD & EE are prime examples of North Charleston's altercation of documents in an effort to cover up their intentional wrong doings. Exhibit FF is the unprecedented, "non-traditional" and illegal hold the City of North Charleston used to prevent the Building Official from completing a mandatory inspection on 4321 Waterview Circle.

The plaintiffs in this case have been stifled in obtaining FOIA information, discovery in the form of Production of Documents, Admissions, and depositions, further admissions and interrogatories that are expected to follow the production of documents. The Defendants after a word of caution and a direct order from the district Judge have produced no requested discovery according to the FRCP. Defendants have also ignored the District Judges order to produce and is in flagrant disregard of a court order. The Swofford case in the Middle district in Florida is a mirror image of the types of e-discovery and discovery violations defendants can conspire to perform inflicting devastating expenses, vexations, and time consuming hours on plaintiffs. *Swofford v. Eslinger, Case. No.6:08-cv-Orl-35DAB (FL.M.D. Sept. 28, 2009).*

In conclusion the order of Judge Carr should be vacated. Several motions have been overlooked and simply ignored. Indeed defendants made no attempt to engage in a substantive good faith conference prior to filing it motion for protective order. The plaintiff is entitled to an immediate judicial remedy in the form of an order requiring the City of North Charleston to issue the plaintiffs Certificate of Occupancy and discovery or be found in contempt. At the minimum all habitation requirements have been satisfied, inspected and approved, and a temporary C/O is in order and should be granted. Based on the additional aforementioned reasons a vacation of, now retired , Judge Carr's order is mandatory and in order so that justice be served and preserved with dignity. Plaintiff is entitled to all expenses, cost, and attorney fees.

DATED this 18th day of February, 2011.

CERTIFICATE OF SERVICE

I John Singletary herby certify that a true and correct copy of this **SUPLEMENTAL OBJECTION TO THE REPORT OF JUDGE CARR** in forgoing style and matter was dispatched with sufficient U.S. prepaid postage to defendants attorney of record, and other interested parties on February 18th, 2011.

Dated: February 18, 2011

Respectfully Submitted

John Singletary
johnsing@knology.net
(843) 693-2823
4321 Waterview Circle
North Charleston, SC   29418



PLAINTIFF'S
EXHIBIT
C

# One resident's dream home leads to changes in zoning

By Warren Wise (Contact)
The Post and Courier
Monday, October 8, 2007

Grace Beahm
The Post and Courier

A four- story house on Waterview Circle is leading to zoning changes in Evanston Estates in North Charleston.

John Singletary Jr. just wanted to build his dream house.

Nearby residents say what he hammered together has created a nightmare for the neighborhood.

Singletary started constructing a four-story, 6,500-square-foot house in August in a residential subdivision on the Ashley River in North Charleston.

Residents in the well-kept neighborhood of Evanston Estates weren't quite sure if it was a house, a hotel or an apartment building.

"It's humongous," said Tommy Garrick, president of Evanston Estates Civic Club.

"It's an eyesore," said Keith Thompson, who lives down the street from the towering structure. "It's out of place."

Some have called it the Days Inn of Evanston Estates.

Neighbors wanted to know more.

They asked about it at their civic club meeting. They

**Article tools**

E-mail story

Printer-friendly version

Comments

iPod friendly

Text alerts to your cell phone

Get daily news e-mailed to you

Subscribe to the *Post and Courier*

Save this page to Del.icio.us

WHO WE'VE HELPED
WHAT THEY SAY
Helping Americans Withou
Prescription Coverage
"I appreciate the assistance a
peace of mind that Pfizer's
program helps provide."
Barbara S, Toledo, OH
helpful answers
PfizerHelpfulAnswers.com 1-866-706-

called their city councilwoman. They questioned the height of the towering, 48-foot-tall brick house, which dwarfs a two-story Victorian house beside it and others in the subdivision.

They also wanted to know if the Waterview Circle lot's zoning allowed anything other than a house in their neatly manicured neighborhood off Dorchester Road.

They quickly learned that it did.

A huge section of the upscale subdivision facing the marsh — more than 65 parcels — is zoned for multi-family use though every developed lot has a single-family house on it. They also learned there are no height restrictions on houses in the area where Singletary is still putting up bricks on his five bedroom home.

It's too late to do anything about Singletary's house, but the city plans to remedy the zoning flaw and enact height restrictions starting today.

"We were looking at properties along Waterview Circle generally to see if there was a question of height limit," North Charleston Planning Director Bill Gore said. "I noticed the multi-family designation and that it was not consistent with where we are headed in that neighborhood."

Despite the zoning, Singletary vows that he is building a house — with an entire first floor for parking and storage and three floors of living space above it. He is married and has three children.

"There are no intentions of it being anything other than a house," said the accountant and former Murray Hill resident.

Gore isn't sure why part of Evanston Estates, which is comprised entirely of single-family homes except for a few vacant parcels, is zoned to allow apartments or condominiums or anything multi-family. He believes it was zoned that way long before it became part of North Charleston, which was founded in 1972.

WHO WE'VE HELPED
WHAT THEY SAY
helpful answers
Helping Americans Withou
Prescription Coverage
Get Pfizer Medicines for
Free or at a Savings
LEARN MORE
PfizerHelpfulAnswers.com 1-866-706-

Sponsored Links

Latest local stories

- Man dies of gunshot wound
- Two visions at odds for St. Andrews Center
- Rent eats away at S.C. charter schools' budgets
- Girl struck by pickup dies from injuries
- One resident's dream home leads to changes in zoning
- Coming Up
- Good Morning Lowcountry
- 'She was my sunshine'
- Enjoying blue grass under blue skies
- It's still all about money

--more local news

Councilwoman Phoebe Miller doesn't intend for it to stay that way.

"We don't want any apartments or duplexes there," she said.

Today, the city Planning Commission will consider changing the zoning of all the affected properties on Waterview Circle and Helene, Lela and Renee drives to single-family residential.

"We want to make sure no one will be able to build any multi-family units over there," Miller said.

Garrick also didn't know if any of the properties in the neighborhood were zoned for multi-family use. He added that neither the neighborhood nor the city puts restrictions on the height or maximum size of a house along Waterview Circle, and Singletary's house meets all the current regulations.

To remedy the lack of a height limit, along with the land-use changes, the city is proposing uniform height restrictions on all properties in its three Ashley River scenic districts.

Each district now has different height restrictions to shield development along the river from historic plantations on the other side of the Ashley River. The restrictions vary from 35 feet above ground level to 35 feet above base flood elevation. The change would put the height limit at 35 feet above base flood elevation or 35 feet above ground level, whichever is higher, for all three districts, Gore said.

None of the properties along Waterview Circle near the marsh are in the scenic district, but Gore said the district will be expanded to include those lots.

"Our actions are designed to provide protection for future development that might be out of scale," Gore said. "There are some large homes in the neighborhood that could be converted to multi- family. That's not what we envision for that neighborhood. We would like to

protect its single-family character."

City Council will hold public hearings Nov. 8 on the rezoned properties as well as the height restrictions.

*Reach **Warren Wise** at 745-5850 or wwise@postandcourier.com.*

**Notice about comments:**
Charleston.net is pleased to offer readers the ability to comment on stories. We expect our readers to engage in lively, yet civil discourse. Charleston.net does not edit user submitted statements and we cannot promise that readers will not occasionally find offensive or inaccurate comments posted in the comments area. Responsibility for the statements posted lies with the person submitting the comment, not charleston.net. If you find a comment that is objectionable, we urge you to click "suggest removal" and it will be evaluated against our terms and conditions and removed if it is in violation of those terms.
**Full terms and conditions can be read here.**

## Comments

**Posted by exorcist_pencocky** on October 8, 2007 at 5:52 a.m. (Suggest removal)

>>> Each district now has different height restrictions to shield development along the river from historic plantations on the other side of the Ashley River. <<<

Who does this black man think he is, building such a large home in the City of North Charleston.

Forcing the good residents of the city of charleston to view such a monstrosity as they look out across their pristine marshes.

**Posted by sjmehlhose** on October 8, 2007 at 6:55 a.m. (Suggest removal)

**Posted by DCartisan** on October 8, 2007 at 8:28 a.m. (Suggest removal)

I think exorcist-pencocky was being sarcastic on people building houses on the marsh and getting upset when others do the same.

---

**Posted by Early** on October 8, 2007 at 8:39 a.m. (Suggest removal)

Probably so DCartisan but it's nice to get the blood pressure up on Monday morning. I bet most who posted up there don't need that second cup now.

---

**Posted by exorcist_pencocky** on October 8, 2007 at 8:49 a.m. (Suggest removal)

>>> "There are no intentions of it being anything other than a house," said the accountant and former "Murray Hill" resident. <<<

Gee, it was really important to include the part, former Murray Hill resident, wasn't it P&C.

>>> To remedy the lack of a height limit, along with the land-use changes, the city is proposing uniform height restrictions on all properties in its three Ashley River scenic districts.

Each district now has different height restrictions to "shield development along the river from historic plantations on the other side of the Ashley River". The restrictions vary from 35 feet above ground level to 35 feet above base flood elevation. The change would put the height limit at 35 feet above base flood elevation or 35 feet above ground level, whichever is higher, for all three districts, Gore said. <<<

You readers have no clue as to why and by whom, this zoning was forced on the City of North Charleston, do you.

Or why the P&C felt inclined to include the story, and why the City of North Charleston, "thankfully" won't stop the man.

To help you readers breath again, if you read my first comment again you might just notice I was being sarcastic against those in the city of charleston who are upset at the height of his home, while building larger ones on the other side of the Ashley themselves.

You sure I'm not BLACK.

---

**Posted by lexylady** on October 8, 2007 at 8:56 a.m. (Suggest removal)

Well, you must admit it is typical!! If the truth be known, his 3 children are probably grown with their own children, and the next thing ya know there will be 10 or 15 folks in that house. Oh Yeah: I don't live any where near the place. I just feel for the neighbors. What power our Politicians have over us. Just the swipe of a pen on paper with a signature, can change your life forever.

---

**Posted by common_sense_plz** on October 8, 2007 at 9:05 a.m. (Suggest removal)

lexylady:

John is a good friend of mine. He is a HARD working man and his wife is just as nice. For the record - the three children are all under the age of 5.
I've seen the plans. This is mountain from a mole hill. Jealous people with nothing else better to do but whine and cry when someone is doing better than them.

okay exorcist_pencocky enlighten me as to why this article was even written.

---

**Posted by sjmehlhose** on October 8, 2007 at 9:17 a.m. (Suggest removal)

I can understand the concerns of neighbors. Somebody years ago waited until my grandparents left for Florida for the winter, then got a variance to build a house 2 feet from the property of the house my grandparents lived in for 50 years. The house was so tall that during the day it blocked ALL daylight from their entire property.

---

**Posted by CADguy** on October 8, 2007 at 10:44 a.m. (Suggest removal)

I hate to see what his utility bills will be trying to heat and cool that amount of sq. footage.

I bet it is a bit overwhelming in comparison to the other homes in the neighborhood. I wonder if the Civic Club is anything like an HOA where plans need to be submitted before work is approved/begins.

---

**Posted by Early** on October 8, 2007 at 10:45 a.m. (Suggest removal)

If everybody is bitching, where is the covenants govern the buildings in the neighborhood, every single half a$$ neighborhood has them. If he is within the gridlines, shut up!

---

**Posted by CADguy** on October 8, 2007 at 10:46 a.m. (Suggest removal)

Oh.. and not to mention the cost of furnishing the place.

---

**Posted by Two_Sheds** on October 8, 2007 at 11:35 a.m. (Suggest removal)

Where in the article did it mention the guy's race? Just curious as to why people are flashing the race card.

And nothing says "new money" like building such a monstrous house in the midst of a moderate-sized neighborhood.

Although I'm sure he's a very nice guy, it's still totally ostentatious, bordering on tacky. If he wanted to build something that huge, it would've been more tasteful to buy a more private lot, or to build in a neighborhood with similar-sized homes, so as not to stand out so much.

---

**Posted by burton** on October 8, 2007 at 11:59 a.m. (Suggest removal)

lexylady, was that comment necessary? I agree that the HOA (Home Owner's Association), if there is one, should have seen the plans beforehand. It sounds like there may not be a HOA with a ARB (Architect Review Board) but that would be surprising considering the income levels in that community. I just hope his neighbors don't make their lives a living hell.

---

**Posted by exorcist_pencocky** on October 8, 2007 at 12:02 p.m. (Suggest removal)

two_sheds - If you drove thru Murray Hill you would not ask that question.

The marsh front houses on Waterview are all fairly big. Look at all the homes thru out the city of charleston being built with the first floor storage and garage. Insurance, you know. Flooding.

---

**Posted by lexylady** on October 8, 2007 at 12:09 p.m. (Suggest removal)

common_sense_plz, I am perfectly happy with the home that I own now and I don't have the need to be jealous. Don't speak for me, please. If you could read it again, it says exactly what I meant for it to say.There are some people in this world who have no respect for their neighbors and are heck bent on screwing things up for everybody because they are all for themselves and nothing else matters. That includes (nice) people too.

---

**Posted by sbumgarn** on October 8, 2007 at 12:28 p.m. (Suggest removal)

whats the big deal? let the man build his house... thats the problem people worry about what everyone else is doing instead of themselves! there is worse out in the world besides the man trying to build a home for his family..

---

**Posted by sjmehlhose** on October 8, 2007 at 1:01 p.m. (Suggest removal)

What he is building will adversly affect the neighbors property values directly. I certainly wouldn't want a towering monolith going up next door to me either. I don't blame the neighbors for being upset.

---

**Posted by SeaSaw** on October 8, 2007 at 1:47 p.m. (Suggest removal)

I think the man has the right to build anything he wants anywhere he wants to, as long as he abides by the building codes and guidelines for that subdivision. Investment wise it could be a bad decision due to the fact that he is overbuilding for the area. Of course that

will only come into play if and when he decides to sell. Last time I checked money only has one color. Unfortunately that is how society as a whole judges us.

---

**Posted by prosperous_hb** on October 8, 2007 at 2:59 p.m. (Suggest removal)

How does someone building a big house make such big news? The county should not even fuss about it b/c with a house that big, they'll be getting a lot of tax revune from this guy.

---

**Posted by common_sense_plz** on October 8, 2007 at 3:52 p.m. (Suggest removal)

lexylady: Sounds like I hit a nerve with you. A general comment and you get bent out of shape. Be happy, but you didn't have to sterotype him.

Also, I spoke with John after reading the article and some of the cry baby comments. The article fails to mention the this is NOT even the largest home in the neighborhood.

---

**Posted by cvs** on October 8, 2007 at 5:38 p.m. (Suggest removal)

Well I say, to each, their own if this guy wants to build a house this big then so be it. Afterall it is his responsibility to maintain his home. I really don't know what all the hoopla is all about let this man do whatever he wants as long as it is according to the HOA. I wish you the best in this matter.

CVS
JMObservation

---

**Posted by preachlove** on October 8, 2007 at 5:48 p.m. (Suggest removal)

prosperous_hb - "How does someone building a big house make such big news?"

I agree; and even more so, this isn't news at all.

---

**Posted by PinkPassion07** on October 8, 2007 at 6:33 p.m. (Suggest removal)

First, why is this a top story? This family is building a home like so many other people. What is big news about that? All of these comments and this article is quite unnecessary. Every person uses their money in whatever way they want, this family decided to spend it in their home. They wanted to build a HOME for their children. What is so wrong with that? So what if the house is larger than the neighbors? The neighbors house was probably bigger than someone else's in that neighborhood. Are you going to write an article about that as well? I am sure I didn't read an article about that in the paper a few years ago.

Whomever said something about jealousy, is correct. It is 2007, houses are built differently. When were the other homes in that neighborhood built? I'm sure not in the last year. Requirements changed. For one, I know that most houses in Charleston will not allow you to build a basement underground anymore. Over half the houses in that neighborhood have FULL basements. If you pulled the basement up out of the grown, how tall would their house really be? I'm sure that the family got all the REQUIRED signatures to have their house built. I don't know any house that does not have to met the requirements. So therefore, your OFFICIALS signed off on it.

"It's an eyesore," said Keith Thompson, who lives down the street from the towering structure. "It's out of place." An eyesore? It's an eyesore because someone is being prosperous? If you could afford to build your dream home, why not build it? A home is where your family is...why not build something that you can be PROUD OF!

My last 2 cents.....GET OVER IT!!! They have been blessed to build their dream home and are able to do it. It's a shame to see people trying to hold back a family moving forward. (Not that its working.)

---

**Posted by beemz** on October 8, 2007 at 7:39 p.m. (Suggest removal)

what a beautiful house good luck to you and your family. to all the haters tell them to take a flying hike or better still a hard nose dive into cement.

beemz
beautiful and still waiting to attend the ZOO.

hi cvs,rtc.

---

## Post a comment

(Requires free registration.)

Username:

Password: (Forgotten your password?)

Comment:

Preview comment

exorcist_pencocky:
What do you know, somebody poured an extra spoonful of racist on your corn flakes this morning!

---

**Posted by common_sense_plz** on October 8, 2007 at 7:23 a.m. (Suggest removal)

exorcist_pencocky:
Are you jealous that it's a BLACK man and not you?

---

**Posted by prettytee4** on October 8, 2007 at 8:06 a.m. (Suggest removal)

whats up with the racial comment already this morning? does it matter that he's a black man or a white man? thats the problem right now with this society! why does everything have to be racial?

---

**Posted by flowergirl** on October 8, 2007 at 8:07 a.m. (Suggest removal)

Let the man build his house. He has every right to, just like you and me.

---

**Posted by mac0cm4** on October 8, 2007 at 8:21 a.m. (Suggest removal)

Gotta love whiny (jealous) neighbors. Nothing like a warm welcome to the neighborhood, eh?

---

**Posted by Early** on October 8, 2007 at 8:24 a.m. (Suggest removal)

oooohhhh Papa Jo Jo, somebody brought out the race card early on a Monday morning, where is eofigureoa, she'll set ya straight.

---

Mrs. Mary
740-2585
Zoning Inspector

Feb. 2007
OLD

PLAINTIFF'S EXHIBIT D

City of
North Charleston
SOUTH CAROLINA
DEPARTMENT OF PLANNING & MANAGEMENT

**Site Plan Submittal Requirements for New Residential:**

1. Submittal of a plot plan that reflects the proposed building, driveways, building set backs along with protected trees 10" dbh or greater is required.

2. Please provide a tree summary that indicates the total number of protected trees on the site, the total number of trees under the footprint of buildings and driveways, and of the remaining trees, the total number of trees you are proposing to cut. Please note that the actual tree canopy is required to be shown on the drawing and that inch for inch replacement is required for the removal of grand trees. (Example: 10 protected trees, five under building/driveway, five remaining trees – 1 proposed for removal) Place an "X" mark to indicate tree removal and circle to reflect removal.

3. If there are no trees on the site, please advise accordingly. Example: No trees

4. Please indicate whether a sidewalk will be constructed. Example: No sidewalks or Sidewalks

5. Please indicate the building height. Example: Building height 25 ft.

**Tree Protection Requirement:**

1. Prior to any earth moving activity, you will need to contact this office to set-up an appointment to have your tree barricades inspected.

2. Please note that when installing tree protection you will need to use the orange mesh which should be extended out to the tree canopy.

Post Office Box 190016 • North Charleston, S.C. 29419-9016 • Telephone (843) 740-2571 • Fax (843) 740-2575





NEW

City of
North Charleston
SOUTH CAROLINA
DEPARTMENT OF PLANNING & MANAGEMENT

**Site Plan Submittal Requirements for New Residential:**

1. Submittal of a plot plan that reflects the proposed building, driveways, a/c units, steps, porches, patios, drainage easements and building set backs (including roof overhangs) along with protected trees 8" dbh or greater is required.

2. In order to ensure accurate setbacks inspections please indicate at the site where the property and house corners are located.

3. Please provide a tree summary that indicates the total number of protected trees on the site, the total number of trees under the footprint of buildings and driveways, and of the remaining trees, the total number of trees you are proposing to cut. Please note that the actual tree canopy is required to be shown on the drawing and that inch for inch replacement is required for the removal of grand trees. (Example: 10 protected trees, five under building/driveway, five remaining trees – 1 proposed for removal) Place an "X" mark to indicate tree removal and circle to reflect removal.

3. If there are no trees on the site, please advise accordingly. Example: No trees

4. If sidewalks were shown on the final plat at the subject site, please show them on the site plan.

5. Please indicate the building height. Example: Building height 25 ft.

**Tree Protection Requirement:**

1. Prior to any earth moving activity, you will need to contact this office to set-up an appointment to have your tree barricades inspected.

2. Please note that when installing tree protection you will need to use the orange mesh which should be extended out to the tree canopy.

Post Office Box 190016 • North Charleston, S.C. 29419-9016 • Telephone (843) 740-2571 • Fax (843) 308-4727

2:09-cv-01612-RMG Date Filed 03/14/11 Entry Number 136 Page 157 of 211

City of North Charleston, SC

R. KEITH SUMMEY, *MAYOR*
LEGAL DEPARTMENT

PLAINTIFF'S EXHIBIT F

December 30, 2010

Mr. J. Brian Harvey
PO BOX 1409
Pembroke, Georgia 31321

Re: Freedom of Information Act

Dear Mr. Harvey:

Please consider this letter a response to your recent Freedom of Information Act request related to 4321 Waterview Circle. Your request sought the following items:

1) a copy of the building permit and all inspection records and reports;

2) any noted violations including documentation and notifications to Mr. Singletary;

3) a complete copy of the building ordinance in effect on the date of the issuance of Mr. Singletary's building permit;

4) a complete copy of the zoning ordinance in effect on the date of the issuance of Mr. Singletary's building permit;

5) a complete copy of all changes, additions, deletions, addendums, substitutions, etc., to the building and zoning ordinances effected after the date of issuance of Mr. Singletary's building permit;

6) the recorded minutes from any meeting of the Planning Commission, Zoning Board of Appeals, or any other recognized governmental body of the City of North Charleston pertaining to property located at 4321 Waterview Circle, North Charleston, S. C.

The City can reasonably produce documents responsive to Items 1 and 6. The estimated cost associated with the production of these items is $27.38. Regarding Item 2, I am informed that the City did not issue traditional "ordinance summons" violation notices (i.e. "tickets") initially as a result of the fact that Mr. Singletary worked through the Board of Zoning Appeals process. I

PO Box 190016 • North Charleston, SC 29419-9016 • 843-554-5700 • northcharleston.org
J. Brady Hair, *City Attorney* • Derk Van Raalte, *Deputy City Attorney* • Richard W. Lingenfelter Jr., *Deputy City Attorney* • Timothy D. Amey, *Deputy City Attorney*

understand that Mr. Singletary saw an inspector at his house, visited City Hall and that Board of Zoning Appeals paperwork was submitted as a result thereof. Regarding Items 3 and 4, I am informed that the Zoning and Building Departments do not have archived copies of complete prior code versions available. Amendments are made on a rolling basis so it is not possible to keep static copies of how the Code appeared on any particular date. Should you wish to recreate the ordinances in place on a given date I would think that your most reasonable option would be to consult the current version of the North Charleston Municipal Code (available online), look at particular sections of interest, and then specifically request certain amending ordinances that pertain to those sections (generally listed at the end of each section in the printed or online version of the Code of Ordinances.) Regarding Item 5, please specify the particular sections of the ordinances in which you are interested and I can provide you with a cost estimate. I believe it would be cost prohibitive to you for the City to try to respond in the manner the request is currently written.

Should you wish to receive the information responsive to Items 1 and 6 please remit $27.38 to my attention and I will provide the responsive documents. Additionally, if you wish to reframe and/or narrow the additional items as described above I will try to provide you with a reasonable cost estimate on those items as well.

Sincerely,

D Van Raalte

Derk Van Raalte

APPROVAL O[illegible]AL RECORDS SERIES RETENTION/DI[illegible]TION SCHEDULES

In accordance with provisions of Title 30, Code of Laws of South Carolina, 1976, Sections 30-1-10 through 30-1-140, the attached Local Records Series Retention/ Disposition Schedules are submitted for approval.

PLAINTIFF'S EXHIBIT G

PART I - MUNICIPAL DEPARTMENT(S) OR OFFICE(S)

North Charleston
Municipality

Planning and Management
Department(s)/Office(s)

I certify that I am authorized to act for this (these) department(s) in approving the destruction of non-permenent records and the retention of records of permanent value. The non-permanent records indicated in the attached Records Series Retention/Disposition Schedules have no further administrative, fiscal or legal value to this (these) department(s) and may be destroyed after the expiration of the retention period approved for each record series. The records determined to be of permanent value indicated in the retention schedules attached to this approval form will be retained as specified in those schedules.

The attached Records Series Retention/Disposition Schedules are approved.

Schedules attached to this approval are numbered as indicated on the reverse side of this form.

4-25-86 — Date | John W Cawley — Signature of Approving Authority | Director — Title

PART II - MUNICIPAL GOVERNING BODY

I am authorized to act for the governing body of this municipality and certify that the governing body has approved the Record Series Retention/Dispositin Schedules as described in Part I, above.

4-25-86 — Date | [signature] — Signature of Chairman or Presiding Officer of Governing Body | Mayor — Title

PART III - ARCHIVES

The records named on the attached Record Series Retention/Disposition Schedules have been examined for their research and permanent value by this department and are approved to be disposed of as described on the individual schedules unless excepted below.

Exceptions, if any: Records selected for permanent retention after screening (over)

5/22/86 — Date | [signature] — Director, S. C. Department of Archives and History

DEPARTMENT(S)/OFFICE

Planning and Management

SCHEDULE NUMBERS

NC-PM-01 through NC-PM-23

Exceptions, if any, cont'd.: the following series, NC-PM-10 Grant Files, NC-PM-11 Administrative Files, and NC-PM-19 Correspondence shall be retained in a repository approved as suitable for this purpose by the S.C. Department of Archives and History.

7. APPROVAL OF OFFICIAL CUSTODIAN

I certify that I am the official custodian (or authorized representative thereof) of the records described and scheduled herein and do hereby agree to the disposition of the records as set forth in item 5 of this form in accordance with provisions of the Public Records Act, Code of Laws of South Carolina, 1976, Sections 30-1-10 through 30-1-140.

Official Title | Signature | Date

8. APPROVAL OF GOVERNING BODY

The governing body of the County/Municipality/School District of ______________, approves the disposition of the records named in item 3 and scheduled in item 5 in accordance with the provisions of the Public Records Act, Code of Laws of South Carolina, 1976, Sections 30-1-10 through 30-1-140.

Signature of Chairman or Presiding Officer of Governing Body | Date

9. ARCHIVES APPROVAL

The disposition of the records as set forth in item 5 of this form is approved in accordance with provisions of the Public Records Act, Code of Laws of South Carolina, 1976, Sections 30-1-10 through 30-1-140.

Charles E. Lee

Director, South Carolina Department of Archives and History | Date

10. DISPOSITION

Disposition of the records named herein has been carried out as instructed in item 5.

Records Officer | Date Certified

11. REMARKS

LOCAL RECORDS SERIES RETENTION/DISPOSITION SCHEDULE

SCHEDULE NUMBER NC-PM-02

1. ~~COUNTY~~/MUNICIPALITY/~~SCHOOL DISTRICT~~
North Charleston

2. OFFICE OR DEPARTMENT
Planning and Management

3. TITLE OF RECORDS SERIES
Codes and Ordinances

4. DESCRIPTION OF RECORDS

This record consists of copies of ordinances passed by the municipality concerning the Planning and Management Department. Included are zoning ordinances, Road Code, Subdivision Regulations, Flood Damage Prevention Ordinance, and an ordinance creating the North Charleston Planning Commission.

5. A. RETENTION SCHEDULE

Retain permanently in the office.

B. RESTRICTIONS

None

6. JUSTIFICATION

These codes and ordinances represent local statutes passed by the city dealing with the Planning and Management Department and have permanent administrative value to the office.

(continued on reverse side)





*City of North Charleston*

SOUTH CAROLINA

DARBIS L. BRIGGMAN
Building Director

BUILDING DEPT.

June 3, 2008

**Re: 4321 Waterview Circle/Zoning Violations**

Dear John Singletary:

The Building Department for the City of North Charleston was informed on May 19, 2008 that there were outstanding zoning violations at the property located at 4321 Waterview Circle. A hold was then placed on the project and no further inspections were to be scheduled until the violations were corrected.

Sincerely,

Darbis L. Briggman
Building Official
City of North Charleston

dg
cc: Darbis L. Briggman

Post Office Box 190016 • North Charleston, S.C. 29419-9016 • Telephone (843) 740-2560 • Fax (843) 745-1054



IN THE STATE OF SOUTH CAROLINA

COUNTY OF CHARLESTON

John Singletary

Appellant,

vs.

City of North Charleston, Board of Zoning Appeals,

Respondent.

IN THE COURT OF COMMON PLEAS
NINTH JUDICIAL CIRCUIT
Case No.: 08-CP-10-3929

**ORDER DENYING APPELLANT'S MOTION FOR A POST-RULING RECUSAL**

FILED
2009 JAN 22 PM 1:19
JULIE J. ARMSTRONG
CLERK OF COURT

**Background**

This case revolves around the measurement of a front yard setback at the Appellant's residence located at 4321 Waterview Circle, in North Charleston, South Carolina. After a full hearing on the merits, I affirmed the North Charleston Board of Zoning Appeals' ruling requiring Appellant to bring his home into compliance with the setback. Appellant then filed this post-ruling motion asking me to recuse myself because I once served as a municipal judge in North Charleston.

NO
NO
NO
1st Request in Dec 2008 copy of sign in at Disc. Board

**Discussion**

I served as a municipal court judge in North Charleston from 1988-1990. Municipal court jurisdiction does not encompass matters that involve zoning issues and I would not have had the opportunity to form any relationships that affected my judgment in this matter. Likewise, although Appellant did not raise the issue, I also served as interim city attorney for North Charleston approximately 4 months in 1995. It has been so long ago that, like my service as municipal judge, I had forgotten about it. I have routinely presided over cases affecting The City of North Charleston for the past 13 years in various capacities.

Brady Hair worked w/ Bar Tender

what #

≅ 19 Cases For NC
never ruled against NC

Brady Hair    Tie is to City + City Atty who recommended Brady/Hair

I have formed no relationships that affect my judgment in this case and do not recognize the names of any persons whose names appeared in the record as members of the North Charleston Board of Zoning Appeals. Therefore, Appellant's motion for recusal is denied.

**Conclusion**

I have thoroughly considered the Appellant's motion, supporting and opposing material and arguments, and based on same DENY Appellant's motion for recusal.

AND IT IS SO ORDERED.

Roger M. Young, Circuit Judge

1/20, 2009
Charleston, South Carolina.

PLAINTIFF'S EXHIBIT J

STATE OF SOUTH CAROLINA COURT OF COMMON PLEAS

COUNTY OF CHARLESTON CP-10-3929

JOHN G. SINGLETARY, JR., )
Plaintiff, ) TRANSCRIPT OF RECORD
-vs- ) December 18, 2008
) Charleston, South Carolina
CITY OF NORTH CHARLESTON )
BOARD OF ZONING APPEALS, )
Defendant. )

B E F O R E:

The Honorable Roger M. Young, Sr., Judge.

A P P E A R A N C E S:

John Singletary, Pro Se

Tim Amey, Esquire
Attorney for the Defendant

Amanda K. Haffenden, RPR, CRR
Circuit Court Reporter

THE COURT: All right. You're Mr. John Singletary, Jr.?

THE PLAINTIFF: Yes, sir.

THE COURT: All right. Mr. Singletary, as I understand this, you're representing yourself. You're appealing a zoning issue, I guess, against you down in North Charleston, and you're asking for an expedited hearing. So what would you like to tell me here this morning?

THE PLAINTIFF: Well, Your Honor, to start off with, the variance here, which I guess, is in question, I never needed a variance hearing. I never needed a variance. I applied for a permit, I was issued a permit, and I built the home according to specs, and the home was completed -- the steps were completed back in November of 2007. The house was completed in February of this year, and it wasn't until April I received something stating that the steps were out of compliance.

Now, with the variance, I didn't need the variance for several reasons: One, the permit took care of the steps, and they coerced me into applying for the variance. Four carloads of about nine people came out and told me that if I didn't come that day and apply for the variance, they were going to stop work on it. The variance --

MR. AMEY: Your Honor, I apologize. I know we're here on an appeal, and I would have to object to the relevance to some of the things that Mr. Singletary is saying, just to preserve the record for appeal. I have no problem lodging it as a continuing objection.

THE COURT: I know absolutely nothing about this matter, so I just need him to tell me what's going on.

MR. AMEY: If I could just reserve that, thank you.

THE PLAINTIFF: The variance itself was carried out, and correctly, like I stated, the North Charleston's ordinance itself says that they have to notify me, the public, in the paper, 15 days prior to the hearing.

The application and the check was carried over there the day of the hearing, which means there was no proper notification. They never notified me by mail, like they were supposed to, and for that hearing, I was told that at 6:00 there would be the hearing. The hearing took place at 5:00. I got there at 5:20. It was the third to the last on the docket to be heard. They denied it. So the initial one, I never even got to speak. I came. I sat through the entire proceeding, all the way until the very end, and they told me they moved

it up to number one without any type of notification.

The other thing is that the subsequent -- I went to the mayor. The mayor said, Well, request a second variance hearing, which I did, and at that hearing, the chair requested from the audience that by a show of hands the people in the community who were in favor of leaving the steps -- which I do have a petition signed from them that is part of the record. They, by a show of hands, show who they are.

They counted three times. On three occasions it was in my favor. The chair at that point made a motion, and also tried to second the motion, to deny the steps. The bylaws for North Charleston zoning board of appeals states there has to be a concurring majority of a five member board in order to approve or disapprove. At that meeting, there were only three members present, and out of the three members, only two voted against. One was for, which means that there was a simple majority, not concurring majority.

The concurring majority means that three out of the five board members must vote in favor or against, and so at that meeting, there would have had to have been a unanimous decision to vote either for it or against it. That did not happen.

However, they carried the vote anyway. I

think their decision was predisposed against me and that this came about because I had a disagreement with a neighbor who had encroached upon my property, and so I made him move his fence back. That's when this started.

The initial complaint was that there was -- the height of my house, there was something wrong with it. Well, the city gave me written documents stating there was no height requirement, and they denied it until I produced a document showing that it was signed by the planning department head that there was no requirement.

The next thing they moved to was the right to setback. After the right to setback, it then moved to the rear setback. To the rear setback, to the left setback, and from the left setback, to the steps. Now, the ordinance states that you have to be 20 feet back from the street line, and the city staff actually came out, and together we measured from the street line back to where the building would be, because she was under the impression, from reading the ordinance, and gave me the impression, that it was to the main part of the building, because many plans are submitted with no steps at all, as long as they're built according to the ICC regulations.

And so we set a site plan, they approved the site plan, approved it back in 2007. After that, I heard nothing from them for a year and a half concerning any

type of infraction. They came out. They had at least 18 times to come out and inspect, eight times in which the inspector came out, and there was nothing at all wrong.

I passed every single inspection that has been required by law, and, still, they denied me a certificate of occupancy, based upon the fact that they say that the property line is where the setback starts, not the street line.

The ordinance clearly says it's the street line, so I would ask that you have them adhere to their own ordinance, which is the street line. The property line to the steps, it would mean that the steps would be -- I think it's either three or four feet protruding into the setback, which most municipalities allow you to proceed into the setbacks, but the ordinance says it goes from the street line to the main part of the building, which is 44 feet back.

Many other houses in my neighborhood are one zone that are closer to the street than mine, and when I take at look at the overall for North Charleston, there are -- I sent a list of at least 50 different homes that would not even be 20 feet back. Some subdivisions, the entire subdivision would be less than 20 feet back and are one zone, and I, through the freedom of information act, I have requested numerous documentation, which has

simply been ignored. They have failed to either produce or to answer me in writing as to why they could not produce.

During the variance hearing, I was told by the city's attorney that he would give me a copy of the tape recording. Later, once I requested it -- because there was pertinent information on the record that is crucial to me proving my case, including the way the Roberts rules of orders was flagrantly disregarded. The chair cannot make the motion, try to second the motion, and carry the vote.

So when I asked could I have a copy of it, I was told that the tape malfunctioned. Of course, since then, as early as today, I was told that the tape does exist; however, I would have to request it through the freedom of information act, but, again, that does not guarantee I get it.

Like I said, the home has been completed since February of this year. I have needed a certificate of occupancy solely based upon the steps, which the steps are, like I said, not as close to the road as many steps in the subdivision.

If I were to be -- if all of the steps in the subdivision of the homes were to use the property line as the starting point for the setback, then 80 percent of

the homes would not adhere to the ordinance. They would be out of compliance, and I requested to have a review concerning that. It simply has been ignored.

My steps are in compliance, but I take a look at the subdivision requirements, it says 25 feet back from the street line, so I meet that requirement. The plans were given to the city. They were approved. The homeowners' association approved the plans with no problem, and they were built according to the specifications. So I don't think it's right that I be singled out to say, You have to use the property line when no one else in the vicinity or no one in North Charleston has to use the property line.

I understand that the neighborhood may be disgruntled, but that does not give them the right to go to the city and have the city make me go through undue ordinances that don't exist.

When I say don't exist, the ordinance has -- the city has clearly states 30 feet from the street line; however, they have come up with a property line from the starting point, and property line is mentioned no where in the ordinance in the city of North Charleston, nowhere in the ordinance. And a year and a half after the home has been built, you now tell me that it's outside of the ordinance? When not only is it a monolithic slab, so

it's all poured in one, when the slab was poured, they came out and inspected the slab before any vertical structure was put up, so they knew exactly where the steps were going to be placed, and if it was a problem at that time, then it should have been said that, well, you're outside of compliance.

The simple truth is that I'm not outside of compliance. Since then, the other inspections that have taken place, mechanical, they've come to do the plumbing, they have come to do the electrical, mechanical, the water -- every single inspection has been passed, has been conducted and passed.

At one point we had to come to court because they said that they refused to come out and do a plumbing inspection from the building department who determined structural integrity based on ICC regulations versus the planning department, but because there was an outstanding issue in the planning department. This is a year and a half after the home had been built, and so they deny me the right to do the plumbing inspection.

So we came down here, and we went out in the hallway and we finally conceded that they would come out and do the plumbing inspection; however, they would not issue the final certificate of occupancy, and so they came out. I passed that inspection.

Next, I requested a temporary certificate of occupancy so that I could move into the home until the matter with the steps was completed, and the ICC code allows for that. And so I sat down with a building official, so not only does he not have a problem issuing the final, he didn't have a problem issuing the temporary, and according to ICC rules, that is exactly what the temporary is for, is to move into a building until it has been completed so that you don't put undue pressure on the person in the other areas to be taken care of.

My entire house is completed. They have found no fault with what I've done, yet they denied me a final certificate of occupancy, as well as they denied me a temporary certificate of occupancy, simply based on the fact that they're misusing the setback starting point to be the property line. The street line is the street line and doesn't change. The right-of-way line meets the property line. It doesn't change, and the property line is the property line.

Now, I understand that in the future you could possibly widen the street. It's a residential neighborhood with no intentions of being widened to a four-lane highway, and so the street line would probably remain the same, but even if it didn't, at this point in

time, the street line is 26 feet away from my steps, which there are many plans that are submitted to the building department and the steps are not even included on the plans because it is the main body of the house that is used as a setback point, and, in this case, they use my steps.

But even if they use my steps, I comply, so I don't see why the city of North Charleston is putting the undue pressure on me to abide by or discrimination against me and putting undue pressure on me to abide by rules that don't exist in the ordinance and that no one else in the subdivision has to abide by, so I pray that the Court will allow me to receive the certificate of occupancy to occupy my home, and if the Court takes a different position than mine, then, to give me some injunctive relief by allowing the stay to remain until I can do an appeal so that I am not fined or a stopped work order will be placed on my home.

THE COURT: All right. All right.

MR. AMEY: Judge, I'll have to admit to a little bit of confusion on my part. In the motion Mr. Singletary made, I was under the impression we were here to discuss the stay or the consent order being lifted, and the agreement that we made, which he mentioned, one of the things -- several things were in

play. One of the things, the city would not continue to prosecute the continued violation on a daily basis of his steps -- or his steps encroaching on the front yard setback, and the city would also allow for him to come in and have a plumbing inspection, and, that being understood, we weren't going to issue -- have you seen a copy of the consent order?

THE COURT: No.

MR. AMEY: It also stated that the city would not issue a CO. Are we here to discuss the merits of the entire appeal?

THE COURT: No. I'm giving you five minutes to discuss whatever you feel like you need to before I spend a little bit of time in the file.

MR. AMEY: Okay. Well, as far as just dealing what I perceive to be the motion for today, it's a little bit hard for me to understand why we would come in and allow Mr. Singletary to be free from the agreement that he made with the city in the consent order stating that. He could come in and apply for a plumbing inspection and that the city would no longer or would not prosecute any continuing violations of our ordinance during the pendency of this appeal until the matter was resolved, and on the flip side of that, the city was not going to grant a CO until the city granted a decision on

the merits of the zoning board of appeals decision, which is why we're here essentially. It's his appeal from that decision.

There was a lot of extraneous, in my mind, irrelevant stuff that was brought in that has nothing to do with the records that's been preserved and served to this Court, but I guess to kind of dig in and go over, you know, what exactly this case is about, especially from the city's perspective, ultimately, this case is about Mr. Singletary's stairs. That's why we're here. He built the stairs well into the front yard setback, and as a result of that encroachment, the city came to him and said, Mr. Singletary, these stairs aren't in compliance. To begin with, let me rewind a little bit.

Originally, he came in with the site plan, submitted to the city planning and zoning administrator of the city, and the site plan indicated that the building, or the house would be built, in conformity with the city's codes. The city approved it, based on those drawings of his site plan, and at some point in the midst of construction, doing further inspections, it appeared he wasn't building the house the way he said he was going to with the site plans, and so one of our zoning inspectors contacted him and let him know you might to submit a revised cite plan because this isn't

what you showed us in your drawings. This is not being built according to those specifications.

So he came back in. He submitted a revised plat, or site plan, to the city which also -- and I think in this situation it indicated the stairs would be there; however, that based on his measurements it was still complied with the city's codes, and in those drawings, when you take a look at everything in the record, you can see that Mr. Singletary clearly accounted for this confusion over what exactly constitutes the street line, the right-of-way line, which, if you look at the code during these, they're one and the same, the front street, or right-of-way line, the way the code states it, but his confusion with that term and the actual pavement itself, which falls well within the lines, the exterior lines of the right-of-way, in both of these drawings that he submitted to the city, his plans comply with our codes, and our zoning administrators approved the plans based on the drawings that he submitted.

As it turned out, when he built the house, he built the stairs, well beyond what was indicated in his drawings, and, essentially, the city came to him and said, You can't have the stairs here. They're encroaching into the setback, and we got to figure something out.

The resulting decision was to come before the Court of zoning appeals to request a variance, which in my mind is almost somewhat of an admission that you built it not in accordance with the code and you're asking for some relief with the board of zoning appeals, so he came before them, and it got to be -- I have it notarized. There has to be extraordinary exceptional conditions that generally do not apply, and as the board saw it, none of those requirements for a variance were met, and the board denied his request for a variance.

So then we came here. Mr. Singletary -- you know, he filed his appeal, and he came to us and said, I want to have -- or I guess he came to the Court, rather, and requested a stay from further prosecution, which I guess he was talking about a little bit, and the ultimate order was there was a consent order signed.

As the judge indicated we should do, we basically come to an agreement. We're going to go in terms where he could have his plumbing inspection, we wouldn't prosecute any further, but the city wasn't going to issue the certificate of occupancy.

And now we're back here before the Court today, and what it looks to me like Mr. Singletary is requesting is that he be relieved from the terms of that agreement that we made and the city has held up its end

of the bargain. We did the inspection. He passed. That was fine. We haven't prosecuted him for any further violation of our codes, and as far as we're concerned, we've done everything we're supposed to, and now Mr. Singletary is coming in and asking to be relieved from one thing he agreed to that he signed.

We went through revisions before we signed the documents and turned it into the Court. It was clear and understood what the terms were, and he wouldn't be issued a temporary certificate of occupancy or otherwise, to come in and try to finagle and say that he agrees to that, even though he clearly agreed that the consent order would not -- or the certificate of occupancy would not be issued until this appeal has been heard, to us, seems a little crazy.

And, essentially, as far as the merits of the case go, I'll pull back to the fact that the whole thing is about the stairs. The stairs could be built in a way that they could not encroach into the setback and they would look nice and everything else, but they're built directly off the front of the house. They could come diagonally across the site. There are a lot of things that could have been done. There are ways Mr. Singletary could have helped himself and not prolonged things to the way they are now, but as it stands, he filed an appeal.

We're here to discuss the appeal, and the record of the board of zoning appeal's decision, which, according to South Carolina law, needs to be interpreted in the same manner as the finding of fact by a jury, and so in that situation, you're basically looking for an error of law.

We would submit that he didn't meet the requirements of a variance and therefore there was no variant of law. I understand the situation. It's a compelling situation, and I truly feel bad for him that he hasn't been able to move into his house, but the whole case could have been resolved a long time ago. All he had to do was either build the stairs and the house generally, with the site plan he submitted or, having built it not in compliance, in conformity with what he showed us and in compliance with the code to reconstruct the stairs in a manner that would comply, and we wouldn't be here today.

Beyond that, Your Honor, any questions that you may have -- like I said, I'm a little bit confused about exactly what we're going into, but I don't want to cover too much, but if you have any questions, I'm happy to try to answer those.

THE COURT: All right. I'll spend a little time in the file and see if I can't sort it out and figure out what we do. All right? I'll let you know

something, hopefully before the end of the year, but I'll try to spend a little time on it in the next couple days.

But I've got to charge a jury here in a few minutes and I've got, as you heard, one before you, and I'll try to rule on that one today or tomorrow. I might be able to get to it before Christmas, but certainly before the end of the year I'll let you know. I just got to spend a little bit of time trying to figure this thing out. Okay? But I know it's important to you, so I will get to it as soon as I can. All right?

THE PLAINTIFF: May I have one final word?

THE COURT: What would you like to say?

THE PLAINTIFF: The whole thing about the setback is the health and safety of the public, the steps are 26 feet back from the street. I built the exactly as it says on the plans. Now, the revision that they're talking about, the planning commission wrote revised on the top of that. I never wrote or submitted a revised plan. I simply, on the plan, showed where the steps were built that were not required on the official zoning plan.

In addition to that, the rise requirement -- because the house has to be built up, FEMA regulation, it means the steps have to come down further out because of the rise and run requirement. The steps have been built for a year and a half, and the way they're built into the

house is integral.

On top of that, the wrought iron on the house was done by none other than Mr. Phillip Simmons. The last house that he has even put on, and that would mean that I would have to destroy the wrought iron from Mr. Phillip Simmons, who is the most world renowned iron smith there is.

It's not a public safety issue, and so I don't see what the idea behind two feet of steps that is setback, starting point is the question, should be when -- I'm trying to, I guess, devote my 13th and 14th amendment right to enjoy the rights of occupying my home. That's an unfair right that I should have as a citizen, and I understand that the neighbor is disgruntled, and I understand that they went to city hall and I understand that a year and a half later they come to me to say, You can't move into your home, it has already been a year that I have been out of the home.

I have been paying for where I am. I have been paying light, water, gas, Internet. All of that is on in the home and has been in the home since the early part of this year. In addition to that, the double expenses that I have, I have lost income from the home that I am presently living in because I cannot rent it out, and so to prolong it means that I am continually

absorbing those costs so I ask --

THE COURT: I understand, Mr. Singletary, and I'm sympathetic. I understand. There is very little I can do today to resolve your problem, because if I just rule in your favor, then they can appeal it, and that ain't going to resolve your problem.

THE PLAINTIFF: Well, the fact that the documents were destroyed and not turned over concerning the tape from the variance hearing means that I had -- I don't have the information necessary to continually prove the crucial points of my case, so the lower Court's decision should be overturned because they have either destroyed or they have not protected the information.

THE COURT: I understand. Just let me see what I can figure out. Okay? I'm going to give your file the consideration it deserves. I just have to budget a little bit of time because this is not the only thing I have to do today.

I have a jury waiting out there, and I need to get that case to the jury, and then I can spend a little bit of time with the other case I have that is equally important to those folks. This, I know, is important to you. I'm going to try to get it all sorted out. Okay?

(Whereupon, the proceedings were concluded.)

I, the undersigned, Amanda K. Haffenden, RPR, CRR, Official Court Reporter for the Ninth Judicial Circuit of the State of South Carolina, do hereby certify that the foregoing is a true, accurate, and complete transcript of record of all the proceedings had and evidence introduced in the trial of the captioned case, relative to appeal, in the Circuit Court for Charleston County, South Carolina, on the 18th of December 2008.

I do further certify that I am neither of kin, counsel, nor interest to any party hereto.

June 17, 2009

Circuit Court Reporter

AMANDA K. HAFFENDEN, RPR, CRR
Circuit Court Reporter
P.O. Box 424
Summerville, SC 29484
(843) 771-3755

June 17, 2009

TO: John Singletary
25937 Alabama Drive
North Charleston, SC 29405

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE: Singletary vs. North Charleston
DATE: December 18, 2008
TRANSCRIPT OF PROCEEDINGS
BEFORE: Honorable Roger M. Young

21 pages at $3.25 per page: $68.25

POSTAGE: $4.95

LESS DEPOSIT: $73.20

TOTAL DUE: 0




City of
North Charleston
SOUTH CAROLINA
DEPARTMENT OF PLANNING & MANAGEMENT

May 29, 2008

Mr. John Singletary
4321 Waterview Circle
North Charleston, SC 29418

RE: Information Request

Dear Mr. Singletary:

With regard to your inquiry concerning the possibility of using your house on 4321 Waterview Circle as a location to shoot a movie, this would not be permitted under the current regulations. A Certificate of Occupancy could not be issued in the face of an outstanding zoning violation .

Sincerely,

William B. Gore
Zoning Administrator

Post Office Box 190016 • North Charleston, S.C. 29419-9016 • Telephone (843) 740-2571 • Fax (843) 308-4727

**John Singletary**

**From:** Haffenden, Amanda K. [AHaffenden@sccourts.org]
**Sent:** Monday, June 15, 2009 10:52 AM
**To:** johnsing@knology.net
**Subject:** RE: Hearing of December 18, 2008

Mr. Singletary:

I have checked my notes from December 18, 2008, and I have nothing regarding your hearing on that date. Is there a possibility that you gave me the wrong date? Also, is it possible that another judge heard your matter?

---

From: johnsing@knology.net [johnsing@knology.net]
Sent: Saturday, June 13, 2009 9:22 PM
To: Haffenden, Amanda K.
Subject: Re: Hearing of December 18, 2008

Thank you for replying to my letter Mrs. Haffenden. I will promptly pay you the fee. I have a hearing scheduled for related matter in this case on th 22 of this month that the info is crucial in my defense. I would greatly appreiciate if you could have the information to me as soon as you possibley can.

Thank you

John Singletry

On Sat 13/06/09 3:46 PM , "Haffenden, Amanda K." AHaffenden@sccourts.org sent:

Dear Mr. Singletary:

I am in receipt of your second letter requesting the above transcript. I recieved the first one and tried to call you several times at the phone numbers you had listed to inquire as to the exact date of the hearing. The original letter merely said the hearing was December 2008. I sent you a follow-up letter requesting same.

I will check my notes from that date and let you know what the transcript cost is on Monday. After I receive payment from you, I will prepare the transcript and forward it on. Our rules state that I have 60 days from the date of receipt of payment to do the transcript; however, I don't think your transcript should be very long, and I would expect to get it to you sooner than that.

You may reach me at this email address. I will email, phone, and send out a letter Monday letting you know the cost of the transcript. If you need any more information, don't hesitate to contact me.

Thank you,

Amanda Haffenden

Date: December 17, 2008
Time: 2:10

**The Court of Common Pleas, County of Charleston**
**Is now in session with the Honorable Judge Young Presiding**
**and Amanda Haffenden reporting.**

**2007-CP-10-2937**

**Carlos and Angela Clark** Versus **James Frazier**

Attorney: Stephen Butaitis Attorney: J. Bennett Crites

The following jurors were drawn to serve.

| | | | | | | |
|---|---|---|---|---|---|---|
| Foreperson | 1. | Ricky Marvin | 157 | 7. | Candance Bennett | 18 |
| | 2. | Stephanie Ford | 88 | 8. | Kiersten Oliver | 190 |
| | 3. | Kathryn Raisley | 201 | 9. | Ronald Scherer | 219 |
| | 4. | Daniela Scott | 220 | 10. | Michael Sullivan | 250 |
| | 5. | Bernard Wrighten | 296 | 11. | Vincent Flowers | 310 |
| | 6. | Brenda Marques | 316 | 12. | Dianna Weathers | 331 |
| | | | Alternate: | | Ivie Parker | 193 |

(MOTIONS)

Deputy Clerk Stacie Gadson swore in the jury.

Judge Young made a preliminary statement to the Jury.

Attorney Stephen Butaitis made opening statements to the Jury on behalf of the Plaintiff.

Attorney J. Bennett Crites made opening statements to the Jury on behalf of the Defendant.

Witnesses for the Plaintiff:
1. Carlos Clarke
2. Angela Clarke
3.Michael Nevels
4. Dr. William Daniels
5.Lanaque Clarke
6. James Frazier
7. April Clarke

The Plaintiff Rest.

Witnesses for the Defendant:
1. James Frazier

The Defendant Rest.

Court adjourned at 5:07 will resume at 10:00
Court resumed at 10:15

Attorney Stephen Butaitis made opening arguments to the Jury on behalf of the Plaintiff.

Attorney J. Bennett Crites made closing arguments to the Jury on behalf of the Defendant.

Attorney Stephen Butaitis made closing arguments to the Jury on behalf of the Plaintiff.

Judge Young  charged the law to the Jury.

Jury Out: 11:36
Jury in with a question 12:20
Replaying Dr's testimony
Jury Out: 12:50

Jury In: 1:40

Verdict: We the jury find for the Plaintiffs, against the Defendant in the amount of $650,000wrongful death damages; $500,000 Survival action damages; $1,000,000 punitive damages.

```
11/29/2010  08:17      CHARLESTON COUNTY CIVIL COURTS       DRM  IP13 C1PIQO:
                   *** CIVIL FILING/DISPOSITION INQUIRY ***
 FUNCTIOI __
             CASE ID: YEAF 2007 TYPE: CP LOCATION: 10 NUMBER: 002937
PLAINTIFF: CLARKE, CARLOS ETAL
   ATTY: BUTAITIS, STEPHEN A
   ADDR1:                               ADDR2:
   CITY:                                ST:   ZIP:      PHONE:
 DEFENDANT: FRAZIER, JAMES
   ATTY: ** NO ATTORNEY **
   ADDR1:                               ADDR2:
   CITY:                                ST:   ZIP:      PHONE:

         ARBITRATION=A/MEDIATION=M/EXEMPT=
    FILING CODE 320  MOTOR VEHICLE ACCIDENT          FILING DATE: 07 11 2007
 JURY=1/NON-JURY=2/PCR=3 1   JURY ROSTER CASE N      ROSTER DATE: 12 30 2008
   JUDGE SUBD 2134 ROGER M. YOUNG                    ASSIGN DATE 07 16 2007
    NEXT OR LAST EVENT MOH   EVENT DATE 06 13 2008    EVENT TIME 11 30
    EVENT DESCRIPTIO MOTION HEARING/MOTION DOCKET     EVENT JUDGE: 2117
DISP INF: CODE 0600 ENDED BY JURY TRIAL            TYPE: 6 DATE: 12 19 2008
DATE TO MAST 00 00 0000 MIE FILE NUM 000000     DATE FROM MAST 00 00 0000
                                                 SUPP FILE DATE 00 00 0000
                             LAST UPDATE 12 29 2008    OPERATOR ID: DAB
ENT MS,PS,PP,DK,EV,SS,MN, OR PF1
```

**John Singletary**

**From:** John Singletary [johnsing@knology.net]
**Sent:** Monday, March 29, 2010 4:17 PM
**To:** 'Don Michel'
**Subject:** RE: dec 18 2008 docket for circuit curt

I am trying to get a copy of the docket that would list the cases, the time of the cases and the judge assigned to each case for Dec. 18. I don't know if it is also possible but if there is a document that shows how long each case actually took I would like that also

John

---

**From:** Don Michel [mailto:DMichel@charlestoncounty.org]
**Sent:** Monday, March 29, 2010 4:08 PM
**To:** John Singletary
**Subject:** RE: dec 18 2008 docket for circuit curt

Mr. Singletary,

What kind of docket are you asking for? Would you like the non-jury motions docket for that Friday December 18 or the jury roster for the week of December 14? Once I know I can assist you in getting that information. Thank you.

Don Michel
Court Management Supervisor
Charleston County Clerk of Court
100 Broad St. Suite 106
Charleston, SC 29401

---

**From:** John Singletary [mailto:johnsing@knology.net]
**Sent:** Monday, March 29, 2010 4:01 PM
**To:** Don Michel; johnsing@knology.net
**Subject:** dec 18 2008 docket for circuit curt

Please forward me a copy of the December 18 2008 docket for circuit court

Thanks

John Singletary
843-693-2823

**John Singletary**

**From:** Don Michel [DMichel@charlestoncounty.org]
**Sent:** Monday, November 29, 2010 8:22 AM
**To:** John Singletary
**Subject:** RE: dec 18 2008 docket for circuit curt
**Attachments:** 0813_001.pdf

Mr. Singletary,

I apologize for the delay. It was my understanding since this was not a Charleston County Non-Jury week you did not require any further information. Attached is a copy of the court minutes from the one case that was tried that week along with the case information.

Please let me know if I can assist you with anything else.

With best regards,

information gathered in 1 day

***Don Michel***
***Court Management Supervisor***
***Charleston County Clerk of Court***
***100 Broad St. Suite 106***
***Charleston, SC 29401***
***Direct: 843-958-5013***
***Fax: 843-958-4440***

---

**From:** John Singletary [mailto:johnsing@knology.net]
**Sent:** Sunday, November 28, 2010 6:05 PM
**To:** Don Michel
**Cc:** 'John Singletary'
**Subject:** RE: dec 18 2008 docket for circuit curt

Hello Mr. Michel,

We communicated in April concerning information for the 18th of December Circuit Court. Thank you for responding. I have patiently waited for 8 months on the information. I am requesting the information for a federal case. Please let me know if it would be better for me to request the information with a subpoena from the federal case clerk.

Thank You

John Singletary

---

**From:** Don Michel [mailto:DMichel@charlestoncounty.org]
**Sent:** Wednesday, April 07, 2010 3:54 PM
**To:** John Singletary
**Subject:** RE: dec 18 2008 docket for circuit curt

Mr. Singletary,

I have just confirmed that there was not a regularly scheduled non-jury term of court for Charleston County that was scheduled for the week of December 15, 2008. The non-jury term for that week was held in Berkeley County. Court Administration schedules non-jury terms to this circuit and then those terms are split between Berkeley and Charleston. This does not mean that our judges holding court that week did not hear any non-jury matters. It just means that this office did not publish a docket therefore can not provide you with any information. It is possible judges heard non-jury matters that were set directly by their offices.

non traditional

As I told you earlier today, it will take some time to gather the cases that were listed on the jury docket for that week but will try and provide that when it becomes available. With kind regards,

***Don R. Michel***
***Court Management Supervisor***
***Charleston County Clerk of Court***
***100 Broad St Suite 106***
***Charleston, SC 29401***
***Phone: (843) 958-5013***
***Fax: (843) 958-5020***

how if no effort put in to finding

---

**From:** John Singletary [mailto:johnsing@knology.net]
**Sent:** Wednesday, April 07, 2010 12:10 AM
**To:** Don Michel
**Cc:** 'John Singletary'; carlasing@knology.net
**Subject:** FW: dec 18 2008 docket for circuit curt

Mr. Michel, Thanks for responding please send a copy of the jury docket and the non jury docket to my e-mail address

Thanks

John

---

**From:** John Singletary [mailto:johnsing@knology.net]
**Sent:** Wednesday, March 31, 2010 12:37 PM
**To:** 'Don Michel'
**Subject:** RE: dec 18 2008 docket for circuit curt

I would like to have a copy of the Jury docket and the non jury docket for December 18, 2008

Thank You

John

---

**From:** Don Michel [mailto:DMichel@charlestoncounty.org]
**Sent:** Wednesday, March 31, 2010 8:21 AM
**To:** John Singletary
**Subject:** RE: dec 18 2008 docket for circuit curt

Mr. Singletary, I need more specific information from you sir. I need to know if you want the civil jury docket or the civil non-jury docket. Once I get this information I will be in better position to try and assist you. Thank you.

***Don R. Michel***
***Court Management Supervisor***
***Charleston County Clerk of Court***
***100 Broad St Suite 106***
***Charleston, SC 29401***
***Phone: (843) 958-5013***
***Fax: (843) 958-5020***

---

**From:** John Singletary [mailto:johnsing@knology.net]
**Sent:** Tuesday, March 30, 2010 3:16 PM
**To:** Don Michel
**Subject:** RE: dec 18 2008 docket for circuit curt

Thank for the response Mr. Michel,
I am looking for information that list each court case the judges on the 18th

---

**From:** Don Michel [mailto:DMichel@charlestoncounty.org]
**Sent:** Monday, March 29, 2010 4:08 PM
**To:** John Singletary
**Subject:** RE: dec 18 2008 docket for circuit curt

Mr. Singletary,

What kind of docket are you asking for? Would you like the non-jury motions docket for that Friday December 18 or the jury roster for the week of December 14? Once I know I can assist you in getting that information. Thank you.

Don Michel
Court Management Supervisor
Charleston County Clerk of Court
100 Broad St. Suite 106
Charleston, SC 29401

---

**From:** John Singletary [mailto:johnsing@knology.net]
**Sent:** Monday, March 29, 2010 4:01 PM
**To:** Don Michel; johnsing@knology.net
**Subject:** dec 18 2008 docket for circuit curt

Please forward me a copy of the December 18 2008 docket for circuit court

Thanks

John Singletary
843-693-2823

10/8/08 10:00

ITEM XI

City of
North Charleston

4900 Lucas Rd
NC
29406

SOUTH CAROLINA
DEPARTMENT OF PLANNING & MANAGEMENT

BACK DATING
HOW POSSIBLE FILLED no prior conversation
APPLICATION APRIL 7 2008
OUT ON

**MEMORANDUM**

To: The Zoning Board of Appeals
From: William B. Gore, Zoning Administrator
Date: April 1, 2008
RE: A request for variance from Article VI, Section 6-1, paragraph (f)

Mr. John Singletary is seeking a variance from Article VI, Section 6-1, paragraph (f) relating to the required front yard setback for the property located at 4321 Waterview Circle (TMS#408-09-00-286) in the R-1, Single Family Residential zoning district. Mr. Singletary recently constructed a house and staff determined that the front steps extend into the front yard setback.

Mr. Singletary argues that he was told by someone in Planning that the setback is measured from the main body of the house. He also notes that some homes along the street are closer to the road than his.

We have never taken the position that a front setback is based upon the main body of the house and I do not believe that anyone in our staff is unaware of this. I have questioned all of the staff and none of them told Mr. Singletary that the front setback was measured in that way. Even if they had, Mr. Singletary is required to show his entire house on his site plan. Our zoning review is based upon what people submit, not discussions we might or might not have had about the project. We reviewed and approved the site plan that he submitted which showed a setback in excess of the 25' required in that subdivision. Upon completion of the structure the staff noted the front steps encroached into the front yard and questioned him about it. He then provided a drawing showing the front steps, which were not shown in that manner on the original drawing he submitted, and they were certainly not approved in that way. It's my impression that Mr. Singletary is making his measurements from the edge of pavement, but showing them on his site plan as being made from the front property boundary which is not the same place. His obligation is to build it as it is drawn. Clearly the site plan was changed with regard to setback and the addition of a different front step feature after it was submitted for review and approved. I recommend denial.

GORE Acknowledge TAPE EXIST

Applicant not present, showed up and said his sign said 6:00 pm. Rest is on the tape. Check to see if he had proper notice of hearing. If not, get him a new hearing.





PLAINTIFF'S
EXHIBIT
O

City of
North Charleston
SOUTH CAROLINA

DERK VAN RAALTE
DEPUTY CITY ATTORNEY

TIMOTHY D. AMEY
DEPUTY CITY ATTORNEY

J.BRADY HAIR
CITY ATTORNEY

RICHARD W. LINGENFELTER, JR.
DEPUTY CITY ATTORNEY

DALE DUTREMBLE
CITY PROSECUTOR

June 22, 2009

Mr. John G. Singletary
2937 Alabama Drive
North Charleston, SC 29405

Re: *4321 Waterview*

Dear Mr. Singletary:

The City of North Charleston is in receipt of your most recent Freedom of Information Act request received by the Clerk of Council on June 11, 2009.

You make reference to being denied a copy of the transcript from the hearing of May 5, 2008. As I previously told you in person, there is no audio transcript of that hearing as a result of defective equipment, of which we were unaware at the time.

In response to your FOIA request, I am enclosing a copy of the Record on Appeal in this matter (previously forwarded to you on May 11, 2009).

Sincerely,

Richard W. Lingenfelter, Jr.
Deputy City Attorney

RWL/tbw

Encl: As Stated

cc: Derk Van Raalte, Esq., w/o encl.
Timothy D. Amey, Esq., w/o encl.

LEGAL: Post Office Box 190016 • North Charleston, S.C. 29419-9016 • Telephone (843) 740-2550 • Fax (843) 745-1082
PROSECUTOR: 2536 Fourth Street • North Charleston, S.C. 29406 • Telephone (843) 740-2554 • Fax (843) 740-2556

AGENDA

ZONING BOARD OF APPEALS

Monday, May 5, 2008

5:00 P.M.

NORTH CHARLESTON CITY HALL

*1ST FLOOR CONFERENCE ROOM*



I.      Call to order

II.     Consideration of the Minutes of the April 7, 2008

III.    Mr. John Singletary is seeking a rehearing of a variance from Article VI, Section 6-1, paragraph (f) relating to the required front yard setback for the property located at 4321 Waterview Circle (TMS#408-09-00-287) in the R-1, Single Family Residential zoning district.

IV.     Mr. Robert Glover is seeking a rehearing of a variance from Article IV, Section 4-5, paragraph (a) relating to the reestablishment of a legal nonconforming use for the property located at 2000 Macon Avenue (TMS#470-11-00-104) in the R-3, Mobile Home Residential zoning district.

V.      Mr. Robert Bocknek is seeking a variance from Article IV, Section 4-5, paragraph (d) relating to the reestablishment of nonconforming mobile homes for the property located at 8950 Selah Street (TMS#486-09-00-044) in the R-1, Single-Family Residential zoning district.

VI.     New Jerusalem Church of God in Christ is seeking a variance from Article V, Section 5-1, paragraph (b) 2 relating to the required setback for a church for the property located at 2929 Louise Drive (TMS#411-11-00-052) in the R-1, Single-Family Residential zoning district.

VII.    Mr. Robert White is seeking a variance from Article VI, Section 6-1, paragraph (d) relating to the required side yard setback for the property located at 4968 Hyde Avenue (TMS#471-16-00-203) in the R-1, Single-Family Residential zoning district.

VIII.   Mr. Dewey Mixon is seeking a variance from Article IV, Section 4-5, paragraph (d) relating to the reestablishment of a legal nonconforming use for the property located at 1095 Bexley Street (TMS#470-08-00-003) in the R-1, Single-Family Residential zoning district.

IX.     Mr. Dewey Mixon is seeking a variance from Article VI, Section 6-1, paragraph (c) relating to the minimum required lot area per dwelling for the property located at 1095 Bexley Street (TMS#470-08-00-003) in the R-1, Single-Family Residential zoning district.

**Those persons who wish to appear before the Commission should sign-in or contact the office of the Department of Planning and Management (740-2571) no later than 4:45 P.M. on the date of the meeting.**

in order for Chair to make motion he must step down in as air a 2nd command

ZONING BOARD OF APPEALS
May 5, 2008
Minutes

The May 5, 2008 meeting of the North Charleston Zoning Board of Appeals was called to order by Vice Chairman Donald Schaeffer at 5:00 P.M. in the First Floor Conference Room at North Charleston City Hall. Other members present were Mr. Dan Coleman and Ms. Anna Montgomery constituting a quorum. Also present were Zoning Administrator, Bill Gore, Legal Staff Tim Amey, and Staff Attorney Richard Lingenfelter and members of the public. Mr. Tony Levine and Mr. Tim Whitfield were absent.

The media, organizations and the public were advised of the meeting in accordance with Section 30-4-80(d) of the South Carolina Code of Laws for 1976, as amended.

The first item before the Board was the consideration of April 7, 2008 meeting minutes.

Mr. Coleman moved:

**"That the minutes of April 7, 2008 be approved with correction of a typo on page 2".**

Ms. Montgomery seconded. The motion carried unanimously with favorable votes. (3-0-0).

The next item before the Board was a request from Mr. John Singletary seeking a rehearing of a variance from Article VI, Section 6-1, paragraph (f) relating to the required front yard setback for the property located at 4321 Waterview Circle (TMS#408-09-00-287) in the R-1, Single Family Residential zoning district.

Mr. Gore stated that this item was scheduled on last month's agenda but Mr. Singletary arrived an hour late for the meeting after the item had already been heard in his absence. The item had been moved up as is customary to accommodate the estimated 25 people who were present . Mr. Gore mentioned that Mr. Singletary indicated to the ZBA at that time that the sign advertising the meeting posted in his yard by the Department of Planning & Management showed the meeting time as 6:00. A photograph of the sign sitting in his yard showing the 5:00 p.m. meeting time for last month's meeting is attached to this report and was taken at the time of posting. Mr. Singletary also contradicted Planning Staff member Adrienne Williams who told the ZBA that she gave him a notification letter for the meeting indicating a 5:00 p.m. meeting time when he visited the office. Mr. Gore said that he also spoke to Mr. Singletary when he visited the Department of Planning and Management office and was positive that he indicated a 5:00 pm meeting time for the ZBA meeting. Nevertheless, the item was rescheduled for Mr. Singletary in order that he may be heard.

How could he know 25 people for that case?

false

After speaking w/ Mayor

How could he know who was for what

Mr. Gore made the following report: that Mr. Singletary recently constructed a house on Waterview Circle and staff determined that the front steps extend into the required front yard setback. He is seeking a variance to allow the steps to remain as constructed. Mr. Singletary submitted the site plan for his house to the Department of Planning & Management on February [illegible]07. It was forwarded to the inspector, Mary Cohen, for review on February 12, 2007. The

plan showed a 35′ setback from the closest part of the house to the front property line and was approved on February 15, 2007. The front setback may be determined in a number of ways depending upon the applicable circumstances. For a new development, the front setback is 20% of the total lot depth up to 40′ and should be at least 20′ from the front property line. For an established neighborhood on a street where most of the lots are developed, the average setback of the lots within 200′ of the site is the setback for the subject site. In the case of a contemporary subdivision which was laid out with a determined front setback, that setback governs. The established setback in the neighborhood by design and restrictive covenant is 25′ from the front property line so the proposed 35′ setback from the front property line met and exceeded that minimum standard. The site plan submitted by the applicant shows a sidewalk extending from the front façade of the home all the way out to the front property line. Ms. Cohen, our chief inspector, conducted a tree protection inspection at the site based on the site plan which had been submitted. The site passed inspection. Mr. Gore also presented a copy of the section from the restricted covenant from Evanston Estates that confirms the 25′ front yard setback.

Mr. Gore further stated that upon completion of the structure (and receipt of citizen complaints), the staff noted the front steps encroached into the front yard and questioned Mr. Singletary about it. He then provided a second drawing showing the front steps configured differently than on the original drawing he had previously submitted. The front steps are shown on the second drawing with a setback of 26′ from his front property line which would comply if it were built that way, but they are not. Mr. Singletary's measurements seem to be made from the edge of pavement, but they are shown on his site plan as being made from the front property boundary which is not the same place. There is usually a 13′ difference between the two in a 50′ street right of way. The site plan was part of the permit that was issued, and the applicant is under obligation to build in accordance with that site plan. Clearly the site plan was changed with regard to setback and the addition of a different front step feature after it was submitted to and approved by Planning.

Mr. Gore also stated that the applicant did obtain a copy of the front side and rear yard setback requirements from the zoning ordinance during a visit to the department of Planning and Management. The side yard setback provisions, which is not the issue in this case, do mention a measurement being made from the main body of the house, and even in the case of a mobile home they confirm that and attached porch, carport, or garage which would not be heated space would be considered to be a part of the main body of the house. He added that the provision is notable in that way, but also that it points out that all dimensions are to be computed from the property line and not from the edge of the pavement which seems to be the case with Mr. Singletary's construction.

Mr. Gore added that Mr. Singletary claims that someone at the Department of Planning & Management told him that the setback is based upon the a measurement from the main body of the house and that he did not show the steps on the plan because the information that he was given indicated that they were not needed. Mr. Gore told the ZBA that counter staff may provide excerpts from the ordinance but do not provide interpretations of the ordinance. He said that interpretations are provided by the Zoning Administrator, and that he has never indicated to Mr. Singletary that the steps were not a part of the main body of the house or that steps need not be shown on the site plan. Under Section 4-6.1 and Section 4-7 of the Zoning

Ordinance Mr. Gore said he considers the steps to be a part of the main body of the house in that they are not listed among the parts of a house that may encroach into a required setback. Mr. Gore said he was not aware of anyone ever being told by the Planning Staff that it was not necessary to show the front steps to a house on a site plan and that he was completely satisfied that the staff had not done so in this case.

Mr. Gore noted that Mr. Singletary also argues that cutting the steps as a remedy to the setback encroachment would result in a violation of the ICC Rise Run regulations. Mr. Singletary adds that tearing down the steps would be cost prohibitive and that he would not be able to match the brick used because it was special-ordered. He asserts that his existing design will use a special-ordered wrought iron by Philip Simmons which would cost a great deal to change, and that a change would ruin the aesthetics of the house. Mr. Gore observed that the Building Official, Mr. Darbis Briggman, has inspected the house in the field and does not support Mr. Singletary's claim of an inevitable violation of the ICC rise-run rule. Mr. Gore provided a copy of a memo from Mr. Briggman confirming that the steps could be altered so as to conform to the Building regulations.

Mr. Gore then summarized his report as follows: that Mr. Singletary clearly built the house according to a different site plan than the one that he submitted, and because the site plan that he says he followed in laying out the site only makes sense if the measurements are based upon distance from the edge of pavement instead of the edge of the right of way, the current setback problem is a problem entirely of his own making. Even if he truly believed that the steps were not a part of the house, the second site plan submitted after the house was built shows the steps at 26' from the front property line. Mr. Gore said had he been presented that site plan prior to construction, he would have approved it because the setback in that neighborhood is 25'. Mr. Gore continued that the problem has nothing to do with anything that Mr. Singletary claims to have been told, as this was not a factor in the design that he claims to have followed. The problem was that he changed the site plan after the involvement of the Zoning staff, and his unauthorized and improperly measured change did not become evident until the steps were under construction.

Mr. Gore recommended denial of the request for variance and that the Zoning Board of Appeals order the removal any portion of the house that encroaches within the required front yard setback.

Mr. John Singletary, the applicant, spoke in favor of the request. He stated there were four mistakes in the presentation Mr. Gore had made. Mr. Singletary referred to the zoning of this parcel not being R-1, Single family residential but R-2, Multi-family Residential at the time of the application. He said he never submitted a second site plan but did give Mary Cohen a drawing showing revisions to the first site plan to reflect how the house and steps had actually been built. Mr. Singletary also took exception to Mr. Gore's statement that the steps were included in the main body of the house and stated that the definition of the main body of the house provided by Mr. Briggman is the heated area of the structure. He added he was told in the Planning Department that setbacks start from the main body of the house, for which he got a sample of a site plan from someone in the department that he brought to the meeting. Also, he said he doesn't think that anybody from the city has ever taken measurements on the site. That the

average setback of other homes in the neighborhood do not comply with what he is being required, 13 feet from the road, plus 25 feet to the stairs. He indicated that means that what the city is saying is that he should comply with something that no one else has.

Mr. Singletary stated that Mary Cohen helped him do the site plan. Then he said she came back and told him to draw it as it is now. He doesn't understand why the city says something one day and then something else. He also said that someone told him that the neighborhood covenant takes precedence over the city. He added that if this covenant takes precedence, then the city picks and chooses what to ask for. Mr. Singletary pointed that if this request is not a safety or public issue he doesn't understand why the variance was denied. He also stated that Ms. Mary measured the setback from the road.

Mr. Gore asked the Chairman for permission to respond to Mr. Singletary's comments.    First, Mr. Gore said zoning indicated in the report is correct and was the zoning in place at the time of the variance application submitted by Mr. Singletary. He noted that the standards for R-1 and R-2 are the same with respect to front setbacks and that an earlier change in zoning on the property did not result in any change in front setback standard.

Second, Mr. Gore said the applicant took exception to his description of the second site plan as have been submitted to the City.  Mr. Gore indicated that the second drawing was provided to the City by Mr. Singletary after the Steps had been built, and after City officials questioned him about the setback of the steps being inconsistent with the site plan on file. Mr. Gore said it makes no difference to the point in question whether he says the second drawing was submitted to the City or given to the City.  The point was that the information that Mr. Singletary provided about how he built the house showed a changed in the location of the house itself from the approved site plan, and showed steps  where none were previously shown.

Third, Mr. Singletary said that Mr. Briggman, the Building Official, had told him in a conversation that day that the main body of the house included the heated space.  Mr. Gore noted that Mr. Briggman was an expert on the Building Codes but was not an authority on the Zoning ordinance which was at issue in this case.  He added that the same excerpts from the Zoning ordinance that Mr. Singletary was given when he visited the Planning office prior to construction of his home plainly stated that non-heated spaces such as porches are considered to be a part of the main body of the house.  He noted again the regulation in 4-7 that lists which parts of a house may encroach into the setbacks, and that the steps are not on that list.  With regard to Mr. Singletary's claim that someone in the Planning office told him that the measurement for the front setback was to be made from the main body of the house, Mr. Gore said that the staff did not discuss steps or distinctions about the main body of the house with Mr. Singletary, and again indicated that Mr. Singletary was provided with the written excerpt from the ordinance describing how the setback should be determined.

Fourth, Mr. Gore responded to Mr. Singletary's statement that he did not believe that anyone from the City had ever measured the setbacks at his property.  Mr. Gore indicated that both Mary Cohen and Darbis Briggman had visited the site on more than one occasion to measure the setbacks.    He noted that Mr. Singletary claimed to have seen Mary Cohen making a measurement from the edge of pavement.

Fifth, Mr. Gore responded to Mr. Singletary's assertion that he was provided by the Planning staff with a sample site plan from another neighborhood that did not show the steps on the site plan. Mr. Gore indicated that the question of whether steps should be shown on his site plan or not was never discussed with his staff and that site plan was given to Mr. Singletary as a general example of how Mr. Singletary's site information should be presented. Mr. Gore noted again that Mr. Singletary's site plan showed a plainly marked sidewalk extending from the front wall of the house where the steps had been built, and that the sidewalk was shown extending all the way out to the front property line. Mr. Gore asked the ZBA why anyone would show a sidewalk on a site plan that they did not intend to construct one, and then intentionally not show steps that they did intend to build. The sidewalk was shown in the location where the steps were built. Mr. Singletary came forward to examine a copy of his original approved site plan with regard to the notation showing a sidewalk where the steps have been constructed.

Sixth, Mr. Gore noted Mr. Singletary's comment that the Restrictive Covenants take precedence over the City's ordinance. Mr. Gore indicated that has never been the City's position. He said that the subdivision was designed with a 25 foot setback and that is evidenced by the structures on the ground as well as the original subdivision plat and restrictive covenants. He noted that the City does not enforce restrictive covenants although they are in this case a perfectly good indication of the established setback for the neighborhood. Mr. Gore added that Mary Cohen told him that she absolutely did not tell Mr. Mr. Gore added that Mary Cohen told him that she absolutely did not help Mr. Singletary draw his first or second site plan. Mr. Gore noted that Mr. Singletary said on the one hand that no one from the city had visited the site to take setback measurements and on the other hand claims to have seen Mary Cohen take measurements from the edge of pavement. Mr. Gore said that Ms. Cohen took a number of measurements after receiving complaints about the steps including measurements from the street in an effort to determine if Mr. Singletary had made the mistake of basing his setback on the edge of pavement instead of his front property line, which seems to be what he has done. He said she also took measurements from the front property line.

Peggy Williams, president of the Neighborhood Association residing at 5293 Waterview Drive, spoke against the variance. She stated that the restricted covenant should be abided by.

Keith Thompson, 4304 Waterview Circle, spoke against the variance. He lives on the same street and if he looks from his house Mr. Singletary's house sticks out from the others. Mr. Thompson wanted to build a front porch years ago but the contractor, who fortunately knew about the restrictions, told him that according to the setbacks he couldn't do what he was intending to.

Lonnie Hamilton, 4304 Waterview Circle, spoke in support of the proposed variance. He said it appears that the problem is the steps. He asked to avoid putting the applicant through a hardship and allow him to go on with a C.O. He asked the board to grant the variance.

Patrick Percy, 4317 Waterview Circle, spoke against the variance. Mr. Percy lives in the house to the right of Mr. Singletary's, and his house meets the setbacks. He said Mr. Singletary mentioned that most of houses did not comply with the setback regulation, so he wanted to ask him to present which specific locations he was referring to adding that Mr. Singletary should have to provide some evidence for his claims. He also said Mr. Singletary showed a list of 25 people from

the civic club who signed on favor of the variance, which was not representative of the much larger membership of the civic club. Mr. Percy also pointed out that if he were making this kind of project he would make sure he was doing it right and if not he was taking the risk that someone would notice it was wrong.

Ruth Middleton, 4351 Helene Drive, spoke in favor of the variance. She stated that it is unfair to come just now, to wait until he had finished the house to say something. The city should have sent inspectors and they should have been there telling him what was wrong.

Mr. Gore spoke asked the Chairman if he could respond to the last comment. He reiterated that the Planning Department reviewed the plan Mr. Singletary had submitted which did not show steps. As there had been no discussion of steps prior to that, we had no reason to believe that the applicant wanted to build any. He said the Zoning review is based on a site plan. The Planning staff went to the site immediately after learning that the applicant had started building steps that seemed to violate the front setback. Mr. Singletary spoke again and asserted that Mr. Gore had earlier written him a Zoning Verification letter indicating that there was no height restriction at that location and had then put a stop work order on him after he started building. The Chairman and several others commented that the present variance had nothing to do with height. Mr. Gore commented that he had indeed written a Zoning Verification letter about no height restriction, but had never put a stop work order on Mr. Singletary concerning building height and had never had any conversation with Mr. Singletary suggesting that there was a Zoning problem with the building height.

Mr. Lonnie Hamilton asked the chairman to count how many people were on favor and how many against the variance, which the chairman did. The counting came to 14 against the variance, and 16, including the applicant, in favor.

Following discussion, Mr. Coleman moved:

> **"That the Board deny the request for variance relating to the front yard setback for the property located at 4321 Waterview Circle in the R-1, Single-Family Residential zoning district".**

Then motion should have died

The motion failed for lack of a second. There was brief discussion that the Chair could second the motion but Mr. Lonnie Hamilton made an outburst in protest from the rear of the room. Legal Staff Rich Lingenfelter ultimately suggested that a motion to approve the variance might clarify the matter.

Following discussion, Anna Montgomery moved:

was told to

> **"that the Board approve the request for variance relating to the front yard setback for the Property located at 4321 Waterview Circle in the R-1 Single Family Residential Zoning District".**

Seconded by Mr. Coleman. Mr. Coleman and Mr. Schaeffer voted against it. The motion to approve the variance failed 1-2-0. Accordingly, the variance was denied.

Reconsideration RRO — as (Planned Conspiracy) ★ but no discussion took place after motion second This shows Malicious intent + deception

No discussion after motion Planned Conspiracy

The next item before the Board was a request for variance from Mr. Robert Glover seeking a rehearing of a variance from Article IV, Section 4-5, paragraph (a) relating to the reestablishment of a legal nonconforming use for the property located at 2000 Macon Avenue (TMS#470-11-00-104) in the R-3, Mobile Home Residential zoning district.

Mr. Robert Glover is seeking a variance from Article IV, Section 4-5, paragraph (a) relating to the reestablishment of a legal nonconforming use in the commercial structure located at 2000 Macon Avenue (TMS#470-11-00-104) in the R-3, Mobile Home Residential zoning district. The existing zoning does not permit commercial or industrial uses. Any uses that lawfully occupied the site under this zoning could continue indefinitely as long as they did not expand or cease operation for more than six months. A review of City records revealed no business license issued for this location four at least the last four years.

Mr. Gore said the applicant indicates that the property was purchased by Robert Posey to operate his amusement business. The business was sold in December of 2006 and the new owner rented the building for warehouse use only and never applied for a business license. In late September of 2007, the building was turned back to the previous owner.

Mr. Gore also stated that the documentation available from city records reveals no business license issued to this address within the last four years, and so none of the business operations during that period could be considered to have been lawful. Accordingly, one might construe that any commercial activity that occurred there would have been subject to enforcement as an unlawful use without the benefit of any legal nonconforming use protection.

Mr. Gore further stated that the ordinance does offer general protection for commercial structures in residential areas, allowing them to be used as Neighborhood Office and B1A provided all parking, setback and buffer requirements are met. He recommended denial of the request for variance.

The applicant, Mr. Robert Glover, spoke in favor of the variance. He noted that nobody in the community has presented a complaint against said variance application. He stated he tried to have a copy of the business license from Charleston County and he can present it as soon as it is available. He said he felt there had been some confusion about the business license issue and that he could provide documentation of a valid business license at that location. Mr. Gore indicated a belief that such documentation would likely eliminate the need for a variance.

Following discussion, Ms. Montgomery moved:

> **"That the Board approve the request for variance allowing the reestablishment of a legal nonconforming use for the property located at 2000 Macon Avenue (TMS#470-11-00-104) in the R-3, Mobile Home Residential zoning district contingent the applicant providing documentation of a valid business license at the subject location."**

Seconded by Mr. Coleman. The motion to approve contingent submittal of business license carried unanimously. (3-0-0).

The next item before the Board was a request from Mr. Robert Bocknek seeking a variance from Article IV, Section 4-5, paragraph (d) relating to the reestablishment of nonconforming mobile homes for the property located at 8950 Selah Street (TMS#486-09-00-044) in the R-1, Single-Family Residential zoning district.

Mr. Gore stated that the site is presently occupied by two manufactured homes. Neither of the two has been occupied nor had legal power within last six months. According to SCEG records these units last had power on March 21, 2007. The legal nonconforming use provision indicates that such a use may be discontinued for a period of six months following which it may not be reestablished. The applicant argues that the tenants who occupied these two manufactured homes secretly tapped into the SCE&G power lines without a valid power account. The applicant, an absentee landlord, was notified of the situation by a neighbor two months prior to making application for the variance and he evicted the tenants on March 15, 2008. He argues that he was unaware of the situation and will place any future power accounts in his name so as to protect his legal nonconforming use rights.

Mr. Gore also noted that this is yet another case where unlawful occupancy of a legal nonconforming use is at issue. The fundamental question is whether the applicant's lack of direct knowledge concerning the behavior of his tenants is valid grounds for a variance. I think this is likely to be a fairly common situation and it is unclear what special circumstances might justify a variance. It is the landlord's responsibility to make sure that the units are lawfully occupied. Although there were clearly tenants in the property within the last three months, there had been no lawful power accounts established in over a year. This type of property management can and often does open the door for all sort of slum like conditions to develop and continue on a property. At some level the Zoning Board of Appeals must decide if it will extend legal nonconforming use protection to locations that were not lawfully occupied with the explanation that the landlord should not suffer because of the actions of his tenants. The key question here is whether the landlord has exercised proper and ordinary care in the management of the property sufficient to inform himself of such matters. He recommended that the Board further explore with the applicant the question of what steps he took in the management of this property to inform himself of the conditions there.

Mr. Gore further stated that Angela McJunkin, Code Enforcement Director, recommends denial of this request due to the age of the mobile homes.

The applicant, Mr. Robert Bocknek, spoke on favor of the request. He said this place has never been vacant although the tenants did not have a valid power account and seemed to have been stealing power via an extension cord to another home. He noted that he has never encountered a situation like that and could not have imagined that such things occur until he actually witnessed it. He said that he initiated eviction proceedings against the tenants upon learning that they were stealing power and that it took some time to get them out.

Julia Long, 2704 Fernwood Drive, spoke against the variance. She said there were two code enforcement problems, but the real issue is that we should have legal standards that need to be met. This is the time to let go of this mobile home use.

Following discussion, Ms. Montgomery moved:

**"That the Board deny the request for variance to reestablish the use of nonconforming mobile homes for the property located at 8950 Selah Street (TMS#486-09-00-044) in the R-1, Single-Family Residential zoning district."**

Seconded by Mr. Coleman. The motion to deny carried unanimously. (3-0-0).

The next item before the Board was a request from New Jerusalem Church of God in Christ seeking a variance from Article V, Section 5-1, paragraph (b) 2 relating to the required setback for a church for the property located at 2929 Louise Drive (TMS#411-11-00-052) in the R-1, Single-Family Residential zoning district.

Mr. Gore stated that New Jerusalem Church of God in Christ is proposing an expansion of the existing structure off of Louise and Charlene Drive. The normal minimum rear yard setback would be 25 ft. while the normal front yard setback would be based on the setbacks of other structures within 200 ft of the site. The proposed rear yard setback is 2.27' and the proposed front yard setback is 2.76'. The applicant points out that the existing structure encroaches within the rear yard setback in a similar manner to the variance being sought although there is no indication of whether the proposed configuration of the structure is dictated by practical consideration relating to the existing building layout. Although the proposed variance would address the rear yard, it would not resolve the problem of a deficient front yard setback. Unless there is some additional information that would confirm a valid basis for granting a variance in either case, I recommend denial of the request.

Michael Johnson, representative from the church residing at 313 Jeffs Circle, spoke in favor of the request.

Shawnda Johnson, 313 Jeffs Circle in Goose Creek, spoke in favor of the request. She stated that this is a low income area, and the purpose of the expansion is to have a church outreach program that would include after school activities that will benefit the community.

Following discussion, Ms. Montgomery moved:

**"That the Board approve the request for variance for the required setback for New Jerusalem Church of God in Christ, located at 2929 Louise Drive (TMS#411-11-00-052) in the R-1, Single-Family Residential zoning district."**

Seconded by Mr. Coleman. The motion to approve carried unanimously. (3-0-0).

The next item before the Board was a request for variance from Mr. Robert White is seeking a variance from Article VI, Section 6-1, paragraph (d) relating to the required side yard setback for the property located at 4968 Hyde Avenue (TMS#471-16-00-203) in the R-1, Single-Family Residential zoning district.

Mr. Gore stated that the applicant is proposing to expand an existing home on Hyde Avenue by the addition of a bedroom, a den, and a porch. The proposed bedroom addition would fall 4'

from the side property line which would require a 1′ side yard setback variance. The normal side yard setback is 5′. The applicant's explanation for his request is that he would like for the addition to have the same building line with the existing construction. He notes that a failure to obtain the variance would result in a visible difference in the building line on that side of the house.

Mr. Gore also stated that although the applicant's explanation is fairly clear it doesn't actually rise to the level of a burden or hardship that would prevent or substantially impede the use. After further discussion Mr. Gore noted that the side of the structure was adjacent to an opaque fence and fairly close to another structure just beyond the fence. He conceded that the portion of the house in question would probably not be visible from the street or the adjacent parcel.

Mr. Robert White, the applicant, spoke in favor of the request. He stated that the roof will match exactly the existing one.

Following discussion, Mr. Coleman moved:

> **"That the Board approve the request for variance related to the required side yard setback to allow the addition to the property located at 4968 Hyde Avenue (TMS#471-16-00-203) in the R-1, Single-Family Residential zoning district."**

Seconded by Ms. Montgomery. The motion to approve carried unanimously. (3-0-0).

The next item before the Board was a request from Mr. Dewey Mixon seeking a variance from Article IV, Section 4-5, paragraph (d) relating to the reestablishment of a legal nonconforming use for the property located at 1095 Bexley Street (TMS#470-08-00-003) in the R-2, Multi-Family Residential zoning district.

Mr. Gore stated that the property is currently occupied by a single-family structure and an additional single unit apartment in the rear yard. The front unit is occupied but the electricity in the rear unit has been off for seven months prior to the application for variance. Mr. Mixson is seeking a variance in order to have power reestablished so he can rent the unit out to a handicapped tenant. He argues that the lady who lived in the unit for five years passed away following which some interior work had to be done. He indicates that he began working on the carpets, cabinet, tub and other items but was interrupted when he had to have cancer surgery. He says his wife also became ill shortly thereafter and the six months elapsed before he even became aware of the requirement.

Mr. Gore also stated that a review of the City's building permit records revealed only a demolition permit perhaps in connection with a condemnation notice. It would appear that some additional information may be needed from the applicant to confirm whether the work that was described had indeed been permitted or would rise to the level of work requiring a Building permit. If the applicant had commenced work under a valid permit and was interrupted by circumstances of bad health beyond his control, I believe that a variance may be warranted. I believe the same consideration would extend to a lesser amount of work which would not

require a permit, if it can be demonstrated to the satisfaction of the Building Department that said work was actually accomplished.

Mr. Dewey Mixson, the applicant, spoke in favor of the request.

Following discussion, Ms. Montgomery moved:

> **"That the Board approve the request for variance related to the reestablishment of a legal nonconforming use for the property located at 1095 Bexley Street (TMS#470-08-00-003) in the R-2, Multi-Family Residential zoning district."**

Seconded by Mr. Coleman. The motion to approve carried unanimously. (3-0-0).

The next item before the Board was a request from Mr. Dewey Mixon seeking a variance from Article VI, Section 6-1, paragraph (c) related to the minimum required lot area per dwelling for the property located at 1095 Bexley Street (TMS#470-08-00-003) in the R-2, Multi-Family Residential zoning district.

Mr. Gore stated that this request is for the same property and same general circumstances as the previous item that you heard. He noted that the earlier variance would allow the applicant to reestablish the use this time but that the larger problem of the substandard lot area per dwelling unit remained. The second variance was intended to address that issue.

Following discussion, Mr. Coleman moved:

> **"That the Board approve the request for variance related to the minimum required lot area per dwelling for the property located at 1095 Bexley Street (TMS#470-08-00-003) in the R-2, Multi-Family Residential zoning district."**

Seconded by Ms. Montgomery. The motion to approve carried unanimously. (3-0-0).

There being no further business to come before the Body, the meeting was adjourned at 6:57 P.M.

ATTEST:

Respectfully submitted,

Luz Agudelo
Zoning Technician



# PETITION

May 5, 2008

We, the undersigned Residents of Evanston Estate City of North Charleston, South Carolina would like to petition for John Singletairy, Jr. a variance for the steps to remain as is at 4321 Waterview Circle. John Singletary grew up in this community, he is probably one of the best residents we could have in Evanston. His family is also a resident of this neighborhood.. They are kind, helpful people and never an unkind word to anyone.

We are not trying to set a precedence we are just trying to help a good neighbor.

Thank you for any help and/or consideration given. If anyone deserves consideration for his property to have this variance, it is John Singletary, Jr.

Again, we thank you.

| NAME | DATE | ADDRESS |
|---|---|---|
| [illegible signature] | 5/03/08 | 4356 Waterview Cir. |
| [illegible] Freeman Jr. | 5/5/08 | 4328 Helene Dr., 29418 |
| Lucille Burton | 5/3/08 | 5289 Renee Dr. |
| Delores Cabil | 5/03/08 | 4356 Waterview Cir |
| Wendy [illegible] | 5-3-08 | 4311 Evanston Blvd. |
| David Brown | 5-5-08 | 5282 Waterview Dr. |
| Joseph Murray | 5-4-08 | 4340 Waterview |
| Ron Wright | 5-3-08 | 4340 Waterview Cir |
| Dollie Brown | 5-5-08 | 5282 Waterview Dr. N. Chas, SC 29418 |
| Julie Thompson | 5/3/08 | 5286 Renee Dr |
| Ruth E Middleton | 5/3/08 | 4351 Helene Dr. |
| Timothy [illegible] Middleton | 5-3-08 | 4351 Helene DR |
| Joseph L. Dean | 5-3-08 | 4358 Waterview Circle |
| Aldetha P. Dean | 5-3-08 | 4358 Waterview Circle |
| [illegible] | 5-4-08 | 4311 Evanston Blvd. |
| Julie Washington | 5-4-08 | 4328 Evanston Blvd |
| [illegible] Washington | 5/4/08 | 4328 Evanston Blvd |
| [illegible] | 5-4-08 | 4320 Waterview Circle |
| [illegible] | 5-4-08 | 4304 Waterview Cir. |
| John L. Graham | 5-4-08 | 4317 Evanston Blvd N.C |
| Christine Graham | 5-4-08 | 4317 Evanston Blvd N. Chas |
| [illegible] Hamilton | 5-4-08 | 4304 Waterview Circle, N. Chas |
| Albertha Isler | 5-5-08 | 4357 Helene Drive |
| Clarence Isler | 5-5-08 | 4357 Helene Drive |
| [illegible] Brewer | 5-5-08 | 4360 Waterview Circle |

Law SC school info

Good of Community

+ Vote 3 time

Majority to Allow steps